**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ZLOOP, INC., *et al*.,[1] | Case No.  15-11660 (XXX) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING
THE CONTINUED USE OF THE DEBTORS' CASH MANAGEMENT
SYSTEM, EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND
(II) EXTENDING THE DEADLINE TO COMPLY WITH THE DEPOSIT AND
INVESTMENT REQUIREMENTS OF SECTION 345 OF THE BANKRUPTCY CODE**

ZLOOP, Inc., and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through their attorneys, DLA Piper LLP (US), hereby move the Court (the "Motion") for entry of an order pursuant to sections 345, 363, and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2015-2 and 4001-3 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) approving the Debtors' continued use of their current cash management system and the Debtors' existing bank accounts and business forms, (ii) authorizing the Debtors to open and close bank accounts as necessary in the ordinary course of business, (iii) granting the Debtors a 60-day extension to either comply with the requirements of section 345(b) of the Bankruptcy Code or file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code, and

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  ZLOOP, Inc. (2960); ZLOOP Nevada, LLC (7516); and ZLOOP Knitting Mill, LLC (7098). The location of the Debtors' headquarters and the service address for each of the Debtors is 816 13th Street NE, Hickory, NC 28601.

(iv) authorizing all banks participating in the Debtors' cash management system to honor certain transfers and charge back fees and certain other amounts.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are Bankruptcy Code sections 345, 363, and 503, Bankruptcy Rules 6003 and 6004, and Local Rules 2015-2 and 4001-3.

## BACKGROUND

A.      **General Background.**

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

3.      The Debtors operate a proprietary, state of the art, 100% landfill free eWaste[2] recycling company headquartered in Hickory, North Carolina.  Founded in 2012 to address the large, untapped, fragmented market opportunity for recycling eWaste, the Company offers

---

[2]      eWaste is an ubiquitous term used to cover almost all types of electrical and electronic equipment (EEE) that has or could enter the waste stream. Examples include TVs, computers, mobile phones, iDevices, stereo systems, toys, small and large appliances (white goods) – almost any household or business item with circuitry or electrical components with power cords or battery supply.

eWaste recycling and data destruction services through its facility in Hickory, NC. The Company provides all levels of government, corporations, and consumers with secure, fast and audited data destruction services, as well as end-of-life recycling of outdated or out-modeled electronics of all types.

4.      Currently, it is estimated that the world creates 240 million tons of eWaste per year, of which only 10% actually gets recycled or reused. In the United States, eWaste is growing by 5 percent annually and accounts for 70 percent of overall toxic waste. Municipal recycling programs typically do not include eWaste services. As a result, over 80% of eWaste recycled in the United States is shipped to other countries for processing and landfill deposit. Landfills release the toxic heavy metals such as mercury and lead, into the environment.

5.      The Debtors provide three types of services: (i) end of life recycling for electronics and electrical equipment; (ii) on-site and off-site, secure and audited data destruction; and (iii) pre-consumer, post-consumer, and mixed plastics recycling. ZLOOP is 100% Landfill Free™, which means that all produced non-salable materials, including waste dust and tailings, are disposed of or destroyed by incineration per federal, state and local regulations.

6.      The Debtors' end-of-life recycling eliminate all downstream environmental and other liabilities for their customers. Utilizing a unique array of machines, the Debtors are able to domestically transform all electronics into feeder-stock commodities and is 100% Landfill Free™. Commodities reclaimed in the recycling process include copper, silver, gold, platinum, palladium, nickel, lead, steel, stainless steel, plastics, green boards, processors and memory chips.

7.      The Debtors' data destruction system reduces media to unrecognizable separated commodities, providing customers with zero landfill and zero downstream liability. The

3

information destruction methods are in complete compliance with, and in fact exceed, HIPAA, FACTA, Gramm-Leach-Bliley, Sarbanes-Oxley Act and various other federal, state, and corporate compliance requirements.  In short, when the Debtors' process is complete, their customers' data is irretrievable.

