## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ZLOOP, INC., *et al.*, [1] | Case No.  15-11660 (XXX) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) MAINTAIN EXISTING
INSURANCE POLICIES AND PAY ALL OBLIGATIONS ARISING THEREUNDER,
(C) RENEW, REVISE, EXTEND, SUPPLEMENT, CHANGE, OR ENTER INTO NEW
INSURANCE POLICIES AND (II) GRANTING CERTAIN RELATED RELIEF**

ZLOOP, Inc., and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through their attorneys, DLA Piper LLP (US), hereby move the Court (the "Motion") for entry of an order pursuant to sections 105(a), 363, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) authorizing the Debtors to (a) maintain existing insurance policies and pay all obligations arising thereunder, (b) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in their business judgment, and (ii) granting certain related relief.  In support of this Motion, the Debtors respectfully state as follows:

---

[1]   The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  ZLOOP, Inc. (2960); ZLOOP Nevada, LLC (7516); and ZLOOP Knitting Mill, LLC (7098). The location of the Debtors' headquarters and the service address for each of the Debtors is 816 13th Street NE, Hickory, NC 28601.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105(a), 363, 1107 and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004(h), and Local Rule 9013-1(m).

## BACKGROUND

**A.      General Background**

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

3.      The Debtors operate a proprietary, state of the art, 100% landfill free eWaste[2] recycling company headquartered in Hickory, North Carolina.  Founded in 2012 to address the large, untapped, fragmented market opportunity for recycling eWaste, the Company offers eWaste recycling and data destruction services through its facility in Hickory, NC.  The Company provides all levels of government, corporations, and consumers with secure, fast and audited data destruction services, as well as end-of-life recycling of outdated or out-modeled electronics of all types.

---

[2]      eWaste is an ubiquitous term used to cover almost all types of electrical and electronic equipment (EEE) that has or could enter the waste stream. Examples include TVs, computers, mobile phones, iDevices, stereo systems, toys, small and large appliances (white goods) – almost any household or business item with circuitry or electrical components with power cords or battery supply.

EAST\102191393.2

4.      Currently, it is estimated that the world creates 240 million tons of eWaste per year, of which only 10% actually gets recycled or reused.  In the United States, eWaste is growing by 5 percent annually and accounts for 70 percent of overall toxic waste.  Municipal recycling programs typically do not include eWaste services.  As a result, over 80% of eWaste recycled in the United States is shipped to other countries for processing and landfill deposit. Landfills release the toxic heavy metals such as mercury and lead, into the environment.

5.      The Debtors provide three types of services: (i) end of life recycling for electronics and electrical equipment; (ii) on-site and off-site, secure and audited data destruction; and (iii) pre-consumer, post-consumer, and mixed plastics recycling.  ZLOOP is 100% Landfill Free™, which means that all produced non-salable materials, including waste dust and tailings, are disposed of or destroyed by incineration per federal, state and local regulations.

6.      The Debtors' end-of-life recycling eliminate all downstream environmental and other liabilities for their customers. Utilizing a unique array of machines, the Debtors are able to domestically transform all electronics into feeder-stock commodities and is 100% Landfill Free™.  Commodities reclaimed in the recycling process include copper, silver, gold, platinum, palladium, nickel, lead, steel, stainless steel, plastics, green boards, processors and memory chips.

7.      The Debtors' data destruction system reduces media to unrecognizable separated commodities, providing customers with zero landfill and zero downstream liability. The information destruction methods are in complete compliance with, and in fact exceed, HIPAA, FACTA, Gramm-Leach-Bliley, Sarbanes-Oxley Act and various other federal, state, and corporate compliance requirements.  In short, when the Debtors' process is complete, their customers' data is irretrievable.

8.      Finally, the Debtors offer state of the art pre-consumer, post-consumer, and mixed plastics recycling.   Plastics represent the most landfilled or shipped-abroad commodity of recycling eWaste.   The Debtors' sophisticated plastics recycling services ensure a "Ready to Ship" premium commodity stream and package each box separately sealed in a plastic bag, so there is no chance for contamination.

9.      Prior to the commencement of these cases, the Debtor experienced significant delays and difficulties associated with the construction and installation by E Recycling Systems, LLC ("ERS") and Recycling Equipment, Inc. ("REI") of the its eWaste recycling system.   The Debtors currently have litigation pending against ERS and REI, stemming from the issues surrounding supply, design and installation of their eWaste recycling systems.   Additionally, the Debtors are defendants in two pending actions brought by a former investor, Kendall Mosing, as described in the Boston Declaration (defined below).[3]

10.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Robert M. Boston in Support of Chapter 11 Petitions and First Day Motions* (the "Boston Declaration"), filed contemporaneously herewith and incorporated herein by reference.

