**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ZLOOP, INC., *et al.*, [1]<br><br>    Debtors. | Chapter 11<br><br>Case No.  15-11660 (___)<br><br>(Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) FINDING ADEQUATE PROTECTION IS NOT REQUIRED, AND (III) SCHEDULING A FINAL HEARING**

ZLOOP, Inc., and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through their attorneys, DLA Piper LLP (US), hereby move the Court (the "Motion"), pursuant to sections 105, 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the U.S. Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of interim and final orders (i) authorizing the Debtors to use Cash Collateral (as defined below), (ii) finding that no party is likely to prevail under a final hearing under Section 363(e) of the Bankruptcy Code, therefore no party is entitled to adequate protection in connection with the Debtors' use of Cash Collateral, and (iii) scheduling a final hearing thereon.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  ZLOOP, Inc. (2960); ZLOOP Nevada, LLC (7516); and ZLOOP Knitting Mill, LLC (7098).  The location of the Debtors' headquarters and the service address for each of the Debtors is 816 13th Street NE, Hickory, NC 28601.

EAST\102207587.2

**JURISDICTION AND VENUE**

1. The Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105, 361, 362, and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 9014, and Local Rule 4001-2.

**BACKGROUND**

**A.   General Background**

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated. Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

3. The Debtors operate a proprietary, state of the art, 100% landfill free eWaste[2] recycling company headquartered in Hickory, North Carolina. Founded in 2012 to address the large, untapped, fragmented market opportunity for recycling eWaste, the Company offers eWaste recycling and data destruction services through its facility in Hickory, NC. The Company provides all levels of government, corporations, and consumers with secure, fast

---

[2] eWaste is an ubiquitous term used to cover almost all types of electrical and electronic equipment (EEE) that has or could enter the waste stream. Examples include TVs, computers, mobile phones, iDevices, stereo systems, toys, small and large appliances (white goods) – almost any household or business item with circuitry or electrical components with power cords or battery supply.

and audited data destruction services, as well as end-of-life recycling of outdated or out-modeled electronics of all types.

4. Currently, it is estimated that the world creates 240 million tons of eWaste per year, of which only 10% actually gets recycled or reused. In the United States, eWaste is growing by 5 percent annually and accounts for 70 percent of overall toxic waste. Municipal recycling programs typically do not include eWaste services. As a result, over 80% of eWaste recycled in the United States is shipped to other countries for processing and landfill deposit. Landfills release the toxic heavy metals such as mercury and lead, into the environment.

5. The Debtors provide three types of services: (i) end of life recycling for electronics and electrical equipment; (ii) on-site and off-site, secure and audited data destruction; and (iii) pre-consumer, post-consumer, and mixed plastics recycling. ZLOOP is 100% Landfill Free™, which means that all produced non-salable materials, including waste dust and tailings, are disposed of or destroyed by incineration per federal, state and local regulations.

6. The Debtors' end-of-life recycling eliminate all downstream environmental and other liabilities for their customers. Utilizing a unique array of machines, the Debtors are able to domestically transform all electronics into feeder-stock commodities and is 100% Landfill Free™. Commodities reclaimed in the recycling process include copper, silver, gold, platinum, palladium, nickel, lead, steel, stainless steel, plastics, green boards, processors and memory chips.

7. The Debtors' data destruction system reduces media to unrecognizable separated commodities, providing customers with zero landfill and zero downstream liability. The information destruction methods are in complete compliance with, and in fact exceed,

HIPAA, FACTA, Gramm-Leach-Bliley, Sarbanes-Oxley Act and various other federal, state, and corporate compliance requirements. In short, when the Debtors' process is complete, their customers' data is irretrievable.

8. Finally, the Debtors offer state of the art pre-consumer, post-consumer, and mixed plastics recycling. Plastics represent the most landfilled or shipped-abroad commodity of recycling eWaste. The Debtors' sophisticated plastics recycling services ensure a "Ready to Ship" premium commodity stream and package each box separately sealed in a plastic bag, so there is no chance for contamination.

9. Prior to the commencement of these cases, the Debtor experienced significant delays and difficulties associated with the construction and installation by E Recycling Systems, LLC ("ERS") and Recycling Equipment, Inc. ("REI") of the its eWaste recycling system. The Debtors currently have litigation pending against ERS and REI, stemming from the issues surrounding supply, design and installation of their eWaste recycling systems. Additionally, the Debtors are defendants in two pending actions brought by a former investor, Kendall Mosing, as described in the Boston Declaration (defined below).[3]

10. A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Robert M. Boston in Support of Chapter 11 Petitions and First Day Motions* (the "Boston Declaration"), filed contemporaneously herewith and incorporated herein by reference.

