**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ZLOOP, INC., *et al*., [1] | Case No.  15-11660 (XXX) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ROBERT M. BOSTON IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Robert M. Boston, being duly sworn, depose and say:

1.     I am the Chairman and Chief Executive Officer of ZLOOP, Inc. ("ZLOOP"). ZLOOP holds 100% of the membership interests of each of ZLOOP Nevada, LLC ("ZLOOP Nevada") and ZLOOP Knitting Mill, LLC ("ZLOOP KM" and, together with ZLOOP and ZLOOP Nevada, the "Debtors"), the above-captioned debtors and debtors in possession.

2.     Mr. Boston, Co-founder of the Company, has served as CEO and Chairman since May 2012. From 2008 to 2012, he was Co-owner and CEO of United Branding Group, LLC based in Concord, NC, which specialized in bringing new and emerging brands/services to market through manufacturing, distribution, marketing, and shelf placement. From 2002 to 2006, Mr. Boston was President and CEO of Rosedale Ice Company, LLC based in Rosedale, MD, the number one maker and distributor of bulk ice in the Baltimore/Washington DC area. From 1994 to 2002, he started, grew and sold several companies in the Beverage and Vending industries. Mr. Boston started his career as a salesman in 1988 at Coca-Cola Enterprises, Inc. based in Baltimore, MD, where he became the number one salesman in the Company's history, outperforming counterparts 4 to 1.

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are:  ZLOOP, Inc. (2960); ZLOOP Nevada, LLC (7516); ZLOOP Knitting Mill, LLC (7098). The location of the Debtors' headquarters and the service address for each of the Debtors is 816 13th Street NE, Hickory, NC 28601.

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

4.     The Debtors remain in possession of their assets and continue to manage their businesses and properties as debtors in possession as permitted by Bankruptcy Code sections 1107 and 1108.

5.     No trustee, examiner or committee has been appointed in these chapter 11 cases.

6.     The Debtors have filed or anticipate filing the following motions and applications (collectively, the "First Day Motions"):

(a)     Motion of the Debtors for Entry of an Order Directing the Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion");

(b)     Motion Of Debtors and Debtors in Possession for Entry of an Order Extending the Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements Motion");

(c)     Motion of the Debtors for Entry of an Order (I) Approving the Continued Use of the Debtors' Cash Management System, Existing Bank Accounts and Business Forms, and (II) Extending the Deadline to Comply with the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code (the "Cash Management Motion");

(d)     Motion of Debtors for Entry of an Order Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Compensation, and Employee Benefits, and (B) Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing (the "Employee Wage Motion");

(e)     Motion of Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices, (II) Determining

That the Utilities are Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "<u>Utilities Motion</u>");

(f)     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Pay All Obligations Arising Thereunder, (B) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies, and (II) Granting Certain Related Relief (the "<u>Insurance Motion</u>"); and

(g)     Motion of the Debtors for Interim and Final Orders (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection; and (III) Scheduling a Final Hearing (the "<u>Cash Collateral Motion</u>").

7.      Additionally, the Debtors anticipate filing at the outset of these chapter 11 cases, among other things, (a) a plan of reorganization (the "<u>Plan</u>"), related disclosure statement (the "<u>Disclosure Statement</u>") and a motion to approve the Disclosure Statement and voting solicitation procedures and forms; (b) a motion seeking to set an early bar date in these cases; (c) applications seeking authorization for the Debtors to retain certain professionals in connection with these cases; and (d) a motion seeking to establish interim compensation procedures for such professionals.

8.      I am submitting this Declaration in support of the Debtors' chapter 11 petitions and First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, employees or other representatives of the Debtors. If I were called as a witness, I would testify consistently with the facts set forth in this Declaration.

9.      This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these chapter 11 cases. Section I of this Declaration provides an overview of the Debtors' operations. Section II recounts the events preceding the bankruptcy

filings.  Section III affirms and incorporates facts that support the relief requested in the First Day Motions.

## I.    Overview of the Debtors' Business.

### A.    Description of Debtors' Operations.

10.    ZLOOP, Inc. ("ZLOOP" or the "Company," and together with its debtor affiliates, the "Debtors") is a 100% landfill free eWaste[2] recycling company headquartered in Hickory, North Carolina.  Founded in 2012 to address the large, untapped, fragmented market opportunity for recycling eWaste, the Company offers eWaste recycling and data destruction services through its Hickory, NC Super Center location.[3]  The Company provides all levels of government, corporations, and consumers with secure, fast and audited data destruction services, as well as end-of-life recycling of outdated or out-modeled electronics of all types.

11.    ZLOOP is an early-revenue company.

12.    Currently, it is estimated that the world creates 240 million tons of eWaste per year, of which only 10% actually gets recycled or reused.  In the United States, eWaste is growing by 5 percent annually and accounts for 70 percent of overall toxic waste.  Municipal recycling programs typically do not include eWaste services.  As a result, over 80% of eWaste recycled in the United States is shipped to other countries for processing and landfill deposit.  Landfills release the toxic heavy metals such as mercury, copper and lead, into the environment.

13.    ZLOOP provides three types of services: (i) end of life recycling for electronics

---

[2] eWaste is an ubiquitous term used to cover almost all types of electrical and electronic equipment (EEE) that has or could enter the waste stream. Examples include TVs, computers, mobile phones, iDevices, stereo systems, toys, small and large appliances (white goods) – almost any household or business item with circuitry or electrical components with power cords or battery supply.

