## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ZLOOP, INC., et al.,[1] | Case No. 15-11660 (KJC) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: Oct. 14, 2015, 2:00 p.m. (EDT) |
| | Obj. Deadline: Oct. 8, 2015, 4:00 p.m. (EDT) |

## KENDALL G. MOSING'S MOTION FOR LEAVE PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 TO REQUEST DOCUMENTS FROM, AND CONDUCT EXAMINATION OF, DEBTORS AND CERTAIN THIRD PARTIES

Kendall G. Mosing ("Mosing") hereby moves pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004") for the Court to enter an order (substantially in the form of the proposed Order attached hereto as Exhibit A) authorizing Mosing to request documents from, and conduct examination of, one or more of the Debtors and the non-debtor parties as identified herein (the "Motion"). In support of this Motion, Mosing respectfully states as follows:

### INTRODUCTION

1.     The Debtors are start-up ventures that have been managed and controlled by Robert Boston ("Boston") and Robert LaBarge ("LaBarge") since the Debtors' formations in or after 2012.

2.     Per the Debtors, Mosing is the Debtors' largest unsecured creditor. Indeed, the Debtors identified Mosing (or entities alleged to be affiliated with Mosing) as holding approximately $24,189,179 of the $25,831,929 in claims identified in the Debtors' *Consolidated*

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are: ZLOOP, Inc. (2960); ZLOOP Nevada, LLC (7516); and ZLOOP Knitting Mill, LLC (7098). The location of the Debtors' headquarters and the service address for each of the Debtors is 816 13th Street NE, Hickory, NC 28601.

*List of Creditors Holding the Twenty Largest Unsecured Claims* (filed with their petitions) [D.I. 1] (the "Unsecured List"),[2] or 93.64% of the total amount of unsecured claims identified by the Debtors in the Unsecured List.

3.    As an undisputed party-in-interest in these bankruptcy cases, Mosing hereby respectfully moves the Court for the authority to conduct Rule 2004 discovery from the Debtors and certain third parties, all as more fully detailed in Exhibits B - P hereto.

4.    Good cause exists for the Court to grant the Motion. As noted above, Boston and LaBarge have controlled the Debtors since their formation and remain in control of the Debtors in their bankruptcy cases. Their leadership, however, has been disastrous. For example, prior to the Debtors' petition date, the Debtors: (i) failed to manage the purchase and/or installation of equipment necessary for the Debtors' regular business operations, leaving the Debtors without the ability to operate and impairing the Debtors' reputation in the marketplace; (ii) mortgaged a previously unencumbered asset (the Nevada facility) mere months prior to the petition date, and then dissipated the funds obtained under that mortgage prior to the petition date; and (iii) otherwise spent tens of millions of dollars, but have never been profitable.

5.    Moreover, there are serious concerns regarding Boston's and LaBarge's exercise of control over the Debtors, including whether Debtor assets have been misused by Boston and/or LaBarge including in order to fund personal or other non-Debtor expenses.[3] For example,

---

[2] Mosing's claims may be in excess of the amounts identified by the Debtors in the Unsecured List and Mosing reserves his rights to identify and prosecute his claims against the estate at the appropriate time(s).

[3] As described in more detail below, Boston has been accused of fraudulent business activity by different parties at different times. For example, Boston was accused of actual fraud, constructive fraud and breach of fiduciary duty in connection with his ownership and management of a company (D.B. Concrete Construction, Inc. ("DB")) as against whom an involuntary petition for relief was filed. In that case, the duly-appointed chapter 11 Trustee (a partner at DLA Piper), represented by DLA Piper as his counsel, filed a complaint against Boston under which the Trustee alleged that Boston implemented a "scheme to use the Debtor's cash and accounts to fund his personal expenses and the expenses of his

Boston appears to have used substantial assets of the Debtors for the purpose of creating a career in motorsports racing for Boston's son, Justin Boston. According to a complaint filed recently against the Debtors (and others) by Kyle Busch Motorsports, Inc. ("KBM"), under Boston's and LaBarge's leadership, the Debtors agreed to pay KBM no less than *$6.4 million* for a two-year contract (beginning in January 2015) for Justin Boston to act as a driver for KBM, and the Debtors are alleged to have paid KBM at least *$1.55 million* in the several months preceding the Debtors' petition date. Moreover, upon information and belief, prior to entering into the KBM contract, Boston similarly misused his position with the Debtors to cause the Debtors to pay millions of dollars in motorsports sponsorship fees, first to create and then to sustain his son's racing career.

