# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ZLOOP, INC., *et al.*,[1]<br><br>　　　　　Debtors. | Chapter 11<br><br>Case No. 15-11660 (KJC)<br><br>(Jointly Administered)<br><br>**Hrg. Date: T.B.D.**<br>**Obj. Deadline: T.B.D.** |

## DEBTORS' MOTION TO ESTABLISH AMOUNT OF RESERVES TO BE FUNDED BY DEBTORS FOR DISPUTED SECURED CLAIMS UNDER PLAN ARTICLE IX(E)

ZLOOP, Inc., and certain of its subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), by and through their attorneys, DLA Piper LLP (US), hereby move the Court (the "Motion") for an order establishing the amount of reserves to be funded by the Debtors under the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation Filed by ZLOOP, Inc.* [D.I. 548] (the "Plan")[2] for Disputed Claims asserted by each of E Recycling Systems, LLC ("ERS") and Recycling Equipment, Inc. ("REI"). In support of this Motion, the Debtors respectfully represent:

## PRELIMINARY STATEMENT

1. The Bankruptcy Code grants this Court wide latitude to estimate contingent and/or disputed claims in conjunction with the confirmation of a debtor's plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code.

2. As discussed below, ERS and REI assert substantial, but unsupported and unenforceable, secured claims against the Debtors' estates. These alleged claims will be

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtors' federal tax identification numbers are: ZLOOP, Inc. (2960); ZLOOP Nevada, LLC (7516); and ZLOOP Knitting Mill, LLC (7098). The location of the Debtors' headquarters and the service address for each of the Debtors is 816 13th Street NE, Hickory, NC 28601.

[2] Defined terms used but not defined in this Motion shall have the meaning ascribed in the Plan.

- 1 -

Disputed Claims under the Plan. In order to permit the Debtors to move expeditiously towards confirmation of their Plan, this Motion seeks the estimation of the ERS claim as a zero-dollar claim and the REI claim at $40,247.20 for the purposes of establishing a Disputed Claims reserve under the Plan.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. The Debtors consent to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

4. On August 9, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

5. On August 9, 2016, the Debtors filed a motion seeking approval to use their cash collateral (the "Cash Collateral Motion"). The Cash Collateral Motion alleged that "neither Mosing, ERS, nor any other party, holds a valid, perfected, enforceable, and unavoidable interest in the Debtor's Cash Collateral." Cash Collateral Motion, at ¶ 23. Neither REI nor ERS objected or otherwise responded to the Cash Collateral Motion, despite that, if they assert an

interest in the Debtors' property they carry the burden to prove the validity, priority and extent of that interest. *See* 11 U.S.C. § 363(p)(2).

6. On September 2, 2015, the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee") in these cases.

Disputed Claims of ERS:

7. Prior to the Petition Date, debtor ZLOOP, Inc. ("ZLOOP") was introduced by REI to ERS, a broker for German and Italian recycling equipment manufacturers. REI solicited ZLOOP's business and represented itself to be experienced in the recycling business. Together REI and ERS represented that they had the experience and expertise to assist ZLOOP in the design, installation, training, maintenance and operation of highly efficient eWaste recycling production lines.

8. In September 2012, ZLOOP began contractual negotiations with ERS for the purchase of a new eWaste System and two Wire Processing Systems. ZLOOP entered into two separate agreements with ERS in November 2012: the "eWaste Agreement" and the "Wire Processing Agreement." ZLOOP agreed to pay a total of $6,215,600: $4,763,600 for the "eWaste System," and $1,452,000 for the "Wire Processing Systems."

9. ERS began piecemeal delivery of the components of the eWaste System and Wire Processing Systems in May 2013, and test runs of parts of the eWaste System and Wire Processing Systems began in the fall of 2013. The eWaste System and Wire Processing Systems that ERS delivered were damaged, missing parts and components, used, of inferior quality, and failed to meet contractual specifications. As such, they could not be properly installed and failed to function properly (or, in some cases even operate at all) as an integrated system. For example, ERS guaranteed that the Wire Processing Systems would process 4,000 pounds of wire per hour; however, the Wire Processing System at the Hickory plant ran only 1,500 pounds per hour, and

the second Wire Processing System was never operational. Similarly, the eWaste System did not process 20,000 pounds of eWaste per hour on a consistent basis. The Debtors expended considerable resources and efforts to make the eWaste System and Wire Processing Systems, as delivered, operational.