8.      Finally, the Debtors offer state of the art pre-consumer, post-consumer, and mixed plastics recycling.  Plastics represent the most landfilled or shipped-abroad commodity of recycling eWaste.  The Debtors' sophisticated plastics recycling services ensure a "Ready to Ship" premium commodity stream and package each box separately sealed in a plastic bag, so there is no chance for contamination.

9.      Prior to the commencement of these cases, the Debtor experienced significant delays and difficulties associated with the construction and installation by E Recycling Systems, LLC ("ERS") and Recycling Equipment, Inc. ("REI") of the its eWaste recycling system.  The Debtors currently have litigation pending against ERS and REI, stemming from the issues surrounding supply, design and installation of their eWaste recycling systems.  Additionally, the Debtors are defendants in two pending actions brought by a former investor, Kendall Mosing, as described in the Boston Declaration (defined below).[3]

10.     A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Robert M. Boston in Support of Chapter 11 Petitions and First Day Motions* (the "Boston Declaration"), filed contemporaneously herewith and incorporated herein by reference.

---

[3]      Nothing herein is intended as an admission, waiver or binding characterization of any rights, claim or defense of the Debtors in this description of pending litigation.

**B.      The Debtors' Cash Management System, Bank Accounts and Business Forms.**

11.      As provided in more detail in the Boston Declaration, in the ordinary course of business, the Debtors maintain 2 bank accounts (the "Bank Accounts") that operate in connection with a centralized cash management system (the "Cash Management System").  Specifically, the Debtors maintain (1) a general operating account; and (2) a separate account for payroll.

12.      A list of the Bank Accounts is attached hereto as Exhibit A.[4]  Through the Bank Accounts, the Debtors efficiently collect, transfer and disburse funds generated from their operations on a daily basis.  The Debtors employ various methods to deposit, withdraw, and otherwise transfer funds to, from and between the Bank Accounts, including checks, automated clearing house transactions, direct deposits and electronic funds transfers.

13.      In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms, including electronic forms and paper forms, preprinted letterhead and related documents (collectively, the "Forms").  Given that the Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession.

### RELIEF REQUESTED

**A.      The Debtors Should Be Granted Authority to Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms.**

(i)  Cash Management System

14.      The Debtors seek authority to continue to use their Cash Management System consistent with their prepetition business practices and procedures.  The Cash Management System is an ordinary course, essential business practice of the Debtors.  The Cash Management System currently in place enables the Debtors to (a) closely control and monitor corporate funds,

---

[4]      The Debtors believe that the list of Bank Accounts attached as Exhibit A is complete, but reserve the right to supplement such list if the Debtors have inadvertently omitted a Bank Account.

(b) ensure cash availability, and (c) reduce administrative expenses by facilitating the efficient movement of funds. Changing accounts could significantly and negatively impact Debtors' cash flow as it takes a substantial amount of time to open new accounts.

15.   In light of the manner in which the Debtors generate and track revenues related to their operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates. Altering the Cash Management System may disrupt payments to key vendors and employees. Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

16.   The Debtors further seek authority to implement ordinary course changes to their Cash Management System in the event that the Debtors determine, in their reasonable business judgment, that changes in the Cash Management System would be beneficial to their operations.

17.   Bankruptcy courts routinely permit chapter 11 debtors to maintain their existing cash management systems, generally treating requests for such relief as a relatively "simple matter." In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); see also In re Columbia Gas Sys., 997 F.2d 1039, 1061 (3d Cir. 1993) (recognizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient"); Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.), 778 F.2d 617, 621 (11th Cir. 1985) (holding that allowing the debtors to use their prepetition "routine cash management system" was entirely consistent with applicable provisions of the Bankruptcy Code).