**B.      The Debtors' Insurance Policies**

11.      The Debtors maintain 5 insurance policies (the "Insurance Policies") that are issued by several third-party insurance carriers (collectively, the "Insurance Carriers") and collectively provide coverage for, among other things (a) general liability, (b) automobile liability, (c) environmental liability coverage, (d) excess liability,   and (f) workers'

---

[3]      Nothing herein is intended as an admission, waiver or binding characterization of any rights, claim or defense of the Debtors in this description of pending litigation.

compensation.   A schedule of the Insurance Policies is attached hereto as <u>Exhibit C</u> and incorporated herein by reference.   Continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' businesses, properties and assets.   Moreover, in many cases, the coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' business activities.

12.     As of the Petition Date, the Debtors owe approximately $28,000 in past-due premiums on account of the Insurance Policies.

<b><u>RELIEF REQUESTED</u></b>

13.     By this motion, the Debtors request entry of interim and final orders, substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u> (the "<u>Interim Order</u>" and the "<u>Final Order</u>," respectively), (a) authorizing the Debtors to (i) maintain the existing Insurance Policies and pay all obligations arising thereunder whether pre-petition or post-petition, including any Workers' Compensation Premium payments and (ii) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in their business judgment; (b) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing; (c) scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Order; and (d) granting such other and further relief as may be appropriate.

<b><u>BASIS FOR RELIEF</u></b>

**A.      Maintaining the Insurance Policies and Paying Obligations Related Thereto Is Required by the Bankruptcy Code and the Office of the U.S. Trustee**

14.     The Insurance Policies are essential to preserve the value of the Debtors' businesses, properties, and assets.   Not only are some of the Insurance Policies required by the various regulations, laws and contracts that govern the Debtors' commercial activities, but

EAST\102191393.2

section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public," is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  Moreover, the *Operating Guidelines for Chapter 11 Cases of the Office of the United States Trustee for the District of Delaware* (the "UST Guidelines") also require a debtor to maintain insurance coverage throughout its chapter 11 case.

15.     Payment of obligations owing in connection with the Insurance Policies and the renewal, revision, extension, supplementation, or change of existing Insurance Policies and entering into new insurance policies as needed in the Debtors' business judgment are necessary to protect and safeguard the Debtors' ongoing operations and ensure compliance with the UST Guidelines.

**B.     Payment of the Insurance Obligations Is Warranted Under the Doctrine of Necessity**

16.     Courts generally acknowledge that, under appropriate circumstances, they may authorize special treatment for, or authorize a Debtor to pay for, certain prepetition obligations.  See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (noting that in the Third Circuit a debtor may pay prepetition claims that are essential to the continued operation of the debtor's business); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages); Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).  When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

17.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries charged with "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Inherent in the fiduciary duties of a debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value," which, in certain instances, can be fulfilled "only … by the preplan satisfaction of a prepetition claim." Id. Indeed, the court in CoServ specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate …." Id.

18.    Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. See, e.g., Ionosphere Clubs, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); James A. Phillips, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).[4]

---

[4]    Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit preplan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtor's business reorganization plan. See In re UNR Indus., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); Ionosphere Clubs, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

- 7 -

19.     In addition to the authority granted a debtor in possession under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code, courts have developed the "doctrine of necessity" or the "necessity of payment" rule, which originated in the landmark case of Miltenberger v. Logansport, C. & S.W.R. Co., 106 U.S. 286 (1882).  The Third Circuit has held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  See In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (stating that a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); In re Just for Feet, Inc., 242 B.R. at 824–25 (noting that debtors may pay prepetition claims that are essential to continued operation of the business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

20.     Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11."  Ionosphere Clubs, Inc., 98 B.R. at 176; Just For Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization."); see also In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such

payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (finding that it is appropriate to provide for the "unequal treatment of pre-petition debts when [such treatment is] necessary for rehabilitation . . .").

21.     Failure to pay amounts to preserve the Insurance Policies as and when they come due may harm the Debtors' estates in several ways.  Specifically, there is the potential for an insurance company to terminate coverage, which would likely place additional strain on the Debtors' relationships with employees and creditors, who benefit from the Debtors' insurance coverage, and would also eviscerate the Debtors' ability to prevent loss in value caused by casualty, natural disaster or another unforeseen event.  In the event of termination of insurance coverage, the Debtors would need to obtain replacement insurance, likely at a higher price.  The cancellation of Insurance Policies would threaten to halt the Debtors' operations altogether.  In light of the importance of maintaining insurance coverage with respect to their business activities, the Debtors submit it is in the best interest of their estates to maintain the Insurance Policies and to pay related amounts as described herein under the Bankruptcy Code.  In addition, the Debtors should be authorized to renew, revise, extend, supplement, or change existing Insurance Policies or enter into new insurance policies as needed in the Debtors' business judgment to ensure that appropriate insurance coverage is maintained during these chapter 11 cases and that the Debtors are fulfilling their fiduciary duties.