---

[3] Nothing herein is intended as an admission, waiver or binding characterization of any rights, claim or defense of the Debtors in this description of pending litigation.

**B.     Mosing and ERS May Assert Interests in Cash Collateral**

11.     Prior to the commencement of these chapter 11 cases, the Debtors contracted for a search of the public records in North Carolina and Delaware. The search results revealed that on or about August 14 and 15, 2014, several months following Mosing's grant of broad, immediate unconditional releases in favor of ZLOOP and others and about two weeks before commencing the First Action, Mosing's litigation counsel filed UCC-1 financing statements against ZLOOP, Inc. and possibly others, identifying substantially all assets of the Debtors as collateral, including cash and bank accounts and the proceeds of all such property.

12.     Neither ZLOOP, Inc. nor ZLOOP, LLC granted Mosing a security interest in any property. Neither Mosing nor ZLOOP is party to an account control agreement. ZLOOP believes that Mosing is not in possession of any property of ZLOOP. In the event Mosing holds a security interest in cash collateral and the filing of the UCC-1 financing statement acted to perfect such interest, Mosing's interest is unenforceable and avoidable under, among others, 11 U.S.C. §§ 544, 547 and 548.

13.     The search results further revealed that in or about October, 2014, ERS filed UCC-1 financing statements against ZLOOP, Inc. and possibly others, identifying substantially all assets of the Debtors as collateral, including cash and bank accounts and the proceeds of all such property.

14.     Neither ZLOOP, Inc. nor ZLOOP, LLC granted ERS a security interest in any property. Neither ERS nor ZLOOP is party to an account control agreement. In the event ERS holds a security interest in cash collateral and the filing of the UCC-1 financing

statement acted to perfect such interest, ERS's interest is unenforceable and avoidable under, among others, 11 U.S.C. §§ 544, 547 and 548.

15. ZLOOP never executed or delivered to either Mosing or ERS a grant of a security interest. Neither Mosing nor ERS is party to an account control agreement with ZLOOP and One Community Bank respecting Debtors' Bank Accounts. Accordingly, neither Mosing nor ERS holds a security interest in any of the Debtors' property, and even if such a security interest does exist, neither Mosing's nor ERS's alleged security interest is perfected.

16. Out of an abundance of caution, however, the Debtors are seeking authorization to use Cash Collateral, to the extent Mosing or ERS asserts a secured interest in the Debtors' Cash Collateral, to ensure there are no unnecessary interruptions to the Debtors' operations that would cause immediate and irreparable harm to the Debtors and their entities.

17. Such use of Cash Collateral would be necessary to, among other things, pay vendors, employees, service and/or utility providers and to otherwise properly service the Debtors' customers and operate their businesses. The inability to do any of these would cause immediate and irreparable harm to the Debtors and their estates.

18. Mosing and ERS may assert—but do not hold—a security interest in a broad variety of the Debtors' assets, including the Debtors' cash and proceeds of their other properties that upon receipt would constitute Cash Collateral. The Debtors have never granted a security interest to Mosing and Mosing and ERS have not obtained a judgment and executed on any accounts or other property of the Debtors. Consequently, while Mosing and ERS may assert that each enjoys a lien resulting from filed UCC-1 financing statements, such statements do not in themselves grant a lien and Mosing and ERS have no other basis to assert

-6-
EAST\102207587.2

an interest as each is not a party to any contract or other agreement that would create such an interest.

19. Neither Mosing nor ERS is the bank holding the Debtors' accounts, and the Debtors' accounts are no in Mosing's or ERS's name, shared or otherwise. Additionally, while Mosing and ERS have filed UCC-1 financing statements asserting various interests, neither Mosing nor ERS is a party to an account control agreement by which the Debtors' bank agrees to follow Mosing's and ERS's instructions.

20. Neither Mosing nor ERS holds a security interest in any of the Debtors' property and neither "controls" the Debtors' bank accounts. Therefore, as discussed below, the Debtors' cash on hand and cash flow are not encumbered by any security interests in favor of Mosing or ERS and, as such, do not constitute "Cash Collateral" of Mosing, ERS or any other Secured Lender (as such term is defined in section 363(a) of the Bankruptcy Code, "Cash Collateral").

**C.    Debtors' Use of Cash Collateral**

21. In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs. In addition, the Debtors require cash on hand to fund these chapter 11 cases and to successfully reorganize.

22. The Debtors believe they have sufficient cash that is not subject to any security interests to maintain ongoing day-to-day operations and fund their working capital needs and the costs and expenses of these chapter 11 cases. Out of an abundance of caution, however, the Debtors are seeking authorization to utilize Cash Collateral, in the event Mosing or ERS *asserts* a security interest in the Debtors' Cash Collateral, to ensure there are no unnecessary interruptions to the Debtors' operations. Such use of Cash Collateral would be necessary to,

among other things, pay vendors, employees, service and/or utility providers and to otherwise properly administer their chapter 11 cases, service the Debtors' customers and operate their businesses.  The inability to do any of these would cause immediate and irreparable harm to the Debtors' estates.