[3] The ZLOOP Super Centers are designed to have capacity to handle the anticipated volume of eWaste in a 300 mile radius from each planned Super Center site.  Presently, ZLOOP – Hickory is located at 816 13th St NE, Hickory, NC 28601; and ZLOOP – Fernley is located at 190 Resource Drive, Fernley, NV 89408.  The Hickory plant went operational in January of 2014. While ZLOOP has place deposits on equipment for the Fernley, NV plant, the Fernley plant is not operational.

and electrical equipment; (ii) on-site and off-site secure and audited data destruction; and (iii) pre-consumer, post-consumer, and mixed plastics recycling. ZLOOP is 100% Landfill Free™, which means that all produced non-salable, including waste dust and tailings, are disposed of or destroyed by incineration per federal, state and local regulations. Zloop owns 8 registered trademarks 4 pending trademarks and 1 provisional process patent.

### 1. End of Life Recycling

14.    ZLOOP provides end-of-life recycling services that eliminate all downstream environmental and other liabilities for their customers. Utilizing a unique array of machines, ZLOOP is able to domestically transform all electronics into feeder-stock commodities and is 100% Landfill Free™. Commodities reclaimed in the recycling process include copper, silver, gold, platinum, palladium, nickel, lead, steel, stainless steel, plastics, green boards, processors and memory chips.

15.    Copper Wire is the Company's secondary focus. Its wire processing machines are able to remove and separate the copper wire from plastic and other sheathing, producing #1 and #2 copper scrap.[4] Wire is recovered from demolition and construction sites, automotive salvage yards, as well as in bulk from Africa, Europe and Asia. Each machine is capable of running 1,500 pounds per hour. Copper Aluminum Radiators are the Company's tertiary focus. The same machines that "clean" copper wire for scrap are also capable of separating the aluminum from the copper in radiators. The source feed is commercial and residential cooling units, automotive and refrigerators found in scrap yards. Each machine is capable of running 1,500 pounds per hour.

16.    Utilizing real-time weight measurements from every output conveyor ZLOOP is

---

[4] #1 and #2 copper scrap refer to smelting industry standards of prepared scrap metals with #1 copper scrap having the greatest value as it is the purest and most desired by smelters.

able to provide real-time mass balancing as well as 24/7 access to audit reports via ZLOOP's proprietary customer portal.    Additionally, utilizing Samsung's iPolis camera technology, ZLOOP is able to provide customers visual access when their product is running.    Scales audit 100% of the input and output in terms of weight.    End of Life Recycling accounted for $452,356 revenue from start of operations through August of 2014 and 52% of the business; and accounts for $848,554 revenue for the last 11-month period and 82% of the business.

### 2.  Data Destruction

17.    ZLOOP's data destruction system reduces media to unrecognizable separated commodities, providing customers with zero landfill and zero downstream liability.    The information destruction methods are in complete compliance with HIPAA, FACTA, Gramm-Leach-Bliley, Sarbanes-Oxley Act and various other state, federal, and corporate compliance measures.    The data is irretrievable.

18.    ZLOOP ensures that the chain of custody is secure from the customer's location to the off-site recycling center.    For clients who desire in-person verification of data destruction, ZLOOP also provides mobile on-site services.    First, all electronics are inventoried by serial number and tagged with a proprietary ZLOOP Centers bar code for easy identification and tracking.    Next, all electronic data is rendered irretrievable by data destruction methods that meet or exceed HIPAA, FACTA, Gramm-Leach-Bliley and various other state and federal compliance measures.    Additional security protocols, such as degaussing (magnetically erasing data), can be executed based upon each client's approved data destruction plan.    Asset tags are then removed, and the materials are shredded to a 10mm particle size using an industrial hammer mill.    Upon completion, ZLOOP provides the customer with a report listing the serial number and services performed for each device, as well a Certificate of Data Destruction, which is backed by data

liability insurance.

19.     Data Destruction accounted for $11,334 revenue from start of operations through August of 2014 and 3% of the business; and accounts for $103,780 revenue for the last 11 months and 10% of the business.

### 3. Plastics Recycling

20.     Plastics represent the most landfilled or shipped-abroad commodity of recycling eWaste.   ZLOOP offers the following pre-consumer, post-consumer, and mixed plastics recycling services:

- Plastic Separation – ZLOOP utilizes sorting technology that uses both mechanical and hand selection of plastics of different types and colors.

- Metal Detection – ZLOOP utilizes metal detection equipment prior to granulating as another step of ensuring a premium commodity stream.

- Granulation – ZLOOP uses state-of-the-art granulators reducing materials to 3/8 of an inch.

- Dusters – Each ZLOOP granulator uses de-dusting technology ensuring a premium commodity stream.

- Ready To Ship – ZLOOP packages each box separately sealed in a plastic bag so there is no chance for contamination.

21.     Plastic recycling services accounted for $339,211 revenue from start of operations through August of 2014 and 46% of the business; and accounts for $79,687 revenue for the last 11-month period and 8% of the business.