6.      These are staggering amounts. But as further described below, they may only be the tip of the iceberg of the potential misuse of the Debtors' funds. For example, approximately $14 million of the amounts owed by the Debtors to Mosing were received by the Debtors beginning in December of 2013 and continuing into 2014. As of the petition date, however, the Debtors reported cash on hand of only $18,583. Similarly, in 2015, Boston and LaBarge caused the Debtors to mortgage the Debtors' Nevada facility (a previously unencumbered property) and the Debtors received millions of dollars in that transaction. However, mere months later, again, the Debtors reported holding only $18,583 in cash in these bankruptcy cases. Under Boston and LaBarge, then, the Debtors have burned through millions of dollars, including several millions of dollars shortly before the petition date, but appear to have little to show for it.

7.      Good cause also exists for the Court to grant this Motion because (i) as described above, Mosing is a significant creditor in these cases and (ii) the Debtors' filings confirm that the

---

family, including payment on non-business personal mortgages and expenses related to extravagant real estate owned by Boston and Mrs. Boston." *See* Amended Complaint (the "DB Compl."), ¶ 26; *see also infra*, ¶¶ 15, 19-26. A copy of the DB Compl. is attached hereto as Exhibit Q.

Debtors have a limited budget for their bankruptcy cases, including for estate professionals. In this regard, the Debtors budgeted approximately $161,250 for payment of their professionals through and including September 2015, and the Debtors made no separate provision in their budget for other estate professionals. While the Debtors assume (under their budget) that they will realize funds from the sale of certain real property, the Debtors also have represented to the Court that they intend to file a plan of reorganization that will pay creditors 100%. *See* Transcript of First Day Hearing at 31:1-4, *In re Zloop Inc. et al.*, Case No. 15-11660 (KJC)(Bankr. D. Del. Aug. 11, 2015) [D.I. 30] ("Hearing Transcript"). Accordingly, it is clear that neither the Debtors nor their estates have the funding necessary to support an investigation of the Debtors' assets, property and transfers, without, at a minimum, significantly depleting the estates and potential recoveries to the estates' creditors.

8.      By this Motion, then, Mosing seeks targeted discovery regarding the Debtors' assets, payments and other transfers. This discovery will help to answer the questions that hang over Boston's and LaBarge's management of the Debtors, including who received the tens of millions of dollars spent by Boston and LaBarge while they have been in control of the Debtors. Moreover, granting the relief requested by Mosing hereunder will contribute to the overall progression of these bankruptcy cases while maximizing the preservation of estate assets for the benefit of the Debtors' creditors.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

9.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are Section 105(a) of the Bankruptcy Code and Rule 2004.

4

## BACKGROUND

### A.    The Bankruptcy Filings

10.    On August 9, 2015, ("Petition Date"), the above-captioned debtors (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court").

11.    The Debtors filed their Unsecured List with their respective petitions. [D.I. 1]. Mosing is identified as the Debtors' largest unsecured creditor in the Unsecured List. *See id.* Approximately $14 million of the amounts identified in the Unsecured List as owed to Mosing was received by the Debtors beginning in December 2013 and into 2014. Upon information and belief, early in 2015, the Debtors also received several millions of dollars by mortgaging their Nevada facility in a transaction under which the Debtors' obligations may have been personally guaranteed by Boston and LaBarge. Notwithstanding the Debtors' receipt of each of these substantial amounts, the Debtors had only $18,583 in cash as of the Debtors' Petition Date. *See* D.I. 77, 78, 79.

12.    The Unsecured List includes other alleged unsecured creditors including: (i) Recycling Equipment Inc. ("REI"), who is alleged by the Debtors to hold a disputed claim in the amount of $234,107 (*see* Unsecured List); and (ii) E Recycling Systems, LLC ("ERecycling"), who is alleged by the Debtors to hold a disputed claim in the amount of $312,460 (*id.*). On September 2, 2015, the United States Trustee appointed each of REI, ERecycling and Carolina Metals Group ("Carolina") to the Official Committee of Unsecured Creditors ("Committee"). The Debtors did not include Carolina in the Unsecured List, and therefore (presumably) Carolina may hold a claim against the Debtors in an amount less than $6,755, the lowest amount identified for a creditor in the Unsecured List. *See* Unsecured List.