10. The condition of the eWaste System and Wire Processing Systems caused ZLOOP over a nine month delay and negatively impacted ZLOOP's production, revenue, and customer reputation.

11. On May 30, 2014, ZLOOP filed suit against ERS and others, asserting claims for breach of contract, unfair and deceptive trade practices, negligent misrepresentation, fraud, fraudulent inducement, and tortious interference with contract (the "Equipment Action"). Significantly, prior to the commencement of the Equipment Action, ERS had completed delivery of the component parts of the eWaste Agreement and the Wire Processing Agreement.

12. On October 28, 2014—four months after ZLOOP filed suit against ERS and almost two years after the parties entered into the eWaste Agreement and the Wire Processing Agreement—ERS, for the first time, filed a UCC-1 financing statement with each of the Secretary of State for the State of Delaware and the Secretary of State of the State of North Carolina (together the "UCC-1 Statements"), purporting to perfect a security interest in certain of the equipment that constituted the eWaste System and Wire Processing Systems ("Purported Collateral").

13. On November 6, 2015, ERS filed a proof of claim in these Chapter 11 Cases, assigned claim number 13, asserting a claim in the amount of $821,392.53, with $621,560.00 allegedly secured by ERS's purported interest in the Purported Collateral (the "ERS Secured Claim").

14. By virtue of the Equipment Action, Debtors hold Causes of Action against ERS and rights of setoff, under the Plan at Article IX(N) shall be determined and given effect before ERS is entitled to Distributions under the Plan..

Disputed Claims of REI:

15. Further, on July 31, 2015, ZLOOP commenced an action against REI (the "REI Litigation"), asserting claims for breach of contract, unfair and deceptive trade practices, negligent misrepresentation, fraud, fraudulent inducement, and tortious interference with contract.

16. On November 9, 2016, the Court entered the *Order (I) Approving and Authorizing the Private Sales of Surplus Equipment Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Directing Turnover; and (III) Granting Related Relief* (the "Trailer Sale Order") [D.I. 181], which among other things, required the Debtor to remit $40,247.20 of the proceeds of the sale approved thereby to be held in escrow (the "REI Escrow") pending agreement between the Debtors and REI, or entry of a further order of this Court regarding the disposition of the REI Escrow and subject to REI's asserted lien therein and all defenses and lien challenges of the estates.

17. On November 16, 2015, REI filed a proof of claim in these Chapter 11 Cases, assigned claim number 19, asserting a claim in the amount of $855,237.45 with $40,247.20 allegedly secured by the REI Escrow and the remaining $814,990.25 allegedly secured by a right of setoff pursuant to Sections 506 and 553 of the Bankruptcy Code (together, the "REI Secured Claim").

18. By virtue of the REI Litigation, Debtors hold Causes of Action against REI and rights of setoff, which under the Plan at Article IX(N) shall be determined and given effect before REI is entitled to Distributions under the Plan.

19. On August 19, 2016 the Debtors filed their Plan, and, on August 19, 2016, the Debtors filed the *Motion of the Debtors for Entry of an Order (A) Approving the Disclosure Statement on an Interim Basis, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, (C) Approving the Form of Ballot and Solicitation Materials, (D) Establishing the Administrative Expense Bar Date and Voting Record Date, (E) Scheduling a Plan Confirmation Hearing and Deadline for Filing Objections to Final Approval of the Disclosure Statement and Confirmation of the Plan, and (F) Approving the Related Form of Notice* [D.I. 557].

20. The Plan is a liquidating plan that contemplates the distribution of the sale proceeds, together with proceeds of Causes of Action to be pursued following the Effective Date of the Plan, to holders of Allowed Claims in the order of bankruptcy and state law priorities. By agreement of the Professionals, on the Effective Date they will receive Distributions of cash on hand after all Allowed Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims are paid or reserved for in full.