18.   The Debtors respectfully submit that under the circumstances, the maintenance of the Debtors' Cash Management System in substantially the same form as it existed prior to the

6

Petition Date is in the best interests of the Debtors' estates and creditors. Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition operations and (b) assist the Debtors in their efforts to reorganize and preserve value.

19.     Further, the continued postpetition use of debtors' cash management systems also has been approved as a routine matter in other bankruptcy cases in this District. See, e.g., In re Restora Healthcare Holdings, LLC, No. 14-10367 (PJW) (Bankr. D. Del. Feb. 26, 2014) (authorizing the continued use of the Debtors pre-petition cash management system); In re Orchard Supply Hardware Store Corp., No. 13-11565 (CSS) (Bankr. D. Del. June 18, 2013) (authorizing the debtors to continue to maintain, operate and make transfers under their cash management system); In re Rural/Metro Corp., No. 13-11952 (KJC) (Bankr. D. Del. Aug. 6, 2013) (authorizing the debtors to continue to manage their cash pursuant to the cash management system they maintained prepetition); In re Real Mex Restaurants, Inc., No. 11-13122 (BLS) (Bankr. D. Del. Oct. 5, 2011) (authorizing debtors to continue using their cash management system according to their prepetition practices during the pendency of their chapter 11 cases).[5]

(ii)    Bank Accounts

20.     As set forth above, the Debtors currently maintain multiple Bank Accounts in the ordinary course of their businesses. In order to ensure that the Debtors' vendors continue to provide goods and services to the Debtors, it is critical that the Debtors maintain as much

---

[5]     The referenced orders are voluminous in nature and are not attached to this motion; however, in accordance with Local Rule 7007-2, as made applicable to main cases by the Court's General Chambers Procedures, undersigned counsel has copies of each order and will make them available to the Court or to any party that requests them. Additionally, the Orders are available on the Court's CM/ECF PACER site.

consistency as possible during the early stages of these cases in order to avoid serious disruption to their operations.  To preserve a "business as usual" atmosphere, as part of their request to maintain their Cash Management System, the Debtors hereby request that they be permitted to continue to use their Bank Accounts with the same account numbers.  Absent this relief, the UST Guidelines would require the Debtors to close all of their prepetition Bank Accounts and open new accounts, which will disrupt the Debtors' ability to receive funds from various payors and disrupt the Debtors' relationships with critical customers and suppliers, all of whom are accustomed to working with the current Cash Management System.  Allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

21.     To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise the Bank not to honor checks issued by the Debtors prior to the Petition Date, except as otherwise expressly permitted by an order of the Court.  The Debtors will communicate to the Bank the checks that have been expressly permitted by an order of the Court.  The Debtors, moreover, have the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.

22.     Pursuant to Local Rule 2015-2(a), "upon motion of the debtor, the Court may, without notice and hearing, permit the debtor to . . . use its existing bank accounts."  Del. Bankr. L.R. 2015-2(a).  Authority to continue the use of bank accounts has been granted in other chapter 11 cases.  See, e.g., In re Restora Healthcare Holdings, LLC, No. 14-10367 (PJW) (Bankr. D. Del. Feb. 26, 2014) (authorizing debtors to continue using all of their prepetition bank accounts under the same account numbers); In re Real Mex Restaurants, Inc., No. 11-13122 (BLS)

(Bankr. D. Del. Oct. 5, 2011) (same); In re Orchard Supply Hardware Store Corp., No. 13-11565

(CSS) (Bankr. D. Del. June 18, 2013) (authorizing the debtors to continue to maintain, operate

and make transfers under their cash management system).

23.    In addition, the Debtors request authority to open and close bank accounts.  The

Debtors request that the Bank and any other bank be authorized to honor the Debtors' requests to

open or close any bank accounts; provided, however, that any new domestic account is

established at a bank insured with the FDIC and that is organized under the laws of the United

States or any state therein or, in the case of accounts that may carry a balance exceeding the

insurance limitations set thereby, on the list of authorized bank depositories for the District of

Delaware.