22.     Courts in this jurisdiction have approved relief similar to the relief requested in this motion.  See, e.g., In re Conexant Sys., Inc., No. 13-10367 (MFW) (Bankr. D. Del. April 11,

2013) (authorizing debtors to continue prepetition insurance coverage and maintain financing of insurance premiums); <u>In re Vertis Holdings, Inc.</u>, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012) (authorizing debtors to maintain, extend and renew existing insurance programs and pay all insurance obligations including premiums, deductibles, retrospective adjustments, expenses, taxes, fees, etc.); <u>In re Bicent Holdings LLC</u>, No. 12-11304 (KG) (Bankr. D. Del. Apr. 24, 2012) (same); <u>In re Friendly Ice Cream Corp.</u>, No. 11-13167 (KG) (Bankr. D. Del. Oct. 5, 2011) (same); <u>In re Appleseed's Intermediate Holdings, LLC</u>, No. 11-10160 (KG) (Bankr. D. Del. Feb. 18, 2011) (same); <u>In re The Majestic Star Casino</u>, No. 09-14136 (KG) (Nov. 23, 2009) (same).[5]

## C.    Cause Exists to Authorize and Direct the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

23.      The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment, and to honor all electronic payment requests made by the Debtors, related to the obligations described herein, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date.  The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.  The Debtors represent that they have sufficient availability of funds to pay the amounts described herein.  Also, under the Debtors' existing cash management system, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment made with respect to the Insurance Policies. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating

---

[5]    The referenced orders are voluminous in nature and are not attached to this motion; however, in accordance with Local Rule 7007-2, as made applicable to main cases by the Court's General Chambers Procedures, undersigned counsel has copies of each order and will make them available to the Court or to any party that requests them.  Additionally, the Orders are available on the Court's CM/ECF PACER site.

to authorized payments, will not be honored inadvertently and that all applicable financial institutions should be authorized and directed, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests with respect to the Insurance Policies.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

24.     As described above, the Debtors seek authority pursuant to the Interim Order to pay outstanding amounts related to the insurance during the first 21 days of these chapter 11 cases.  Under Bankruptcy Rule 6003, the Court may authorize the Debtors to satisfy the amounts related to certain of the Insurance Policies within the 21-day period after the Petition Date because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. See Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr, S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

25.     As discussed above, if the Debtors do not obtain the relief requested in the Interim Order, they would suffer immediate and irreparable harm because (a) the Debtors would not be able to continue their operations if an insurance company terminated coverage due to nonpayment of premiums, (b) the Debtors would be at severe risk of jeopardizing their assets if they did not have adequate coverage; (c) the Debtors' assets would be harmed by the subsequent need to obtain replacement insurance at a likely higher price, and (d) it would be difficult for the Debtors to obtain favorable terms for future insurance policies.  Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of

Bankruptcy Rule 6003 and seek authority to pay the amounts related to the Insurance Policies pursuant to the Interim Order.

## WAIVER OF BANKRUPTCY RULES REGARDING NOTICE AND STAY

26.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

## RESERVATION OF RIGHTS

27.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  Additionally, nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors.  The Debtors expressly reserve their rights to contest any claim or billing dispute.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

28.     Notice of this Motion shall be provided to the following entities: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) the United States Attorney's Office for the District of Delaware; and (d) the Internal Revenue Service.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

- 12 -

## NO PRIOR REQUEST

29.     No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Interim and Final Orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, (a) authorizing the Debtors to (i) maintain the existing Insurance Policies and pay all obligations arising thereunder, whether accrued pre-petition or post-petition, and (ii) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in their business judgment; (b) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing; (c) scheduling a Final Hearing; and (d) granting such other and further relief as may be appropriate.

EAST\102191393.2

Dated:  August 9, 2015
Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

 */s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
R. Craig Martin (DE 5032)
Daniel N. Brogan (DE 5723)
Kaitlin M. Edelman (DE 5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware  19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com
      craig.martin@dlapiper.com
      daniel.brogan@dlapiper.com
      kaitlin.edelman@dlapiper.com

*Proposed Counsel to Debtors and*
*Debtors in Possession*

EAST\102191393.2