23. The Debtors believe that because neither Mosing, ERS, nor any other party, holds a valid, perfected, enforceable, and unavoidable interest in the Debtor's Cash Collateral, no party will be prejudiced in any way by the Debtors' proposed use of Cash Collateral.  Given these circumstances, the Court should authorize the use of Cash Collateral on the terms and conditions set forth herein.

## RELIEF REQUESTED

24. By this Motion, the Debtors seek entry of interim and final orders, pursuant to sections 105, 361, 362, and 363 Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 9014, and Local Rule 4001-2, (a) authorizing the Debtors to use Cash Collateral during these chapter 11 cases, (b) finding that Mosing or ERS is not, and no other party is, entitled to adequate protection in connection with the Debtors' use of Cash Collateral, and (c) scheduling a final hearing.

25. The Debtors have submitted herewith a proposed interim order granting the relief requested herein (the "Interim Order").

26. Local Rule 4001-2(a)(i) requires the disclosure of certain provisions of the Interim Order.  The Debtors are not proposing to stipulate to any party's claim or lien or to grant extraordinary relief or propose adequate protection beyond the means contemplated by section 361 of the Bankruptcy Code.  Accordingly, the Debtors make no disclosures under Local Rule 4001-2(a)(i).

27. Additionally, Bankruptcy Rule 4001(b)(1) and Local Rule 4001-2(a)(ii) requires a summary of the essential terms of the proposed use of Cash Collateral:

(a) Bankruptcy Rule 4001(b)(1)(B)(i) requires the disclosure of the name of each entity with an interest in the Cash Collateral. There is no entity with a valid, enforceable, perfected, unavoidable interest in the Debtors' Cash Collateral.

(b) Bankruptcy Rule 4001(b)(1)(B)(ii) requires the disclosure of the purposes for the use of Cash Collateral. The Debtors seek authority to use Cash Collateral for, among other things, (i) working capital requirements; (ii) general corporate purposes, including funding their operations during these cases; and (iii) the costs and expenses of administering the chapter 11 cases.

(c) Bankruptcy Rule 4001(b)(1)(B)(iii) requires the disclosure of the material terms, including duration, of the use of the Cash Collateral: Debtors propose to use their cash for the duration of their chapter 11 cases.

(d) Bankruptcy Rule 4001(b)(1)(B)(iv) requires the disclosure of the proposed Adequate Protection of other entities' interests in the Cash Collateral. The Interim Order provides that in the event and to the extent that the Court determines by a final order that a creditor holds a valid, enforceable, perfected, and unavoidable interest in Cash Collateral, that such interest be granted a replacement lien in the same type of post-petition property and to the same extent as existed as of the Petition Date, but only to the extent of the diminution of such creditor's interest resulting from the use of Cash Collateral.

28. The relief requested herein is in the best interests of the Debtors, their estates and creditors.

## BASIS FOR RELIEF

### A. Applicable Legal Standard.

29. The Debtors' use of property of their estates is governed by Bankruptcy Code section 363, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the

> [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

30. Bankruptcy Code section 363(c)(2) permits a debtor to use Cash Collateral. Specifically, it provides that the Debtors may use Cash Collateral either: (a) if "each entity that *has an interest* in such cash collateral consents" or (b) if the Court authorizes such use after notice and a hearing. 11 U.S.C. § 363(c)(2) (emphasis added).

31. To the extent a secured party has an interest in the Debtors' Cash Collateral, Bankruptcy Code section 363(e) requires a debtor to adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during the chapter 11 case. Because neither Mosing nor ERS holds a valid, enforceable, perfected and unavoidable security interest in the Debtor's Cash Collateral, neither is entitled to adequate protection.

32. Moreover, to the extent either asserts an interest over the Debtors' Cash Collateral, Mosing and ERS each carry the burden of proving its validity, priority and extent. See 11 U.S.C. § 363(p)(2) ("the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."). Neither can carry this burden, because neither has any such interest in the Debtors' Cash Collateral.

33. A security interest in a deposit account is perfected "when the secured party obtains control [of the account] and remains perfected by control only while the secured party retains control [of the account]." See 6 Del. Code § 9-314(b).

34. "Control" with respect to a deposit account can be established by meeting one of three requirements: (1) the secured party can be the bank in which the account is

-10-

maintained; (2) the debtor, secured party and bank can enter into an agreement that "the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor;" or (3) the secured party can become the "bank's customer with respect to the account." See 6 Del. Code § 9-104(a).