### B.     Organizational Structure of the Debtors.

22.     ZLOOP, Inc., a Delaware corporation, holds 100% of the membership interests in

Debtors Zloop Nevada, LLC and Zloop Knitting Mill, LLC. ZLOOP, Inc. also holds 100% of the membership interests of ZLOOP International, Ltd., a Belize limited liability company. Robert M. Boston and Robert S. LaBarge each hold approximately 48.54% of the issued and outstanding common stock of ZLOOP, Inc., with certain other individual non-debtors holding the remaining approximately 2.93% stock in ZLOOP, Inc. A schedule of stock holdings in ZLOOP is attached as Exhibit A. ZLOOP International, Ltd. holds no assets and conducts no business. Accordingly, ZLOOP intends to seek relief from its requirement to file periodic financial reports under Rule 2015.3 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

23.     ZLOOP was originally organized with the advice of counsel to raise capital through the sale of regional eWaste collection franchises. In 2012 and 2013, ZLOOP sold 15 franchises: 3 in North Carolina, 8 in Texas, 3 in Louisiana, and 1 in West Virginia. Of the 15 ZLOOP franchises, 11 (8 in Texas, 3 in Louisiana) were purchased by Kendall Garrett Mosing ("Mosing").

24.     In the Spring of 2014 following the Hickory, NC plant becoming operational, with the advice of counsel and an investment banking firm engaged by ZLOOP to assist in raising additional capital, ZLOOP converted from a limited liability company to a Delaware corporation, agreed to rescind or repurchase all franchises and was engaged in soliciting additional capital.

### C.      The Debtors' Prepetition Capital Structure.

25.     As of the Petition Date, the Debtors' unaudited consolidated balance sheet reflect total assets of approximately $25 million, including the land and improvements, but excluding certain commodity inventories that are the output of eWaste recycling, and total liabilities of approximately $32 million. The Debtors' material debt obligations include a disputed

approximate $10 million debt claimed by Mosing arising out of the franchise rescission agreement, a disputed $14 million claim asserted by Mosing (the "Mosing Patriot Claim"), approximately $3.5 million owed to Eagle Group Finance, L.P related to the mortgage on the Fernley, Nevada facility, and approximately $400,000.00 in trade debt. The Debtors' books also reflect notes payable to the two co-founders.

### 1. Secured Debt

26.     The loan agreement in the amount of $3.5 million between Eagle Group Financing, L.P. and Debtor ZLOOP Nevada, LLC is secured by the Debtors' interest in 190 Resource Drive, Fernley, Nevada 89408.  Loan terms include 12-months, interest only. Debtors pre-paid 6-months of interest.  The Debtors intend to sell this facility early in their chapter 11 cases.

### 2. Unsecured Debt

27.     As of the Petition Date, ZLOOP is the defendant in tow actions commenced by Mosing.  The first was initiated in Louisiana and seeks to assert damages in the approximate amount of $28 million, on account of both Mosing's claim for payment under the rescission agreement and the Mosing Patriot Claim.  The second is an action commenced in Texas, but is limited solely to the Mosing Patriot Claim.  The litigation is described in greater detail below.

28.     As of the Petition Date, the Debtors estimate that they have approximately [$400,000.00] of unsecured trade debt and other outstanding operating expenses, including approximately $187,000.00 in contract labor expenses and approximately $160,000.00 in equipment setup expenses.

29.     29.     Robert M. Boston and Robert S. LaBarge have both lent personal capital into the company in order to fund the day to day operations of the debtor as well as legal fees for

both the Mosing claims and the ERS and REI claims. Mr. Boston has lent the debtors $507,146 and Mr. LaBarge has lent the debtors $55,250.

### 3.   Equity Interests

30.      ZLOOP, Inc. has a total of 100,000.00 authorized shares, of which 10,069.54 shares are issued and outstanding.  Robert M. Boston and Robert S. LaBarge each hold 4,887.47. The remaining 294.6 shares are held by the individuals listed on Exhibit A.  An additional 889.54 shares are unissued and reserved for issuance under warrants to purchase common stock.

## II.   <u>Events Leading to Chapter 11.</u>

### A.   Construction Issues

31.    ZLOOP was introduced to ERS by Recycling Equipment, Inc. ("ERI").  ERI solicited ZLOOP's business and represented itself to be experienced in the recycling business. After gaining ZLOOP's confidence, REI introduced ZLOOP to E Recycling Systems, LLC ("<u>ERS</u>"), a broker for German and Italian recycling equipment manufacturers.  Together ERI and RES represented that they had the experience and expertise to assist ZLOOP in the design, installation, training, maintenance and operation of highly efficient eWaste recycling production lines.

32.    In September 2012, ZLOOP began contractual negotiations with ERS and managing member James Cunningham for the purchase of a new large scale eWaste recycling system capable of processing 20,000 pounds of eWaste per hour (the "<u>eWaste System</u>") and two Wire Processing Systems capable of processing 4,000 of wire or cable per hour (the "<u>Wire Systems</u>" and together with the eWaste System, the "<u>Systems</u>").

33.    ZLOOP management was invited to accompany Cunningham on a trip to Europe to demonstrate ERS' high quality eWaste recycling systems, including a "sorting hut", which

Cunningham described as "hospital grade."  ZLOOP subsequently entered into two separate agreements with ERS in November 2012: the Agreement for the Sale and Purchase of Electronic Waste Processing System (the "eWaste Agreement") and the Agreement for the Sale and Purchase of Wire Processing Systems (the "Wire Agreements" and together with the eWaste Agreement, the "ERS Agreements").  Under the ERS Agreements, ZLOOP agreed to purchase systems similar to those Cunningham displayed in Europe.  In addition, ZLOOP acquired the exclusive rights to the configuration of the Systems in the United States for one year.  ZLOOP agreed to pay a total of $6,215,600: $4,763,600 for the eWaste system, and $1,452,000 for the Wire Systems.