RLF1 12898539v.3

B.    **The First-Day Hearing and Related Matters**

13.    On August 11, 2015, the Court held a first-day hearing in these cases. Boston was in Court, and the Debtors presented Boston as their first-day affiant and moved the admission into the record of Boston's related declaration (the "Declaration"). Hearing Transcript at 6:19-21. Through August of 2014, Boston represented that the Debtors had generated approximately $802,901 in revenue from their business operations. Declaration, ¶¶ 16, 19, 21. During the 11 months preceding their Petition Date, Boston represented that the Debtors had generated approximately $1,032,021 in revenue. *Id.* Thus, according to Boston, the Debtors have generated less than $2 million in revenue since their formation in 2012.

14.    Boston included certain information regarding his pre-Zloop employment in his Declaration. There, he discussed his employment from 1988 to the present, and he identified several positions that he held for the time periods of 2002 to 2006 and 2008 to 2012. *See id.* ¶ 2. Boston did not, however, disclose that he had been the President and 50% owner of DB prior to October 2007, and the sole shareholder of DB and its President after October 2007 (through at least DB's petition date). *See id.*; DB Compl. ¶¶ 5-6.

15.    Boston's failure to disclose his ownership and management of DB may not have been accidental. DB was subject to an involuntary petition filed in July of 2008, and a petition for relief was entered against DB in August of 2008. According to the Trustee in DB's bankruptcy case (a partner at DLA Piper, represented by DLA Piper in the lawsuit against Boston), Boston committed actual fraud at DB:

> Boston treated the Debtor as his personal cash register looting the Debtor's funds and causing the Debtor to incur extensions of credit in a scheme of actual fraud against the Debtor's creditors and those who extended credit to the Debtor . . . . Boston's scheme reduced the Debtor to the position where it had been stripped of funds and was unable to pay its debts.

DB Compl. ¶ 26.  Accordingly, Boston's failure to disclose his ownership and management of DB in his Declaration may have been an intentional effort to avoid disclosure of the significant allegations of actual fraud made against him by the Trustee in DB's bankruptcy case.

### C.   Legal Actions Filed By or Against Boston, LaBarge and/or the Debtors

16.    As noted by the Debtors in their first-day filings with this Court (*see* Declaration ¶¶ 48-52), the Debtors are party to two prepetition actions filed by Mosing, one pending in the United States District Court for Louisiana (the "Louisiana Action") and one pending in the United States District Court for the Western District of Texas (the "Texas Action").

17.    The Texas Action was filed by Mosing in December 2014, and seeks to recover on claims arising from the Debtors' failure to repay $14 million drawn by the Debtors on a credit facility at Patriot Bank ("Patriot").  Mosing provided security to Patriot in connection with the credit facility and Mosing succeeded (by assignment) to Patriot's rights under the credit facility. As of the Petition Date, a motion for summary judgment was briefed and pending in the Texas Action and a hearing on that motion had been scheduled with the Texas court.

18.    The Louisiana Action was initiated in August 2014.  The complaint in that matter (the "LA Complaint") includes eight separate counts, including counts relating to violations of Federal Securities laws (which includes four sub-counts), Louisiana Blue Sky laws, Louisiana Business Opportunity Law and Louisiana Unfair Trade Practice Law, and fraud, conversion, breach of contract, detrimental reliance and negligent misrepresentation.  Boston and LaBarge are defendants in that action, a fact not disclosed by Boston in his Declaration. *See* Declaration ¶¶ 48-51.

19.     The LA Complaint is very detailed and includes multiple allegations of the misuse of funds and/or fraudulent or other wrongful acts of Boston and/or LaBarge.  These allegations include (among others):

i.     Boston and LaBarge solicited investments in, and financing for, the Debtors through the issuance and dissemination of private placement memorandum and other materials that contained false and misleading information regarding the Debtors, their business operations and/or prospects (*see* LA Complaint ¶¶ 58,62);

ii.    Debtors' counsel (McGuireWoods) advised Boston and LaBarge that their solicitation materials were misleading and the Debtors were required to issue revised, complete and accurate solicitation material, and Boston and LaBarge reacted to that advice by causing the Debtors to fire counsel (*see id.* ¶¶ 53,62);

iii.   Boston and LaBarge caused a falsified UCC financing statement that on its face included a stamp showing that it had been filed with the North Carolina Secretary of State to be delivered to Mosing for the purpose of inducing Mosing to believe that he had a perfected security interest (*see id.* ¶ 78); and

iv.    When Boston was confronted with the fact of the false UCC financing statement, Boston's response was to attack the inquiry with aggressive, vulgar language and to threaten litigation (*see id.* ¶ 78) ("Be for warned that I will sue the s[**]t out of you personally.  And I will F[***]ING WIN!!! ON a final note go F[***] YOURSELF.").