## RELIEF REQUESTED

21. By this Motion, the Debtors seek entry of an order (the "Order"), substantially in the form attached hereto as Exhibit A, pursuant to Bankruptcy Code sections 502(c) and 105(a) estimating the ERS Secured Claim in the amount of zero dollars and the REI Secured Claim in the amount of the REI Escrow, $40,247.20, for the purpose of establishing a reserve for disputed claims under the Plan.

## BASIS FOR RELIEF

22. This Court may estimate the REI Secured Claim and the ERS Secured Claim under section 502(c)(1) of the Bankruptcy Code, which provides that: "There shall be estimated for purpose of allowance under this section – (1) any contingent or unliquidated claim, the fixing

- 6 -

EAST\128005432.2

or liquidation of which, as the case may be, would unduly delay the administration of the case…" 11 U.S.C. § 502(c).

23. Article IX(E) of the Plan provides that:

On any date that Distributions are to be made under the terms of the Combined Plan and Disclosure statement, the Plan Administrator shall reserve Cash or property equal to (100%) of the Cash or property that would be Distributed in such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, unless otherwise ordered by the Bankruptcy Court following notice to the affected Claim Holder. Such cash or property, as the case may be, shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

Plan, at Article IX(E)

24. Additionally, the Plan provides that "[t]he Post-Effective Date Debtor or the Plan Administrator, as the case may be, retain the right to reduce any claim by way of setoff in accordance with their books and records." Plan, at Article IX(N).

25. Although the text of section 502(c) refers only to the estimation of contingent and unliquidated claims, courts have recognized the ability to estimate disputed claims as well in conjunction with a debtor's establishment of reserves for disputed claims under a plan. *See In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 724 (Bankr. E.D. Ky. 2004) (holding that section 502(c) liquidating supervisor had right to seek estimation of disputed claims pursuant to plan of reorganization); *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422-23 (Bankr. S.D.N.Y. 2003) (estimating both liquidated and unliquidated amount of administrative claim under section 502(c)).

26. In addition, although section 502(c) refers to the estimation of claims for the purposes of allowance, courts have estimated claims for other purposes, including setting appropriate reserves for distribution purposes. *See, e.g., JPMorgan Chase Bank v. U.S. Nat'l Bank Assoc'n (In re Oakwood Homes Corp.)*, 329 B.R. 19, 22 (D. Del. 2005) (holding that

- 7 -

bankruptcy court's decision to set reserve at $0 for a disputed claim pursuant to a provision of the plan "was not erroneous"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 277-78 (Bankr. S.D.N.Y. 2007) (estimating creditor's claim for future expenses for purposes of establishing reserve); *In re Enron Corp.*, Case No. 01-16034-AJG, 2006 WL 544463 (Bankr. S.D.N.Y. 2006) (estimating disputed claims for reserve purposes where plan provision "authorizes the Court to estimate claims pursuant to § 502(c)").

27. When estimating claims or setting reserves under a plan, the burden of proof "follows the same rules as deciding objections to proofs of claim." *In re Stone Hedge Props.*, 191 B.R. 59, 64–65 (Bankr. M.D. Pa. 1995); *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 458 (Bankr. E.D. Pa. 2007) ("[T]he better view is that [the burden of proof] should be consistent with the burden of proof in claims litigation.").

28. Therefore, while a proof of claim constitutes prima facie evidence of the validity and amount of the claim, a debtor "need only present evidence supporting its objection to shift the burden of proving the claim to the claimant." *Stone Hedge*, 191 B.R. at 65. The claimant must then prove the validity of its claim "by the preponderance of the truncated evidence presented at the hearing." *In re FRG, Inc.*, 121 B.R. 451, 457 (Bankr. E.D. Pa. 1990).