   (iii)  Business Forms

24.    As noted above, the Debtors use the Forms in the ordinary course of their

businesses.  Due to the nature and scope of the Debtors' business operations and the large

number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is

important that the Debtors be permitted to continue to use the Forms without alteration or change

and without the "Debtor in Possession" designation.  Otherwise, the estates will be required to

bear a potentially significant expense that the Debtors' believe is unwarranted.  Note, however,

that in compliance with Local Rule 2015-2, once the paper Forms are depleted, the Debtors will

then replace them with forms containing the "Debtor in Possession" designation.

25.    As parties that presently conduct business with the Debtors likely will be aware of

the Debtors' status as debtors in possession, the alteration of the Forms would be unnecessary

and unduly burdensome.  Further, this Court has allowed debtors to use their prepetition business

and check forms without the "Debtor-in-Possession" label in other cases.  See, e.g., In re Restora

Healthcare Holdings, LLC, No. 14-10367 (PJW) (Bankr. D. Del. Feb. 26, 2014) (authorizing the

9

debtors to maintain prepetition forms); In re Orchard Supply Hardware Store Corp., No. 13-11565 (CSS) (Bankr. D. Del. June 18, 2013) (authorizing debtors to use their present forms, including preprinted checks, without reference to their status as debtors in possession, provided, however that debtors would start imprinting the legend "DIP" thereon as soon as practicable); In re Real Mex Restaurants, Inc., No. 11-13122 (BLS) (Bankr. D. Del. Oct. 5, 2011) (authorizing debtors to use their present forms, including preprinted checks, without reference to their status as debtors in possession, provided, however, that debtors would start imprinting the legend "DIP" thereon as soon as practicable).

**B.    The Court Should Allow the Debtors 60 Days to Comply With the Requirements of Section 345(b) of the Bankruptcy Code.**

26.    Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other investment made by a debtor, except those insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States, must be secured by a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the United States Trustee for the relevant district or the deposit of securities of the kind specified in 31 U.S.C. § 9303.  Section 345(b) provides further, however, that a bankruptcy court may allow the use of alternatives to these approved investment guidelines "for cause."  In re Serv. Merchandise Co., 240 B.R. 894 (Bankr. M.D. Tenn. 1999).

27.    The Service Merchandise court set out a list of factors to be considered in determining whether or not "cause" exists for the use of an alternative to the approved investment guidelines:

(a)    The sophistication of the debtor's business;

(b)    The size of the debtor's business operations;

10

(c)     The amount of investments involved;

(d)     The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor in possession funds are held;

(e)     The complexity of the case;

(f)     The safeguards in place within the debtor's own business of insuring the safety of the funds;

(g)     The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h)     The benefit to the debtor;

(i)     The harm, if any, to the estate; and

(j)     The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

240 B.R. at 896–97.

28.     Local Rule 2015-2(b) provides that no waiver of "section 345 shall be granted without notice and an opportunity for hearing in accordance with these Local Rules."  However, Local Rule 9006-2 provides that "if a motion to extend the time to take any action is filed before the expiration of the period prescribed by the Code, the Fed. R. Bankr. P., these Local Rules or Court order, the time shall automatically be extended until the Court acts on the motion.

29.     To the extent that any of the Debtors' funds are not deposited in accordance with section 345 of the Bankruptcy Code or Local Rule 4001-3, the Debtors request that the Court allow them a 60-day extension of time to (a) comply with the requirements of section 345(b) of the Bankruptcy Code or Local Rule 4001-3 or (b) file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code.  This Court has permitted similar extensions in other cases.  See, e.g., In re Barnes Bay Dev. Co., No. 11-10792 (PJW) (Bankr. D. Del. Mar. 21, 2011) (granting a 60-day extension for debtors to either comply with section 345(b) of the Bankruptcy Code or to make other arrangements as agreed with the

11

U.S. Trustee); In re Rural/Metro Corp., No. 13-11952 (KJC) (Bankr. D. Del. Aug. 6, 2013) (excusing debtors from compliance with the requirements of section 345(b), to the extent necessary, for 30 days without prejudice to the Debtors right to seek a further waiver).