35.     Neither Mosing nor ERS can meet any of these requirements: (1) neither is a bank that holds the Debtors' deposit accounts; (2) the Debtors, their bank and either Mosing or ERS are not parties to any account control agreement, and (3) the Debtors' accounts are in the Debtors' names; and (4) neither Mosing nor ERS is the bank's customer "with respect to" the Debtors' deposit accounts.  Accordingly, Mosing nor ERS has neither perfected any interest in the Debtors' deposit accounts.

36.     Mosing nor ERS holds a valid, enforceable, perfected and unavoidable interest in the Debtors' Cash Collateral and, therefore, neither is entitled to adequate protection in connection with the Debtors' proposed use of their own unencumbered cash on hand and cash flow.

**B.     The Debtors' Access to Cash Collateral.**

37.     A debtor's cash "is the life's blood of the business," and the bankruptcy court must ensure that cash "is available for use even if to a limited extent." In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a debtor to use cash collateral to continue its operations so long as the interest asserted by any affected secured creditor in such cash collateral is adequately protected. See, e.g. In re Wright Grp., Inc., 443 B.R. 795, 808 (Bankr. N.D. Ind. 2011) (bank's asserted interest in cash receipts was not perfected, therefore suce receipts did not constitute "Cash Collateral" subject to the protections of Secton 363(c)(2)) accord 5 Norton Bankr. L. & Prac. 3d § 94:6 ("It is axiomatic that the restrictions

-11-


of Code § 363(c)(2) on the usage of cash collateral will apply only if the creditor has a properly perfected security interest in the underlying collateral and proceeds.")Thus, where a creditor actually holds a valid, enforceable and perfected interest in Cash Collateral, courts are required to balance the debtor's need to use Cash Collateral in its reorganization effort against the secured creditor's need for adequate protection. Stein v. U.S. Farmers Home Admin. (In re Stein), 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). In ruling whether a secured creditor is adequately protected early in a case, courts "will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections . . . ." In re Dynaco Corp., 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

38. Consistent with these principles, courts repeatedly have recognized that use of Cash Collateral is appropriate where the Cash Collateral will be used to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. See, e.g., Dynaco, 162 B.R. at 394 (granting a motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally access to Cash Collateral is necessary in order to operate a business"); George Ruggiere Chrysler-Plymouth, 727 F.2d at 1020 (allowing debtor to use Cash Collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1399 (10th Cir. 1987) (permitting debtor to use Cash Collateral after finding that there was only a low risk that secured creditor's interest would diminish).

39. As there is no party with a valid, enforceable, perfected and unavoidable security interest in the Debtors' cash or bank accounts, application of this balancing test is not necessary in these cases. It is essential that the Debtors ensure that vendors, employees, service and/or utility providers a paid promptly during these cases. The inability to make these payments would cause immediate and irreparable harm to the Debtors' estate by hamstringing the Debtors' operations. In addition, as debtors in possession, the Debtors have a fiduciary duty to protect and maximize the estates' assets. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). There is no potential harm to creditors to weigh against this vital interest of the Debtors in the free use of their unencumbered cash and cash on hand.

40. Moreover, it is important that the Debtors maintain the confidence of the customers they service, the counterparties with whom they do business, and the employees that provide essential day-to-day services for the Debtors. The Debtors' ability to access Cash Collateral during these chapter 11 cases will provide all parties in interest with assurance as to the stability of the Debtors' operations. Accordingly, the use of Cash Collateral will not diminish Mosing's or ERS's interests in property of the estates or any other creditor, instead it will provide a significant benefit to the estates and all parties in interest.

**C.      The Court Should Schedule a Final Hearing.**

41. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court schedule a final hearing on the Motion as soon as practicable and fix the date prior to the final hearing for the filing of objections to the Motion.

**NOTICE**

42. Notice of this Motion shall be provided to the following entities: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) Mosing; (d) the United States Attorney's Office for the District of Delaware; and (e) the Internal Revenue Service. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

**NO PRIOR REQUEST**

43. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the proposed Interim Order, substantially in the form of the attached hereto as Exhibit A; (ii) after the Final Hearing, enter a final order substantially in the form that shall be filed with the Court; and (iii) grant such other and further relief as this Court deems just and proper.

Dated: August 9, 2015
Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

 */s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
R. Craig Martin (DE 5032)
Daniel N. Brogan (DE 5723)
Kaitlin M. Edelman (DE 5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com
craig.martin@dlapiper.com
daniel.brogan@dlapiper.com
kaitlin.edelman@dlapiper.com

*Proposed Counsel to Debtors and Debtors in Possession*