34.    After entering into the ERS Agreements, ZLOOP began marketing efforts targeting potential franchisees and investors, and as a result, a number of franchisees entered into franchise agreements with ZLOOP.  ZLOOP's customer marketing efforts were also successful, resulting in several eWaste processing contracts.  For example, ZLOOP entered into a $7 million agreement to recycle millions of Keurig brand coffee brewer units.

35.    ERS began piecemeal delivery of the Systems in May 2013, and test runs of parts of the Systems began in the fall of 2013.  The Systems that ERS delivered were damaged, missing parts and components, used, of inferior quality, and failed to meet contractual specifications.  As such, they could not be properly installed and failed to function properly (or, in some cases even operate at all).  For example, ERS guaranteed that the Wire Systems would process 4,000 pounds of wire per hour; however, the Wire System at the Hickory plant can run only 1,500 pounds per hour, and the second Wire System, intended for the Fernley plant, was never operational.  Similarly, the eWaste System cannot process 20,000 pounds of eWaste per hour on a consistent basis.

36.    The condition of the Systems caused ZLOOP over a nine month delay and negatively impacted ZLOOP's production, revenue, and customer reputation.  On May 30, 2014, ZLOOP filed suit against ERS and Cunningham in the United States District Court for the Western District of North Carolina, Statesville Division, asserting claims for breach of contract, unfair and deceptive trade practices, negligent misrepresentation, fraud, fraudulent inducement, and tortious interference with contract.[5]

37.    Further, on July 31, 2015, ZLOOP commenced an action against REI and others in the Catawba County, NC Superior Court, asserting claims for breach of contract, unfair and deceptive trade practices, negligent misrepresentation, fraud, fraudulent inducement, and tortious interference with contract.

### B.    Mosing Franchises and Contributions

38.     On October 15, 2012, Mosing entered into three franchise agreements with ZLOOP for the purchase of the three Louisiana franchises (the "Louisiana Franchise Agreements").   The Louisiana Franchise Agreements granted Mosing the right to operate ZLOOP recycling businesses in assigned territories in Louisiana.   Together the territories covered by the 3 franchises granted to Mosing control over the entire state of Louisiana.

39.    On October 20, 2012, Mosing purchased a 1% equity interest in ZLOOP for $1 million, reflecting an $100 million valuation.  He purchased an additional 1% equity interest in ZLOOP on January 5, 2013, at the same price.  On October 1, 2013, Mosing and ZLOOP entered into a grant agreement by which ZLOOP granted Mosing a warrant to purchase up to 5.0% of the Class B Interests (as defined in the ZLOOP, LLC Operating Agreement) at a purchase price per

---

[5] The case was originally docketed as Case No. 5:14-CV-87, in the Western District of North Carolina, Statesville Division, but was consolidated with the earlier-filed related case, Recycling Equipment, Inc. v. E Recycling Systems, LLC, Case No. 14-CV-56.  The cases were consolidated for discovery, and Case No. 5:14-CV-87 was administratively closed.

$0.01 of Class B Interests of $10,000.00 (the "Option Agreement").

40.    Mosing subsequently visited ZLOOP's North Carolina headquarters, and served as an advisor to the board of ZLOOP, LLC.  Mosing had access to ZLOOP's financial books and records, audits, and entity minutes.  Mosing and his representatives and agents assumed responsibility for ZLOOP's accounting, prepared and filed ZLOOP's tax returns, and approved disbursements and expenditures.

41.    Mosing also agreed to provide security for a $14 million revolving line of credit from Patriot Bank in favor of ZLOOP (the "Line of Credit").  The Line of Credit was first evidenced by a promissory note dated December 17, 2013, in the amount of $5 million, of which ZLOOP received $4 million and Mosing received $1 million as a return of capital Mosing previously contributed to ZLOOP.  A promissory note between ZLOOP, LLC and Patriot Bank dated April 29, 2014 (the "Note") refinanced the December 17, 2013 note and reflects that the Line of Credit was reissued in the increased amount of $14 million to ZLOOP LLC, notwithstanding that ZLOOP converted to a corporation the prior month.  As security for the Note, Mosing assigned as collateral a deposit account he maintained at Patriot Bank.  The proceeds of the Line of Credit were used for additional infrastructure in the Hickory, NC Super Center and the purchase of the Fernley, NV property. Thereafter, Mosing received an additional $400,000.00 from the Line of Credit.  From the inception of the Line of Credit through August 11, 2014, ZLOOP made regular interest payments pursuant to the terms of the Note.

42.    On January 2, 2014, Mosing exercised his right under the Option Agreement to purchase an additional eight ZLOOP franchises for $10 million, which purchase was "funded" by (i) a note issued by Mosing in the principal amount of $800,000 made in favor of ZLOOP; (ii) applying $1 million previously paid for the option on the Texas franchises; and (iii) converting

loans made by Mosing to ZLOOP in the amount of $7.5 million, plus $700,000 in accrued interest.  The majority of the loans, $5.5 million, was evidenced by two unsecured promissory notes.  As a result of their application toward the purchase of the Texas franchises, the notes were extinguished.  Mosing executed eight separate franchise agreement for each of the eight Texas franchises (the "Texas Franchise Agreements").

        **C.**      **Loeb Capital Raise & Franchise Rescission**

43.     On February 5, 2014, ZLOOP entered into an agreement with Loeb Partners Corporation to raise capital of between $40-80 million for the national expansion of Zloop's business.