20.     Mosing is not the only party to accuse Boston and/or LaBarge of fraud and other wrongful acts in connection with their tenure with the Debtors.  ERecycling, a Committee member, is plaintiff under a counterclaim filed against Boston and LaBarge in an action originally filed by the Debtors against ERecycling (and others).  *See E Recycling Systems, LLC's Amended and Restated Counterclaim against Robert Boston and Robert LaBarge* (filed August 31, 2015) (the "ERecycling Counterclaim") (copy attached hereto as Exhibit R).  Therein, ERecycling alleges that Boston and/or LaBarge stole ERecycling's intellectual property as part of a scheme to create an "eWaste or other recycling system for resale to ZLOOP at a cheaper

8

price" than the Debtor could purchase from ERecycling. *See id.* ¶ 12. If that were not bad enough, ERecycling also alleges that Boston and/or LaBarge attempted to cause fake invoices to be delivered to the Debtors so that Boston and/or LaBarge could pocket the difference between the true cost of the equipment and the amount that Boston and/or LaBarge would cause the Debtors to pay on account of such fake invoices:

> As part of this transaction, Boston and/or LaBarge reached an agreement with REI for the purchase of the copied recycling systems for a purchase price of $1.7 million, or thereabouts. . . .
>
> As part of this transaction, Boston and/or LaBarge did request that REI invoice ZLOOP for the sale of the copied recycling system in the amount of $5 million, so that Boston and/or LaBarge would receive and personally retain a "kickback" of approximately $3.3. million as a direct consequence of Boston and/or LaBarge's unlawful misappropriation of [ERecycling's] protected Trade Secrets.

ERecycling Counterclaim ¶¶ 13-14. Moreover, according to ERecycling, Boston and/or LaBarge actually personally benefitted from this fraudulent scheme:

> Boston and/or LaBarge did, in fact, realize personal gain of at least $200,000.00 as an initial down payment received from REI and in connection with overbilling or other schemes directly connected with Boston and/or LaBarge's misappropriation of [ERecycling's] Trade Secrets as set forth herein.

*Id.* ¶ 15.

21.    The complaint filed by Sarah Frisbey ("Frisbey") against each of the Debtors, Boston, LaBarge and non-debtor Hooch House, LLC ("Hooch House") (copy attached hereto as Exhibit S) is another example of alleged fraudulent and/or wrongful conduct by Boston and/or LaBarge. As reflected therein, Frisbey alleges that Boston and LaBarge controlled Hooch House and caused Hooch House to enter into an agreement for the purchase of certain real property. *See id.* ¶¶ 2-25. The Debtors are not alleged to be parties to Frisbey's agreement with Hooch House (*see id.*), but Boston and/or LaBarge are alleged to have caused the *Debtors* to pay the

9

deposit due to Frisbey from Hooch House. *See id.* ¶ 20. Frisbey also alleges that Boston threatened Frisbey not to pursue her legal remedies after Hooch House breached its agreement with Frisbey. *See id.* ¶ 45.

22.    The allegations of fraud and wrongful conduct described above echo allegations earlier made against Boston in the DB bankruptcy case and, as further described below, in a personal bankruptcy proceeding Boston filed in 2010. As reflected in the DB Complaint, the Trustee there alleged that Boston committed actual fraud, constructive fraud and breach of fiduciary duty in connection with Boston's ownership of, and exercise of control over, DB. According to the DB Trustee, Boston "treated the Debtor [DB] as his personal cash register looting the Debtor's funds and causing the Debtor to incur extensions of credit in a scheme of actual fraud against the Debtor's creditors . . . ." *See* Ex. Q, ¶ 26. Moreover, Boston was alleged to have "breached his fiduciary duty by (i) causing the Debtor to pay Boston's personal expenses, (ii) transferring the Debtor's funds to himself and his family members, and (iii) causing the Debtor to incur debts which it could not repay." *Id.* ¶ 90.[4]

23.    Similar allegations were made against Boston in the personal bankruptcy case he filed in the United States Bankruptcy Court for the District of Maryland in July of 2010 (Case No. 10-27262). There, Boston was sued by the State Employees Credit Union of Maryland, Inc. ("SECU") for (among other things) actual fraud. *See* <u>Exhibit U</u> hereto. According to SECU,