29. There is no guidance in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure as to the measures to be used by Courts in conducting an estimation hearing. Thus, "bankruptcy judges are to use 'whatever method is best suited to the particular contingencies at issue . . . [W]here there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value.'" *In re Stone & Webster, Inc.*, 279 B.R. 748, 810 n.36 (Bankr. D. Del.) (citation omitted); *see also In re Thompson McKinnon Securities, Inc.*, 191 B.R. 976, 979 (Bankr. S.D.N.Y 1996) ("judges are to use '. . . whatever method is best

suited to the circumstances.'") (citation omitted). Bankruptcy courts have wide discretion to choose the proper option to estimate a claim. *See Thompson McKinnon*, 191 B.R. at 989.

30. The principal consideration when estimating the value of a claim is "to promote a fair distribution to creditors through a realistic assessment of uncertain claims." *O'Neill v. Continental Airlines, Inc.,* 981 F.2d 1450, 1461 (5th Cir. 1993). Estimation requires only "sufficient evidence on which to base a *reasonable estimate* of the claim." *Bittner*, 691 F.2d at 135 (emphasis added); *see also In re Windsor Plumbing Supply Co., Inc*. 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims).

31. Here, the extent of each of the ERS Secured Claim and the REI Secured Claim is Disputed. This Court should estimate each Disputed Claim, as outlined below, so that the Debtors may proceed with Plan confirmation and implementation in a way that "promote[s] a fair distribution to creditors through a realistic assessment of uncertain claims" without awaiting the resolution of outside lawsuits or future adversary proceedings "to determine issues of liability or amount owed." *In re Cont'l Airlines, Inc.*, 981 F.2d 1450, 1461 (5th Cir. 1993).

**A. The lien asserted by ERS is patently avoidable, and the whole of ERS's asserted Secured Claim should be treated as a General Unsecured Claim.**

32. ERS alleges that the ERS Secured Claim is secured by a lien on the Purported Collateral.

33. Under 6 Del. C. § 9-324 a purchase-money security interest is only afforded priority if the purchase-money security interest is perfected when the debtor receives possession of the collateral or within 20 days thereafter.[3]

34. As discussed above, ERS and ZLOOP entered into the applicable contracts in or about November, 2012, ERS began delivery of the components of the eWaste System and Wire

---

[3] To the extent this Court determines that North Carolina law rather than Delaware law is applicable, Debtors note that the operative provisions are essentially identical. *See* N.C. Gen. Stat. Ann. § 25-9-324.

Processing Systems in or about May 2013, all equipment was delivered by May, 2013 and the Debtors commenced the Equipment Action against ERS on May 30, 2014.

35. ERS filed the UCC-1 Statements on October 28, 2014, over two years after ERS and Debtors entered into the contracts, and approximately a year and a half after ERS completed delivery of the equipment that is the Purported Collateral.

36. Therefore, ERS did not timely perfect its alleged lien on the Purported Collateral under the provisions of the Uniform Commercial Code pertaining to purchase money security interests and is not entitled to any principle or theory under which the alleged perfection may be deemed to have occurred at or relate back to an earlier time.

37. Moreover, the filing of the UCC-1 Statements is a transfer of an interest in property in which the Debtors hold an interest, and ERS filed the UCC-1 Statements within a year before the Petition Date, and, at the time of the filing of the UCC-1 Statements, the Debtors were insolvent, or the filing of the UCC-1 Statements rendered the Debtors insolvent.

38. ERS gave nothing of value to the Debtors at the time of the filing of the UCC-1 Statements.

39. Therefore, the filing of the UCC-1 Statements is avoidable as a constructive fraudulent transfer under 6 Del. C. § 1304(a)(1) and/or N.C. Gen. Stat. § 39-23.4(a)(1), each as made applicable in these cases by 11 U.S.C. § 544 or under 11 U.S.C § 548 and the lien recoverable for the benefit of the Debtors' estates from ERS under 11 U.S.C. §§ 550 and 551.

40. Therefore, because ERS's asserted liens are patently avoidable and in order to permit the Debtors to move expeditiously to confirmation of their Plan, this Court should limit the ERS Secured Claim for the purposes of the Debtors' establishment of a reserve for Disputed Secured Claims under the Plan to zero dollars.