**C.     The Court Should Authorize Banks Participating in the Cash Management System to Honor Certain Transfers, Charge Bank Fees, and Certain Other Amounts.**

30.     Contemporaneously with the filing of this Motion, the Debtors have filed various motions for authorization to pay prepetition debt.  With respect to some of this debt, prior to the Petition Date, the Debtors issued checks that have yet to clear the banking system.  With respect to other debt, the Debtors intend to issue checks postpetition on account of such prepetition debt once the Court enters an order permitting the Debtors to take such action and maintain their existing Bank Accounts.  The Debtors intend to inform the Bank which prepetition checks should be honored pursuant to orders of the Court authorizing such payment.

31.     As a result of the foregoing, the Debtors request that the Bank be authorized to accept and honor all representations and direction from the Debtors as to which checks, drafts, wires or ACH transfers should be honored or dishonored consistent with any order of this Court and governing law, whether such checks, drafts, wires or ACH transfers are dated prior to, on, or subsequent to the Petition Date.  Pursuant to the relief requested in this Motion, the Bank will not be liable to any party, including any trustee that may be appointed in these or successor chapter 7 cases, on account of (a) following the Debtors' instructions or representations as to any order of this Court, (b) honoring any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) an innocent mistake made despite implementation of reasonable item-handling procedures.   Such relief is reasonable and appropriate because the Bank is not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

32.     Finally, the Debtors request authority for the Bank to charge, and the Debtors to pay or honor, both prepetition and postpetition service fees and other costs, charges and expenses to which the Bank may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees").  The Debtors also request the Bank be authorized to charge back returned items to the Bank Accounts in the normal course of business.

33.     The Debtors require this relief to minimize the disruption of the Cash Management System and their Bank Accounts and to assist them in accomplishing a smooth transition to operating in chapter 11.  Authority for debtors to pay bank fees and banks to charge back returned items has been routinely granted in other chapter 11 cases.  See, e.g., In re IMRIS, Inc., No. 15-11133 (CSS) (authorizing debtors to pay  "Bank Fees related to the the Bank Accounts" and allowing banks to "charge back returned items to the Bank Accourts in the normal course of business.").

**THE DEBTORS SATISFY BANKRUPTCY RULE 6003**

34.     Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm" a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one days after the Petition Date.  While the Debtors do not anticipate that any Bank Fees or other prepetition amounts will be due to the Bank on account of maintaining the Cash Management System, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, the requirements of Bankruptcy Rule 6003 for expedited relief are satisfied, and that Bankruptcy Rule 6003 has been satisfied to permit such payments, if any are necessary.

## REQUEST FOR WAIVER OF STAY

35.    In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the Debtors require immediate relief to continue ordinary business operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## NOTICE

36.    Notice of this Motion shall be provided to the following entities: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) the Bank; (d) the United States Attorney's Office for the District of Delaware; and (e) the Internal Revenue Service.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PRIOR REQUEST

37.    No prior request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B, (i) granting the relief requested herein and (ii) granting such other and further relief as the Court may deem proper.

14

Dated:  August 9, 2015
Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*

Stuart M. Brown (DE 4050)
R. Craig Martin (DE 5032)
Daniel N. Brogan (DE 5723)
Kaitlin M. Edelman (DE 5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware  19801
Telephone:  (302) 468-5700
Facsimile:   (302) 394-2341
Email:  stuart.brown@dlapiper.com
        craig.martin@dlapiper.com
        daniel.brogan@dlapiper.com
        kaitlin.edelman@dlapiper.com

*Proposed Counsel to Debtors and
Debtors in Possession*