44.     On March 26, 2014, ZLOOP was converted from a Delaware LLC to a Delaware corporation.

45.     Loeb Partners advised ZLOOP to rescind the franchises, because the franchise model of raising capital appeared to be impeding Loeb's efforts to raise additional capital.

46.     ZLOOP followed Loeb Partners' advice and solicited rescission of all franchises.  On or about March 27, 2014, ZLOOP sent all franchisees a written Offer to Repurchase Franchises, which provided each franchises with the option to (i) accept a cash amount equivalent in value to the amount paid for the applicable franchise (the "Rescission Option"); or (ii) accept (a) shares of the Company's common stock, par value $0.01 per share (the "Common Stock") equivalent in value to the amount paid for the sale of the applicable franchise, and (b) warrants to purchase the same amount of Common Stock (the "Equity Option").

47.     The solicitation was successful, and all franchise agreements were rescinded.  Of the nine franchisees, six chose the Equity Option, two chose a mixed Rescission Option and Equity Option, and one – Mosing – chose the Rescission Option.  In April 2014, Mosing and ZLOOP executed a Termination Agreement for his eleven franchises in Texas and Louisiana, on

account of which ZLOOP would provide payment in the amount of $10,989,179.00 by December 31, 2014. Through the Termination Agreement Mosing "unconditionally and immediately" released ZLOOP, and others, "from any and all claims, demands, obligations and liabilities whatsoever, known or unknown, whenever arising.

### D.    Mosing Litigation

48.    Notwithstanding that ZLOOP's obligation under the rescission Termination Agreement did not mature until December 31, 2014, and that ZLOOP was in the middle of the Loeb Partners' capital raise, and notwithstanding that ZLOOP was not in default of the Patriot Bank Line of Credit, on August 28, 2014, Mosing filed suit in the United States District Court for the Western District of Louisiana, Lafayette Division, seeking to recover the obligations owing under the Termination Agreement and the funds pledged to Patriot Bank to secure the Line of Credit and damages for alleged securities laws violations (the "First Action").

49.    At the time of filing of this First Action, ZLOOP's payments on the Line of Credit were current, and payment of the principal amount of the loan was not due for another twenty months. As a result of Mosing's filing suit to recover the funds, and despite having received a broad, immediate and unconditional release by Mosing just several months before, ZLOOP did not tender or pay two monthly payments of interest due after the complaint was filed.

50.    On November 19, 2014, ZLOOP filed a Motion to Transfer the First Action to the Western District of North Carolina pursuant to 28 U.S.C. § 1404(a), relying on the forum selection clauses in the franchise agreements. The Louisiana Franchise Agreements and accompanying Disclosure Documents included clearly stated and broadly worded North Carolina forum selection and choice of law clauses. The Magistrate Judge assisting the Louisiana District Court, recommended that the District Court grant the Motion to Transfer on June 25, 2015.

51.    Upon information and belief, in December 2014, Mosing and Patriot Bank

entered into an agreement, whereby Mosing would purchase the Line of Credit documents and claim.  Upon information and belief, the Assignment and Assumption of Loan Documents (the "Assignment") was back-dated effective October 3, 2014.  Neither Mosing nor Patriot Bank informed ZLOOP of the Assignment or negotiations thereof.  Following the Assignment, Mosing asserts that he allegedly sent a letter to ZLOOP on December 12, 2014, informing ZLOOP of the Assignment and declaring the entire indebtedness immediately due and owing; however, neither ZLOOP nor its principals received this letter.  To date, neither ZLOOP nor its principals have received any notice of default, notice of intent to accelerate, or notice of acceleration.

52.    On December 15, 2014, Mosing filed a second action against ZLOOP in the District Court of Harris County, Texas to recover the same $14 million under the Line of Credit (the "Second Action").[6]  The jurisdictional basis for the Second Action is a forum selection clause in the Note.  ZLOOP removed the case to the United States District Court for the Southern District of Texas, Houston Division, on the basis of diversity jurisdiction.[7]  Mosing sought remand on the grounds that ZLOOP had contractual waived its right of removal.  On April 22, 2015, the Texas District Court granted the motion to remand.  Mosing subsequently filed a motion for summary judgment, which ZLOOP opposed, and which remains pending as of the Petition Date.  ZLOOP has also filed a Motion to Stay the Second Action pending further discovery, which also remains pending.  The First Action and the Second Action are stayed by virtue of the filing of these chapter 11 petitions in bankruptcy.

## III.    Facts in Support of First Day Motions.[8]

---

[6] District Court of Harris County, Texas, Case No. 2014-72492.

[7] United States District Court for the Southern District of Texas, Houston Division, Case No. 15-cv-136-GHM.

[8] Capitalized terms used but not defined in this Section III shall have the meanings ascribed to them in the applicable First Day Motion.

53.     Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions.  The Debtors request that each of the First Day Motions described below be granted, as each constitutes a critical element in ensuring a smooth transition into bankruptcy and a successful outcome for the Debtors and their estates in these chapter 11 cases.

### A.     Joint Administration Motion.

54.     By the Joint Administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of these chapter 11 cases and the consolidation thereof only for procedural purposes pursuant to Bankruptcy Rule 1015.   In addition, the Debtors request that the Clerk of the Bankruptcy Court make an entry on the docket of each of the Debtors' cases, other than the ZLOOP, Inc. case, stating that an order has been entered directing joint administration of these chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the ZLOOP, Inc. docket.