---

[4] As noted immediately below, after the DB Trustee sued Boston, Boston's wife and Boston's son, Boston (and his wife) filed a personal bankruptcy case. Counsel for the DB Trustee noted in their final fee application that the DB Trustee and counsel had determined that there was no prospect for recovery as against Boston and his family in light of Boston's bankruptcy filing. *See Application of Counsel to Trustee for Allowance of Final Compensation and Expenses Consisting of: (I) The Time Period of October 21, 2010 through December 22, 2011 and (II) Final Approval of the Interim Fee Awards* [D.I. 305], filed July 26, 2012 (copy attached as <u>Exhibit T</u>), p. 5 ("The Trustee, with the assistance of the Trustee's Attorneys, reached a determination that no recovery could be obtained against the principal owner of the Debtor and Debtor's family. (The Debtor and his wife filed Chapter 7 bankruptcy cases).").

RLF1 12898539v.3

Boston caused DB to issue false documentation in order to secure funding from SECU and in order to "divert funds from [DB] to support his lavish lifestyle including, but not limited to, maintaining multi-million dollar vacation homes in Deep Creek, Maryland and Ocean City, Maryland." *Id.* ¶ 8.

24.    Boston's use of company funds for the benefit of himself and/or his family members was recently highlighted by the complaint filed by KBM against the Debtors, Justin Boston (Boston's son) and Justin Boston Racing, LLC, on or about August 6, 2015.  *See* Exhibit V hereto.  As alleged thereunder, under Boston's and LaBarge's leadership, the Debtors agreed to pay KBM no less than *$6.4 million* for a two-year contract (beginning in January 2015) for Justin Boston to act as a driver for KBM, and the Debtors are alleged to have paid KBM at least *$1.55 million* in the several months preceding the Debtors' petition date. *Id.* ¶¶ 15-16. Aside from KBM, the clear beneficiaries of the Debtors' largesse were Boston, Justin Boston and Justin Boston Racing, LLC (and any members thereof).  Upon information and belief, prior to entering into the KBM contract, Boston also caused the Debtors to pay other persons or entities significant amounts (perhaps millions of dollars) in order to create, promote and maintain a career for his son, Justin Boston, as a driver in motorsports racing.

25.    Finally, in addition to its lawsuit against ERecycling, the Debtors have sued another Committee member, REI, under a verified complaint (signed by LaBarge) (copy attached (without exhibits) as Exhibit W hereto) filed on or about July 31, 2015, mere days prior to their Petition Date.  Under that complaint, the Debtors allege that: (i) Boston and LaBarge initially planned to conduct operations through EZ Computer Recycling, LLC, before forming Zloop and conducting operations thereunder (*id.* ¶ 14); (ii) Boston and LaBarge had limited experience with recycling before they formed debtor Zloop (*id.* ¶ 19); (iii) REI and ERecycling agreed to serve as

the Debtors' "recycling industry experts" (*id.* ¶¶ 77-79); (iv) Boston and LaBarge relied on REI and ERecycling to "provide all of the equipment necessary to meet Zloop's business plan" (*id.* ¶ 93); (v) "LaBarge and Boston were not qualified to inspect the equipment when physically delivered, or to determine operational abilities or performance of the equipment" (*id.* ¶ 135); and (vi) the equipment purchased by the Debtors from ERecycling was deficient and not properly installed, and the Debtors' ability to conduct business operations was thereby "paralyzed" (*id.* ¶ 148 ).

26.     Moreover, as alleged by the Debtors: (vii) the "value of the Systems received by Zloop is substantially less than the amount paid by Zloop pursuant to the Purchase Agreements" (*id.* ¶ 202); (viii) REI's actions caused the Debtors to lose customers and goodwill in the market place (*id.* ¶ 203); and (ix) REI's actions caused the Debtors to lose significant revenue and profits. *See id.* The Debtors pray for over $5 million in alleged compensatory, consequential and special damages, as well as punitive damages, treble damages and other relief. *Id.* p. 41.

**D.     The Debtors' Schedules and Statements and Issues Related Thereto**

27.     On September 9, 2015, the Debtors filed their respective Schedules of Assets and Liabilities [D.I. 77,78,79] ("Schedules") and Statements of Financial Affairs [D.I. 80,81,82] ("SOFAs").