### B. The REI Secured Claim should be estimated at $40,247.20.

41. REI asserts that the REI Secured Claim is secured by two distinct security interests.

42. The first is REI's interest in the $40,247.20 REI Escrow established under the Trailer Sale Order. The Debtors do not dispute that REI holds an interest in the REI Escrow, "pending agreement between the Debtors and REI, or entry of a further order of this Court regarding the disposition of the REI Escrow and subject to REI's asserted lien therein and all defenses and lien challenges of the estates." Equipment Sale Order, at ¶ 4.

43. However, the remaining $814,990.25 of the asserted REI Secured Claim is purportedly secured by REI's "right of setoff pursuant to Sections 506 and 553 of the Bankruptcy Code up to the total amounts of REI's claims against ZLOPP [in the REI Litigation]." *See* Claim No. 19, addendum at p. 4.

44. Section 553 of the Bankruptcy Code governs the recognition of setoffs that arise under applicable non-bankruptcy law in the context of a bankruptcy case, it does not create an independent right of set-off. *See generally Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18-19 (1995). REI carries the burden to establish both that it has a right to setoff under other applicable law and that the conditions of Section 553 have been satisfied so that the Court may recognize the right in these Chapter 11 Cases. *See In re WL Homes, LLC*, 471 B.R. 349, 352 (Bankr. D. Del. 2012) (To effect a setoff under Section 553, "the creditor [must] first establish its right to setoff by finding an independent right of setoff under non-bankruptcy law. It then must show that the conditions § 553 places on setoff are satisfied.")

45. Among other conditions, Section 553 requires that the moving party establish that the respective debts for which a setoff is sought both arise prepetition. *Id.*

- 11 -

EAST\128005432.2

46. REI asserts setoff rights as a defense to the Causes of Action, not any lien on the physical property of the estates or the proceeds thereof. REI's argument that holds administrative expense priority claims stemming from the REI Litigation (*See* Claim No. 19, addendum at p. 4) don't hold water, as those expenses are neither reasonable, nor necessary to the administration of the Debtors' estates.

47. Put simply, REI provides no basis, under state law or otherwise, that would create a right of setoff, nor does it allege any facts or grounds to support a finding, if any right of set off exists, that the required conditions under Section 553 are met.

48. Therefore, in order to permit the Debtors to move expeditiously to confirmation of their Plan, this Court should limit the REI Secured Claim for the purposes of the Debtors' establishment of a reserve for disputed claims under the Plan to the $40,247.20 held in the REI Escrow.

### Reservation of Rights

49. Nothing in this Motion shall be construed: (i) as an admission as to the validity of any claim or lien against the Debtors or their estates, (ii) as a waiver of the Debtors', Mosing's, or the Plan Administrator's, or other successors in interests, rights to dispute any claim or lien, (iii) as a waiver of any causes of action, defenses or potential rights of setoff the Debtors, Mosing or the Plan Administrator, or other successor in interest, may hold with respect to ERS or REI, (iv) to prejudice any of the Debtors', Mosing's, or the Plan Administrator's, or other successors in interests, rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to REI or ERS, or (v) an assumption of any executory contract.

## **Notice**

50. Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) counsel to the Committee, (c) ERS, (d) counsel to REI, and (e) all parties requesting notices in these cases. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE the Debtors respectfully request the Court enter an order, substantially in the form attached hereto as Exhibit A, (i) estimating the ERS Secured Claim as a zero-dollar claim, (ii) estimating the REI Secured Claim as a zero-dollar claim. and (iii) granting the Debtors such other and further relief as it deems just and proper.

Dated: September 2, 2016
Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

/s/ *Stuart M. Brown*
Stuart M. Brown (DE 4050)
R. Craig Martin (DE 5032)
Daniel N. Brogan (DE 5723)
Kaitlin M. Edelman (DE 5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com
craig.martin@dlapiper.com
daniel.brogan@dlapiper.com
kaitlin.edelman@dlapiper.com

*Counsel to Debtors and Debtors in Possession*