55.     The Debtors are all related entities and are filing petitions in the same Bankruptcy Court.   I believe that joint administration will be less costly and burdensome than separate procedural administration of the estates due to the combined docket and combined notice to creditors and parties in interest.  Many applications, motions, orders, hearings and notices will be made in these cases and will affect all of the Debtors and their estates.  Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.   In addition, since the Debtors are seeking only administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

56.     I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service.  This unnecessary duplication of

identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Bankruptcy Court's resources.

57.    Therefore, I believe that the chapter 11 cases should be jointly administered for procedural purposes only, and the Joint Administration Motion should be approved.

**B.    Schedules and Statements Motion.**

58.    By the Schedules and Statements Motion, the Debtors request that the Bankruptcy Court enter an order extending the time within which the Debtors must file their schedules of assets and liabilities and statement of financial affairs through and including 45 days after Petition Date, or September 23, 2015.

59.    I, along with other of the Debtors' employees, officers and professionals have been focused on assisting the Debtors with respect to numerous motions filed with the Court in the early days of these chapter 11 cases, including the Debtors' efforts to file a plan of reorganization early in these cases.

60.    In light of this and other critical matters, and the volume of material that must be compiled and reviewed by the Debtors' officers and professionals in order to complete the Schedules and Statements, I believe there is more than ample "cause" for granting the requested extension.

61.    Therefore, I believe that an extension of time for the Debtors to file their Schedules and Statements is appropriate, and the Schedules and Statements Motion should be approved.

**C.    Cash Management Motion.**

62.    By the Cash Management Motion, the Debtors seek entry of an order (a) approving the Debtors' continued use of their current cash management system and the Debtors' existing bank accounts and business forms, (b) authorizing the Debtors to open and

close bank accounts as necessary in the ordinary course of business, (c) granting the Debtors a 60-day extension to either comply with the requirements of section 345(b) of the Bankruptcy Code or file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code, and (d) authorizing all banks participating in the Debtors' cash management system to honor certain transfers and charge back fees and certain other amounts.

63.     In the ordinary course of business, the Debtors maintain 2 bank accounts that operate in connection with a centralized cash management system (the "Cash Management System").  Specifically, the Debtors maintain (1) a general operating account; and (2) a separate account for payroll.

64.     A list of the Bank Accounts is attached to the Cash Management Motion as Exhibit A.  Through the Bank Accounts, the Debtors efficiently collect, transfer and disburse funds generated from their operations on a daily basis.  The Debtors employ various methods to deposit, withdraw, and otherwise transfer funds to, from and between the Bank Accounts, including checks, automated clearing house transactions, direct deposits and electronic funds transfers.  Debtor Zloop, Inc. is the operating entity.  The other two Debtors own real estate leased to Debtor Zloop, Inc., subject to a triple net lease.  Therefore, there is little potential that the Debtors will be incapable of maintaining segregated books and records, or that the Debtors will be incapable of closing their books and records as of the Petition Date.

65.     In addition, in the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms, including electronic forms and paper forms, preprinted letterhead and related documents (collectively, the "Forms").

66.     I believe that by using the existing Cash Management System, Bank Accounts and investment practices, the Debtors will avoid unnecessary expense and delay that would

disrupt the ordinary financial affairs and business operations of the Debtors, delay the administration of the Debtors' estates, and increase the costs to the estates. I believe that the relief requested in the Cash Management Motion will help to ensure the Debtors' orderly entry into chapter 11 protection and will avoid many of the possible disruptions and distractions that could divert Debtors' attention from more pressing matters during the initial days of these chapter 11 cases. Any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates, and altering the Cash Management System may disrupt payments to key vendors and employees.

67.     I believe that preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition operations and (b) assist the Debtors in their efforts to reorganize and preserve value. In addition, allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in accomplishing a smooth transition to operating in chapter 11 and help avoid any disruption in the Debtors' relationships with critical customers and suppliers.

68.     Further, due to the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, I believe it is important that the Debtors be permitted to continue to use the Forms without alteration or change and without the "Debtor in Possession" designation. Otherwise, the estates will be required to bear a potentially significant expense that I believe is unwarranted. Once the paper Forms are depleted, the Debtors will then replace them with forms containing the "Debtor in Possession" designation.

69.     I believe that the relief requested in the Cash Management Motion is essential to

avoid unnecessary and potentially costly disruptions to the Debtors' operations, avoid potentially irreparable harm, is in the best interest of the estates and, therefore, should be granted.

**D.      Employee Wage Motion.**

70.      By the Wage Motion, the Debtors are requesting the entry of an order authorizing, but not directing, the Debtors to pay certain pre-petition wages, salaries, and other compensation, and authorizing and directing the Banks, as defined in the Cash Management Motion, to receive, process, honor, and pay all checks presented for payment and electronic payments requests relating to the foregoing.

71.      As of the Petition Date, the Debtors employ 8 full-time employees (the "Employees"), excluding the officers of the Debtors.

72.      RUN powered by ADP calculates employee withholding and employer taxes and pays them at each payroll on behalf the Debtors.