28.     Notwithstanding the Debtors' verified allegation (in their complaint against REI) that the equipment the Debtors purchased from REI and/or ERecycling is worth "substantially less than the amount paid by Zloop pursuant to the Purchase Agreements," upon information and belief, the Debtors relied on the "inflated" purchase price of the subject equipment in their Schedules. *See* Schedule B, Question 29. Boston executed the Schedules (*see id.*, p. 33). The Debtors continue to use the "inflated" purchase price of the subject equipment in other filings in

this Court. *See* Monthly Operating Report of Zloop, Inc. [D.I. 108], p. 26, Balance Sheet (executed by LaBarge (*see id.*, p. 1)).

29.    On September 11, 2015, Mosing informed the Debtors of certain preliminary concerns with the Debtors' Schedules and SOFAs, including the lack of information contained therein. *See* Exhibit X hereto. These concerns included the Debtors' failure to include information regarding several non-ordinary transactions by the Debtors, including (but not limited to) the Debtors' payment of substantial sums (within the 2 years prior to the Petition Date) to former interest holders who had alleged that the Debtors, Boston and/or LaBarge had committed misrepresentations, and the amounts paid by the Debtors to create, fund and maintain Justin Boston's career as a motor sports driver. *See id.* p. 1. Mosing also informed the Debtors of property that, upon information and belief, appears to have been acquired by Boston and/or LaBarge and/or their family members during their tenures with the Debtors. *See id.* pp. 1-2.

30.    As described above, Boston filed a personal bankruptcy case in or about 2010. However, none of the property identified in Mosing's September 11 letter appears to have been disclosed by Boston in his personal bankruptcy petition. *See* Exhibit Y, Boston Petition and Statement of Financial Affairs, Questions 10 and 14, Schedule A (Real Property), Schedule B (Personal Property), Items 13 and 14 (business interests). Moreover, Boston reported that he earned no income during the fiscal years of 2008, 2009 and through the date of his bankruptcy filing in July 2010. *See id.*, Statement of Financial Affairs, Question 1.

31.    As of the date of this Motion, the Debtors have not responded to the September 11 letter or the concerns stated therein.

RLF1 12898539v.3

E.    **Mosing's Rule 2004 Discovery**

32.    Mosing's proposed discovery requests are attached hereto as Exhibits B - P.  As set forth therein, Mosing requests authority to serve written requests for the production of documents upon each of:

> (i) the Debtors;
>
> (ii) Justin Boston and Justin Boston Racing, LLC, individuals and/or entities that are alleged to have benefitted from millions of dollars spent by the Debtors;
>
> (iii) KBM and Venturini Motorsports, motor sports companies that may have entered into contracts with the Debtors, Boston or related entities, and received millions of dollars from the Debtors;
>
> (iv) entities affiliated with, or believed to be affiliated with, Boston and/or LaBarge, including (a) EZ Computer Recycling Centers, LLC, (b) Best Properties Holdings, LLC, (c) Hooch House, (d) EZ Holdings of Hickory, LLC, (e) Hickory Commercial, LLC and (f) BJB LLC;
>
> (v) Caron Boston and Robyn LaBarge, the spouses of each of Boston and LaBarge, as each of them (upon information and belief) received funds or other benefits from the Debtors and/or may maintain an interest in entities identified in (iv) above;
>
> (vi)  Community One Bank N.A., the only financial institution known to Mosing or disclosed to date by the Debtors at which the Debtors maintained accounts prior to the Petition Date; and
>
> (vii) Eagle Group Finance, LP, an alleged secured creditor of the Debtors, who may also be the beneficiary under personal guarantees entered into by Boston and/or LaBarge.

33.    Mosing's requests to the Debtors are targeted to identify documents and information related to the Debtors' assets, property or transfers. *See* Exhibit B.  For example, they require the Debtors to produce documents regarding: (i) transfers of interest in property; (ii) employment or related agreements including with one or more of Boston or LaBarge; (iii) other contracts or agreements under which the Debtors may have transferred any interest in property;

14

(iv) accounts payable and bank account records; and (v) other documents that relate to the Debtors' assets, finances, property or other interests.

34.     Mosing's requests to the non-Debtor parties are even more targeted.  Generally, they require each such party only to produce documents regarding any contract with, or transfer from, the Debtors (*see* Exhibits C - P) or, in the case of financial institutions, documents that will reflect the Debtors' receipt and disposition of funds. *See id.*

## RELIEF REQUESTED

35.     By this Motion, Mosing seeks an Order authorizing Mosing to request documents from the Debtors and non-debtor parties as provided in the discovery requests attached hereto as Exhibits B - P, and to conduct the examination of such persons or entities in connection with the production of documents.