73.      The Employees are paid on a bi-weekly basis, and the combined average payroll for the Employees for any pay period, exclusive of payroll taxes, is approximately $7,500 ("Base Compensation").  The Employees are paid every other Friday for a 14-day period ending 6 days before the Friday pay date.  In the ordinary course of business, the Debtors provide the funds necessary to meet their payroll obligations before the close of business on Wednesday before payroll.  The Debtors' next scheduled payroll date is August 14, 2015, and such payroll will cover the period ending August 7, 2015.  As a result of adhering to this payroll process, the Debtors will be required to fund postpetition a payroll with approximately seven (7) days of prepetition obligations owed to their Employees.  The Debtors estimate that, as of the Petition Date, there is an aggregate amount of approximately $6286 in earned, but unpaid salary or wages, as applicable, owed to the Employees ("Unpaid Base Compensation").

74.      Approximately $180,000 of unpaid base compensation is owed to the two officers

of the Debtors.  Mr. Boston and Mr. LaBarge have not taken pay since May 2015, and the annual salary for each was $130k when taken.  Debtors do not seek to pay the officers' pre-petition unpaid base compensation by the Employee Wage Motion.

75.     The Debtors' Employees are essential to the orderly and successful reorganization of the Debtors.  The Employees have an intimate knowledge of the operation of the Debtors' businesses and any deterioration in Employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the Debtors' ability to operate their businesses, the value of the Debtors' assets and businesses, and, ultimately, their ability to reorganize.

76.     In addition, I believe that there are no amounts owed to any single Employee of the Debtors for compensation in excess of the $12,475 cap set forth in Bankruptcy Code section 507(a)(4), and all payments to such Employees will be within the cap set forth in Bankruptcy Code section 507(a)(4) and (5).

77.     For these reasons, and for the reasons and legal arguments set forth in the Employee Wage Motion, I believe that the relief sought in the Employee Wage Motion should be granted.

     **E.**    **Utilities Motion.**

78.     By the Utilities Motion, the Debtors are requesting entry of interim and final orders (a) prohibiting utilities from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition invoices, (b) determining that the utilities are adequately assured of future payment, and (c) establishing procedures for determining adequate assurance of payment.

79.     As mentioned above, the Debtors operate a service based business that relies on a myriad of machinery and hand tools that require the continuous provision of utility services, such as electricity, natural gas, oil, water, sewer, telecom, trash collection and/or other services (each,

a "Utility Service" and collectively, the "Utility Services") from local and/or regional utilities

(each a "Utility Company" and collectively, the "Utility Companies"). The Debtors' average

monthly obligations to the Utility Companies total approximately $4,396.00 in the aggregate.

80.     I believe that uninterrupted Utility Services are essential to the ongoing operations

of Debtors and, therefore, to the successful resolution of these cases. Any interruption of Utility

Services, even for a brief period of time, would negatively affect the Debtors' operations,

including their ability to provide services to their customers, thereby seriously jeopardizing the

Debtors' restructuring efforts and, ultimately, recoveries for their creditors. It is, therefore, critical

that Utility Services continue uninterrupted during these chapter 11 cases.

81.     The Debtors propose to provide "assurance of payment" to Utility Companies,

within twenty (20) days after the Petition Date, by placing a cash deposit (the "Adequate

Assurance Deposit") equal to the cost of Utility Services for a period of two weeks, calculated

based on the historical weekly average costs, into a newly created, segregated account (the

"Utility Deposit Account") for the benefit of any Utility Company, unless any such Utility

Company agrees in writing to a lesser amount, is paid in advance for Utility Services, or already

holds a deposit equal to or greater than two weeks of Utility Services. The Debtors estimate that

the total amount of such deposit would be approximately $2,198.00. The Debtors submit that the

establishment of the Adequate Assurance Deposit, in conjunction with Debtors' ability to pay for

future utility services in the ordinary course of business, constitutes adequate assurance of

payment to the Utility Companies.

82.     Finally, the Debtors propose to protect the Utility Companies by establishing the

Adequate Assurance Procedures provided in the Utilities Motion, whereby any Utility Company

may request additional adequate assurance in the event that it believes there are facts and

circumstances with respect to its providing post-petition services to the Debtors that would merit greater protection.

83.    Therefore, I believe that the Utility Companies have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

### F.    Insurance Motion.

84.    By the Insurance Motion, the Debtors seek authorization to (a) maintain existing insurance policies and pay all obligations arising thereunder, whether occurring pre-petition or post-petition, and (b) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in their business judgment.

85.    The Debtors maintain 5 insurance policies (the "Insurance Policies") that are issued by several third-party insurance carriers (collectively, the "Insurance Carriers") and collectively provide coverage for, among other things (a) general liability, (b) automobile liability, (c) environmental liability coverage, (d) excess liability, and (f) workers' compensation.

86.    As of the Petition Date, the Debtors owe approximately $28,000 in past-due premiums on account of the Insurance Policies.

87.    I believe that payment of obligations owing in connection with the Insurance Policies and the renewal, revision, extension, supplementation, or change of existing Insurance Policies and entering into new insurance policies as needed in the Debtors' business judgment are necessary to protect and safeguard the Debtors' ongoing operations and ensure compliance with the UST Guidelines.  Also, failure to pay amounts related to the Insurance Policies as and when they come due may harm the Debtors' estates, including because Insurance Companies may terminate coverage.

88.    I believe that failure to maintain the Insurance Policies will result in imminent and irreparable harm to Debtors' estate and their creditors and, therefore, the relief requested in the

Insurance Motion is in the best interest of the estates and should be granted.

**G.      Cash Collateral Motion.**

89.      By the Cash Collateral Motion, the Debtors seek authorization to use Cash Collateral in order to fund their operations and pay the administrative expenses of these chapter cases.