## BASIS FOR RELIEF REQUESTED

36.     "On motion of any party in interest, the court may order the examination of any entity" and "the attendance of an entity for examination and for the production of documents . . . may be compelled as provided in Rule 9016." *See* Fed. R. Bankr. P. 2004. "Rule 2004 is the basic discovery device in bankruptcy cases." 9 *Collier on Bankruptcy* 2004.01[1], p. 2004-3 (16th ed. 2015).

37.     "The purpose of Rule 2004 examination is 'to show the condition of the estate and to enable the court to discover its extent and whereabouts and to come into possession of it that the rights of creditors may be preserved.'" *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (*citing Cameron v. United States*, 231 U.S. 710, 717 (1914)). Examination may include (among many other things) any matter which may affect the "administration of the Debtors' estate" including any matter relevant to the case or to the

formulation of a plan. *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) ("Legitimate goals of Rule 2004 examinations include discovering assets, examining transactions, and determining whether wrongdoing has occurred.") (internal citation and quotations omitted); *2435 Plainfield Ave., Inc. v. Twp. of Scotch Plains (In re 2435 Plainfield Ave., Inc.*), 223 B.R. 440, 456 (Bankr. D.N.J. 1998) ("A Rule 2004 exam has been explained as a broad investigation into the financial affairs of the debtor for the purpose of the discovery of assets of the estate and the exposure of fraudulent conduct."); Fed. R. Bankr. P. 2004(b) (examination may relate to "acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the Debtors' estate").

38.     Rule 2004 discovery is proper to aid in the attempt to "discover assets of the debtor which may have been intentionally or unintentionally concealed." *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996). Rule 2004 discovery also is not limited to use by debtors and official committees and creditors and other parties in interest may obtain such discovery consistent with the express language of Rule 2004. *See In re Lehman Bros. Inc.*, 2008 WL 5423214, at *2-3 (Bankr. S.D.N.Y. Nov. 26, 2008) (granting motion filed by individual creditors to conduct Rule 2004 examination for the purpose of "determining what is owed to these individuals" and whether there are other parties entitled to relief); *People's Bank v. Poirier (In re Poirier)*, 214 B.R. 53, 58 (Bankr. D. Conn. 1997) ("The broad scope and ready availability of a Rule 2004 Examination provides a forum for an individual creditor to question a debtor at great length on all matters relevant to the Debtors' financial affairs . . . ."); *In re Valley Forge Plaza Associates*, 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990) ("[T]he particular purpose for which [Rule] 2004 and its predecessor provisions under the Bankruptcy Act were promulgated. . . . is to allow a Trustee, or others interested in accomplishing the same ends, to discover and investigate

how to bring to light possession of assets of the debtor which might be intentionally concealed or overlooked in ignorance or haste.").

39.     Moreover, the scope of discovery permitted under Rule 2004 is unfettered and broad. *See In re Wash. Mut., Inc.*, 408 B.R. 45, 49-50 (Bankr. D. Del. 2009) (noting that a "Rule 2004 examination is commonly recognized as more in the nature of a fishing expedition") (internal citations and quotations omitted); *see 9 Collier on Bankruptcy* 2004.02[1], p. 2004-6 (16th ed. 2015) (quoting *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985)); *see also In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("The understanding generally acceptable today is that the scope of a Rule 2004 examination is very broad."); *In re Cont'l Forge Co.*, 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987) (noting that the general purpose of Rule 2004 is to locate assets and to make those assets available for creditors).

40.     Thus, a Rule 2004 examination affords a party in interest an opportunity to conduct a wide-ranging examination with respect to a Debtors' financial affairs. *See In re Texaco, Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987). And "[b]ecause the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation." *In re Ionosphere Clubs*, 156 B.R. 414, 432 (S.D.N.Y. 1993); *see also In re Mattera*, 2007 WL 1813763, at *2 (Bankr. D.N.J. June 13, 2007) ("[T]hird parties having knowledge of the Debtors' affairs, as well as a debtor itself, are subject to examination.") (citation and quotations omitted); *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373, 378-79 (Bankr. E.D. Pa. 1988) (granting creditor's request to conduct a Rule 2004 examination on third party after noting that "third parties as well as the debtor can be examined under Rule 2004" where those third parties are

shown to have "knowledge of a Debtors' acts, conduct or financial affairs so far as this relates to a Debtors' proceeding in bankruptcy").