90.      The Debtors file the Cash Collateral Motion out of an abundance of caution, because the Debtors believe that rather and (b) a finding that neither Mosing nor ERS holds an interest in cash collateral, or if either holds such an interest, the lien is unenforceable, not perfected and avoidable.   Consequently, I believe that there is a reasonable likelihood the Debtors will prevail at a final hearing under section 363(e) of the Bankruptcy Code, especially in light of the burden of proof on Mosing and ERS under section 363(p)(2) of the Bankruptcy Code.   Accordingly, the Debtors also seek an order including a finding that neither Mosing nor ERS is entitled to adequate protection in in connection with the Debtors' use of Cash Collateral.

91.      In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs.   In addition, the Debtors require cash on hand to fund these chapter 11 cases and to successfully reorganize.

92.      I believe the Debtors have sufficient cash that is not subject to any security interest to maintain ongoing day-to-day operations and fund their working capital needs and the costs and expenses of these chapter 11 cases.   The Debtors have prepared a 13-week projected cash flow for the operation of their business during the first 13 weeks of these bankruptcy cases, which projection is attached hereto as Exhibit B.

93.      Prior to the commencement of these chapter 11 cases, the Debtors contracted for a search of the public records in North Carolina and Delaware.   The search results revealed that on or about August 14 and 15, 2014, several months following Mosing's grant of broad, immediate

unconditional releases in favor of ZLOOP and others and about two weeks before commencing the First Action, Mosing's litigation counsel filed UCC-1 financing statements against ZLOOP, Inc. and possibly others, identifying substantially all assets of the Debtors as collateral, including cash and bank accounts and the proceeds of all such property. Neither ZLOOP, Inc. nor ZLOOP, LLC granted Mosing a security interest in any property. Neither Mosing nor ZLOOP is party to an account control agreement. ZLOOP believes that Mosing is not in possession of any property of ZLOOP. In the event Mosing holds a security interest in cash collateral and the filing of the UCC-1 financing statement acted to perfect such interest, Mosing's interest is unenforceable and avoidable under, among others, 11 U.S.C. §§ 544, 547 and 548.

94.    The search results further revealed that in or about October, 2014, ERS filed UCC-1 financing statements against ZLOOP, Inc. and possibly others, identifying substantially all assets of the Debtors as collateral, including cash and bank accounts and the proceeds of all such property. Neither ZLOOP, Inc. nor ZLOOP, LLC granted ERS a security interest in any property. Neither ERS nor ZLOOP is party to an account control agreement. In the event ERS holds a security interest in cash collateral and the filing of the UCC-1 financing statement acted to perfect such interest, ERS's interest is unenforceable and avoidable under, among others, 11 U.S.C. §§ 544, 547 and 548.

95.    I understand that a UCC-1 financing statement alone is ineffective to grant a security interest and that a grant is a necessary condition to holding a security interest in property of ZLOOP. ZLOOP never executed or delivered to either Mosing or ERS a grant of a security interest.

96.    I understand that in order to perfect a security interest in cash and bank accounts, the alleged secured creditor must be in possession of the Debtors' cash or in control of the

Debtors' Bank Accounts.  Neither Mosing nor ERS is party to an account control agreement with ZLOOP and One Community Bank respecting Debtors' Bank Accounts.  Accordingly, neither Mosing nor ERS holds a security interest in any of the Debtors' property, and even if such a security interest does exist, neither Mosing's nor ERS's alleged security interest is perfected.

97.     Out of an abundance of caution, however, the Debtors are seeking authorization to use Cash Collateral, to the extent Mosing or ERS asserts a secured interest in the Debtors' Cash Collateral, to ensure there are no unnecessary interruptions to the Debtors' operations that would cause immediate and irreparable harm to the Debtors and their entities.

98.     Such use of Cash Collateral would be necessary to, among other things, pay vendors, employees, service and/or utility providers and to otherwise properly service the Debtors' customers and operate their businesses.  The inability to do any of these would cause immediate and irreparable harm to the Debtors and their estates.

99.     Mosing and ERS may assert—but do not hold—a security interest in a broad variety of the Debtors' assets, including the Debtors' cash and proceeds of their other properties that upon receipt would constitute Cash Collateral.  The Debtors have never granted a security interest to Mosing and Mosing and ERS have not obtained a judgment and executed on any accounts or other property of the Debtors.  Consequently, while Mosing and ERS may assert that each enjoys a lien resulting from filed UCC-1 financing statements, such statements do not in themselves grant a lien and Mosing and ERS have no other basis to assert an interest as each is not a party to any contract or other agreement that would create such an interest.

100.    Neither Mosing nor ERS is the bank holding the Debtors' accounts, and the Debtors' accounts are no in Mosing's or ERS's name, shared or otherwise.  Additionally, while Mosing and ERS have filed UCC-1 financing statements asserting various interests, neither

Mosing nor ERS is a party to an account control agreement by which the Debtors' bank agrees to follow Mosing's and ERS's instructions.

101.    I believe that because neither Mosing, ERS, nor any other party holds valid, perfected, enforceable and unavoidable an actual interest in the Debtor's Cash Collateral, no party is entitled to adequate protection or will be prejudiced in any way by the Debtors' proposed use of Cash Collateral.

102.    Therefore, I believe that the relief requested in the Cash Collateral Motion is in the best interest of the estates and should be granted.

*[Signature page follows.]*

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and current to the best of my knowledge and belief.

Dated: August 9,  2015

By:_Robert M. Boston
Title: Chairman and Chief Executive Officer