41.     Here, there is no dispute that Mosing is a "party in interest" with standing to seek authorization for, and to undertake, discovery pursuant to Rule 2004. *See* 11 U.S.C. § 1109(b) ("A party in interest, including . . . a creditor . . . may raise and may be appear and be heard on any issue in a case under this chapter.").

42.     Moreover, good cause exists for the Court to permit Mosing to pursue Rule 2004 discovery from the Debtors and non-debtor parties.  First, there are substantial questions regarding the Debtors' use and disposition of funds.  Indeed, the Debtors had only $18,583 in the bank as of the Debtors' Petition Date, despite the fact that the Debtors had received several millions of dollars early in 2015 (and over ten million dollars in 2014).  *See supra* ¶¶ 6, 11. Second, the Debtors (under Boston and LaBarge's control) appear to have spent millions of dollars on creating and supporting Justin Boston's racing career and Boston is alleged to have caused the Debtors to spend over $1.5 million in early 2015 alone for this purpose.  *See supra* ¶ 5.  Third, the Debtors' Schedules and SOFAs did not include (at a minimum) information regarding the Debtors' non-ordinary expenditures including payments that may have been made by the Debtors for the benefit of Boston and/or LaBarge.  *See supra* ¶¶ 28, 29.  Fourth, the substantial allegations of fraud and/or other wrongful conduct levelled against Boston, LaBarge and/or the Debtors demonstrate that there is good cause to open the discovery process and to allow Mosing -- one of the most interested parties in these bankruptcy cases -- to begin the process of identifying facts that may lead to the recovery and/or preservation of estate assets.

## NO PRIOR REQUEST

43.     No prior motion for the relief requested herein has been made to this Court or any other court.

## CERTIFICATE OF CONFERENCE

44.     Prior to filing the Motion, counsel for Mosing attempted to confer with the Debtors and the other parties subject to the relief sought hereunder and no agreement with any such parties to permit the discovery requested hereunder was reached as of the filing of this Motion.  Counsel will continue to confer with parties regarding the discovery sought hereunder prior to the hearing on the Motion.

## NOTICE

45.     Notice of this Motion has been given to (a) the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel for the Committee of Unsecured Creditors; (d) counsel for KBM; (e) Justin Boston; (f) Justin Boston Racing, LLC; (g) Venturini Motorsports; (h) EZ Computer Recycling Centers, LLC; (i) Best Properties Holdings; LLC, (j) Hooch House; (k) EZ Holdings of Hickory, LLC; (l) Hickory Commercial, LLC; (m) BJB LLC; (n) Caron Boston; (o) Robyn LaBarge; (p) Community One Bank N.A.; (q) Eagle Group Finance, LP; and (r) those parties requesting notice pursuant to Bankruptcy Rule 2002.

## RESERVATION OF RIGHTS

46.     Mosing reserves his right to request and/or conduct any other discovery, pursuant to Rule 2004 or other applicable law, from any person or entity, including, without limitation, those persons or entities from whom Rule 2004 discovery is sought under this Motion.

RLF1 12898539v.3

## CONCLUSION

WHEREFORE, for the reasons stated herein, Mosing respectfully requests that this Court

enter an Order, pursuant to Rule 2004, in the form attached hereto as Exhibit A, and grant such

other and further relief as is just and proper.

Dated: September 28, 2015
        Wilmington, Delaware

                                  */s/ Marcos A. Ramos*
                                  Paul N. Heath (No. 3704)
                                  Marcos A. Ramos (No. 4450)
                                  Robert C. Maddox (No. 5356)
                                  RICHARDS, LAYTON & FINGER, P.A.
                                  One Rodney Square, 920 North King Street
                                  Wilmington, Delaware 19801
                                  Telephone:  (302) 651-7700
                                  Facsimile:  (302) 651-7701

                                   - and -

                                  Charles M. Kreamer, Sr.
                                  James H. Gibson
                                  ALLEN & GOOCH
                                  2000 Kaliste Saloom Road, Suite 400
                                  Lafayette, Louisiana 70508
                                  Telephone:  (337) 291-1300
                                  Facsimile:  (337) 291-1305

                                   - and _

                                  David S. Rubin
                                  KANTROW SPAHT WEAVER
                                  AND BLITZER
                                  445 North Boulevard, Suite 300
                                  Baton Rouge, Louisiana 70802
                                  Telephone:  (225) 383-4703
                                  Facsimile:  (225) 343-0630

                                  *Counsel for Kendall Garrett Mosing*

RLF1 12898539v.3