## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                 |      Chapter 11

ZLOOP, INC., et al., [1]       |      Case No. 15-11660 (KJC)

           Debtors.       |      Jointly Administered

### Reservation of Rights

      We, Bob LaBarge and Bob Boston, the undersigned, hereby submit our objections to the Debtors' Modified Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation (hereinafter "the Plan).

      We are the majority stockholders of Zloop, Inc. (hereinafter "Zloop"). Together, we founded and formed Zloop and currently own 98% of the stock of the corporation.

      We object to Kendal Mosing (hereinafter "Mosing") purchasing the estate for the sum stated in the Plan. We believe that all parties, including all creditors (other than Mosing) would benefit if, rather than giving the estate to Mosing, Zloop were allowed to file claims against him.

      Up until this time, the only story which has been presented to this court has been that told by Mosing. The stay was issued in the Louisiana suit before an answer or counterclaim could be filed. Enclosed as an attachment to this objection is a draft of a proposed pleading, whether presented as a complaint, counterclaim, or crossclaim, which details the basis of our objection.

      The Plan names Mosing and Zloop as released and exculpated parties as to the bankruptcy and also as to all pending and future litigation against them, including litigation by the undersigned. In the Louisiana lawsuit, as well as any other suit filed against the undersigned, multiple affirmation defenses are currently available to be pled, which the Plan appears to limit or eliminate.

<u>Release:</u>

      Mosing has executed a complete general release of all claims in favor of Zloop and also expressly in favor of the undersigned. (See paragraph 75 of the Draft Complaint.)

<u>Setoff:</u>

      In addition to the $1,000,000.00 which Mosing received out of the $14 million Patriot line of credit for repayment of a loan, significant sums from the line of credit were diverted to the personal use of Mosing and his friends and business partners (Mr. and Mrs. Janes).

$500,000.00 of the line of credit was used for a shopping spree for Mosing's wife. The Janes' used over $95 thousand out of the equity line to pay off the mortgage of their residence.

<u>In Pari Delicto:</u>

Mosing made significant false assertions in connection with obtaining the $14 million line of credit with Patriot Bank, including, but not limited to his false claim to be an officer of Zloop. While the situation was being investigated by the Patriot Bank, Mosing "resolved" the situation by purchasing the note.

<u>Indemnity:</u>

The Corporate documents provide indemnity for the undersigned against any third party claim or law suit (including Mosings' claims). It appears that the Plan is attempting to change various corporate documents, including the By-Laws, to retroactively eliminate this right and defense.

In addition to objecting to the Confirmation of the Plan, the undersigned object to various items written in the Plan documents:

1. Elimination of direct as well as derivative causes of action against Mosing: Even if Mosing is allowed to purchase the estate of Zloop, it is inappropriate for the Bankruptcy Court to limit or eliminate possible claims by the undersigned against Mosing.

2. Zloop and Mosing as exculpated and released parties: This has been discussed above. With on-going and future litigation between Mosing, Zloop and the undersigned, protecting Mosing while limiting or eliminating claims and defenses which could be asserted by the undersigned is not appropriate.

3. Mosing as secured creditor: There is no legal or factual basis for the Plan to make Mosing a secured Creditor.

4. Mosing as holder of a $40 million unsecured claim: Once again, there is no legal or factual basis for Mosing to be approved as having a $40 million claim of any kind.

5. "Meritorious" claims as Boston and LaBarge: As the copy of the draft pleading shows, the undersigned contests and objects to such a finding in the Plan.

6. Release of Debtors, Third Party Releases and Injunctions Relating to Releases: The Undersigned objects to sub-paragraphs B, C and D of Section XI. Injunction Exculpation and Releases of the Plan. These provisions are those that purport to limit or eliminate claims and defenses that the undersigned may assert in pending and future litigation with Mosing (or Zloop).

7. Proposed actions disclosed in the Plan Supplement:

   a. Amended By-Laws: The proposed amendment to the By-Laws was not included in the materials acquired by the undersigned. However, the undersigned believes that the anticipated amendments are for the purpose of retroactively eliminating rights and defenses of the undersigned.

   b. Substitution of Counsel: The firm of Phelp Dunbar, LLP not only represents Zloop in the Louisiana litigation, they are also the attorneys for the undersigned in that litigation.

   c. Agreement to Amend and modify Contracts: Mosing wishes to change the contracts and agreements involving the venue selection clauses to retroactively select the federal courts in Louisiana as the appropriate venue for the Louisiana (and future) litigation. The undersigned object to any contracts or corporate documents to be amended, retroactively. The venue provisions were designed to protect the undersigned as well as Zloop. If Zloop wishes to drop its motion for a change in venue in the Louisiana lawsuit, it is for the District Court to decide whether the Motion for change of venue filed on behalf of Boston and LaBarge should be granted. Enclosed is the Opinion of the Magistrate Judge in the Louisiana suit granting the Motion for Change of Venue. It refutes the many false assertions made by Mosing as to why venue should remain in Louisiana.

   Changing contracts entered into by arms-length negotiations retroactively, to the detriment of one party, is inappropriate. This is no different from Mosing attempting to change the financial terms of the contracts retroactively and/or eliminating the general releases he gave to Zloop and the undersigned.

   d. Withdrawal of motions to transfer: Zloop has no legal basis to withdraw the motions to transfer venue that were also made on behalf of Boston and LaBarge.

   e. Letter to Henrich dated October 5, 2016: This letter instructs the Law firm of Phelps Dunbar to turn over all materials to Mosing and his lawyers. This would, by necessity include materials which are protected by attorney client privilege between said law firm and the undersigned. That privilege has not, nor will it be waived by the undersigned.

## CERTIFICATE OF SERVICE

The undersigned hereby certify that a copy of the foregoing Objections to Plan Confirmation together with the attachments was duly served upon the all persons required to be served with said Objections by First Class United States Mail, postage prepaid addressed as follows:

DLA Piper, LLP (US)
Attn: Stuart M. Brown, Esq.
Debtors Counsel
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801

Cole Schotz P.C.
Attn: Daniel F.X. Geoghan, Esq.
Counsel to the Committee
900 Third Avenue, 16th Floor
New York, New York 10022

Cole Schotz P.C.
Attn: David R. Hurst
500 Delaware Avenue
Suite 1410
Wilmington, Delaware 19801

Office of the US Trustee
Attn: David L. Buchbinder, Esq.
844 King Street
Room 2207, Lockbox 35
Wilmington, Delaware 19801

United States Bankruptcy Court For the District of
Delaware
Attn: Hon. Kevin J. Carey
Chambers
824 North Market Street
Wilmington, Delaware 19801

This the 14th day of October, 2016

By:_____

Robert LaBarge
964 18th Ave. Cir., NW
Hickory, N.C. 28601
Phone: (704) 808 0092
Email: blabarge@blabarge.com

By:_____

Robert Boston
P.O. Box 1497
Conover, N.C. 28613
Phone: (321) 507 2006
Email: rboston@rboston.com

This the 14th day of October, 2016

By: _____

Robert LaBarge
964 18th Ave. Cir., NW
Hickory, N.C. 28601
Phone: (704) 808 0092
Email: blabarge@blabarge.com

By: _____

Robert Boston
P.O. Box 1497
Conover, N.C. 28613
Phone: (321) 507 2006
Email: rboston@rboston.com

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(STATESVILLE DIVISION)


ZLOOP, INC, ROBERT "BOB" LaBARGE

AND ROBERT "BOB" BOSTON,

      Plaintiffs,

COMPLAINT

(JURY TRIAL DEMANDED)

v.


KENDALL G. MOSING, CHARMAINE ANN MILLER-MOSING,

ZLOOP LA, LLC, a Louisiana Limited Liability Company,

JANES INDUSTRIAL PRODUCTS, LLC, a Louisiana

Limited Liability Company, INNOVATIVE CLEANING

SOLUTIONS, LLC, JAMES V. JANES, III, MARIAN

JANES AND JANE AND JOHN DOES 1-10,

      Defendants

Now come the Plaintiffs, Robert "Bob" LaBarge and Robert "Bob" Boston (hereinafter "BL" and "BB") by and through their undersigned attorney of record for cause of action and in claim for relief against the Defendants saying and alleging as follows:

## I.

### PARTIES

1.      The Plaintiffs, RL and BB are citizens and residents of the State of North Carolina and have been same for at least six (6) months next preceding the institution of this action. At all relevant times complained of, the Plaintiffs were employed by Zloop, Inc., a Delaware Corporation, domesticated and authorized to conduct business in the State of North Carolina with its principal place of business and corporate headquarters located in Hickory, Catawba County, North Carolina which is within the Western District of North Carolina, Statesville Division.

2.      The Plaintiff, Zloop, Inc (hereinafter "Zloop") is a Delaware Corporation, domesticated and authorized to do business in the State of North Carolina with its primary place of business and corporate headquarters located in Hickory, Catawba County, North Carolina.

3.      The Co-Defendant, Kendall G. Mosing, (hereinafter "Mosing") is a citizen and resident of the State of Louisiana, presently residing at 812 E. Bayou Parkway, Lafayette, Louisiana 70508.

4.      The Co-Defendant, Charmaine Ann Miller-Mosing, (hereinafter "Miller-Mosing") is a citizen and resident of the State of Louisiana, the wife of Mosing and presently residing at 812 Bayou Parkway, Lafayette, Louisiana 79508.

5.    The Co-Defendant, James Industrial Products, LLC, (hereinafter "JIP") is, upon information and belief, a Limited Liability Company, formed on or about June 2, 2002, with its principal place of business located in Lafayette, Louisiana, having as one of its Member-Manager-Owner, James V. Janes, III.

6.    The Co-Defendant, Innovative Cleaning Solutions, LLC, (hereinafter "ICS") is, upon information and belief, a Limited Liability Company with its principal place of business located in Scott, Louisiana, having as one of its Member-Manager-Owner, James V. Janes, III.

7.    The Co-Defendant, James V. Janes, III, (hereinafter "JJanes") is, upon information and belief, a citizen and resident of the State of Louisiana, a Member-Manager-Owner of Co-Defendants JIP and ICS, a treated friend, personal advisor, agent for and co-conspirator with Co-Defendants Mosing, and JJanes, residing at 214 at 214 Timberland Ridge Boulevard, Lafayette, Louisiana 70507.

8.    The Co-Defendant, Marian Janes, (hereinafter "MJanes") is, upon information and belief, a citizen and resident of the State of Louisiana, a Member-Manager-Owner of Co-Defendants JIP and ICS, wife of Co-Defendant JJanes, trusted friend, personal advisor, agent for and co-conspirator with Co-Defendants Mosing and JJanes, residing at 214 Timberland Ridge Boulevard, Lafayette. Louisiana 70507. At relevant times during her association with Zloop, the Plaintiffs and the Co-Defendants, MJanes served as Zloop's Treasurer, accountant, tax advisor, finance director, advisor to Zloop's Board of Managers and Directors while simultaneously served as Mosing's account and financial advisor.

9.    The Co-Defendants, Jane and John Doe, (hereinafter "J&JD") are as yet unknown and un-named Co-Defendant which, upon information and belief, will be identified as discovered during discovery in this matter.

10.    The Co-Defendant, Zloop LA, (hereinafter "ZA"), is a Louisiana Limited Liability Company, with its principal place of business located in Lafayette, Louisiana formed on November 2, 2012 for the stated purpose of holding Mosing's Zloop franchises located in Louisiana having, upon information and belief, Mosing as the sole owner- member -manager.

## II.

## PERSONAL JURISDICTION

11.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

12.    The Court has personal jurisdiction over each of the Defendants pursuant to the provisions of North Carolina's "Long Arm Statute" as set forth in N.C.G.S.Sec. 1-75.4(1) (d; 1-75.4(5)(a), (b) and/or(c); 1-75.4(6) (a-c)) et. seq.; due to the stipulation of jurisdiction in the United States District Court for the Western District of North Carolina-Statesville Division contained in various agreements between the parties which were negotiated by the party's in North Carolina and signed at the corporate office in Hickory, North Carolina.

13.    During all times complained of, the various Defendants made trips to and from the corporate headquarters where they routinely engaged and participated in the operation of Zloop in conjunction with the Plaintiffs, sufficient to meet the "minimum contacts" requirement and confer personal jurisdiction over the Defendants in this Court as to all causes of action asserted

hereinafter. The damages claimed are in excess of $75,000.00 dollars exclusive of interests and costs, and diversity of citizenship exists between the parties.

## III.

## SUBJECT MATTER JURISDICTION AND VENUE

14.     All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

15.     This Court has Subject Matter Jurisdiction over this action pursuant to 28 U.S.C. Sec. 1332 and N.C.G.S. Sec. 7A-243

16.     Venue in this matter is properly vested in the United States District Court for the Western District of North Carolina-Statesville Division pursuant to 28 U.S.C. Sec. 1409; N.C.G.S. Sec. 1-80 and as a result of forum selection previously stipulated to by the parties in various agreement and contracts forming a portion of the basis for the actions asserted by the Plaintiffs in this matter.

## IV.

## PROCEDURAL POSTURE OF THE CASE

17.     All preceding paragraphs are incorporated herein by reference.

18.     The Plaintiffs began working together in 2009 as marketing consultants, and thereafter worked on a number of projects involving the developing market of recycling and related opportunities. After conducting extensive research, the Plaintiffs developed an initial business plan

which included building an eWaste recycling super center in Hickory, North Carolina, to serve as a hub to provide a safe means of eWaste, recycle and sell the value separated commodities recovered from the eWaste.

19.    The Plaintiffs expanded their business plan to include growing their business through selling eWaste collection franchises the initial area surrounding the first super center in Hickory, North Carolina and thereafter expanding into other market areas throughout the United States to be serviced by additional supercenters tasked with collecting, repurposing and selling the collected eWaste.

20.    To provide a proper corporate structure for the developing business plan, the Plaintiffs initially formed EZ Computer, LLC and thereafter its successor, Zloop, LLC, a duly organized Delaware Limited Liability Company domesticated to properly conduct business in North Carolina, wholly owned by the Plaintiffs in equal shares, On or about July 23rd, 2012, the Plaintiffs' announced the startup of Zloop and has since that time operated the initial super center in Hickory, North Carolina.

21.    In the course of operation of Zloop, the Plaintiffs were introduced to and became involved with the Co-Defendants in this action as well as other parties that are Defendants in other related actions presently pending in this and other jurisdictions.

22.    During the course of the Defendants' involvement with Zloop and the Plaintiffs', the Defendants engaged in acts and omissions individually and, upon information and belief, through the formation and operation of a civil conspiracy by and between themselves and others as yet unknown, the intention of which was to damage or destroy Zloop and or the Plaintiffs',

which did in fact destroy Zloop as a business entity and severely damaged the Plaintiffs' individually as more particularly described hereinafter.

23.    Mosing, individually and/or acting in concert with his affiliated entities, materially breached validly executed contracts with Zloop and/or the Plaintiffs' including provisions for redemption of his interest in Zloop, disassociation with the Plaintiffs' and duly executed releases given for value as more particularly set forth hereinafter.

24.    Mosing and others associated with his interest filed a series of spurious lawsuits in Louisiana and Texas which forced Zloop to seek protection under the provisions of the United States Bankruptcy Code in order to continue operation as more particularly described hereinafter.

25.    Despite the bankruptcy, Mosing and the other Defendants aligned with his continued attacks and/or interference making a successful continuation of operation by Zloop under Chapter 11 impossible.

26.    Upon information and belief Mosing and those aligned with his positions, engaged in a series of acts intended to damage and/or destroy the reputation of Zloop and the individual Plaintiffs in order to devalue the corporation and allow Mosing either the opportunity to acquire Zloop or its assets at less than fair market value and, in fact, at a price representing a fraction of the redemption or purchase price of his interest previously negotiated and agreed upon by contract, or insulate himself and his affiliates from suit by the acquisition of Zloop once the buildings, land, equipment and other tangible assets were sold by the payment of a nominal sum to the Estate as demonstrated by the proposed plan as it relates to Mosing.

27.     As a result of the acts and omissions of the Defendants, Zloop was sold at a fraction of its prior value through the Bankruptcy to a third party eliminating not only their employment by, but also any opportunity of the Plaintiffs to retain their ownership or stockholder's equity in Zloop. Zloop's assets were purchased by Colt Refining, Inc. of Merrimack, NH on July 22, 2016 for Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00).

28.     Upon information and belief, Mosing has now negotiated a "Hold Harmless" agreement allowing him to purchase, for a nominal sum given the value of the potential claims against him, any recovery by Zloop of damages proximately caused by his acts and omissions which directly and proximately resulted in the diminution of the value of Zloop from an estimated one hundred million ($100,000,000.00) dollars, prior to such acts and omissions, to a sum of less than three million ($3,000,000.00) dollars paid by the third party purchaser with a resulting catastrophic effect upon the financial equity positions previously held by the Plaintiffs.

29.     In addition to the economic effect upon the Plaintiffs as majority shareholders of Zloop, the acts and omissions of Mosing and the other Defendants, has resulted in unnecessary legal expenses incurred by the Plaintiffs individually as well as a systematic defamation of their character and reputations through spurious lawsuits, orchestrated disclosures of confidential information, false accusations of alleged misconduct, systematic calls for or threats of criminal investigation and other mean spirited acts having as their source the personal agenda of Mosing and those aligned with his interest representing approximately two (2%) of the stockholders, to the point that their personal and professional reputations have been intentionally and unjustly ruined; their employment with Zloop terminated and their future earning capacity and/or employability greatly diminished, if not totally destroyed without concern by the Defendants.

30.     Zloop previously sought protection pursuant to Chapter 11 of the Bankruptcy Code by the filing of a voluntary petition in the United States Bankruptcy Court for the District of Delaware designated as "In re: Zloop, Inc., *et al.*, Debtor." File No. 15-11660(KJC).

31.     DLA Piper LLP (US), appears as bankruptcy counsel for Zloop the Debtor in possession collectively which includes: Zloop, Inc., Zloop Nevada, LLC., and Zloop Knitting Mill, LLC. The headquarters and service address for Zloop is 816 13th Street NE, Hickory (Catawba County), North Carolina 28601.

32.     Absent the intentional acts and omissions of the Defendants and others with whom, upon information and belief, they associated and conspired, the Bankruptcy as well as the costs and losses occasioned thereby would have been unnecessary. In the alternative, if the acts and omissions by the Defendants and others with whom they associated or conspired were not intentional, they were the product of Gross Negligence on their part which had the same effect upon Zloop and the Plaintiffs.

V.

**STATEMENT OF THE CASE**

33.     All preceding paragraphs are incorporated herein by reference as if fully restated herein.

34.     This action arises as a result of the acts and omissions of the named Defendants, including Kendall G. Mosing, an erudite individual investor, who through his own impetuousness and misconduct, individually and acting in concert and/or conspiracy with one or more named defendants and or other un-named parties set out, upon information and belief, to destroy Zloop ,

a recycling business that had not yet completed its start-up phase and the Plaintiffs individually for the purpose of personal gain, out of jealousy, out of total disregard for the truth and rule of law, out of personal disdain, out of abuse of his political and economic power due to his declared status as a "Billionaire" and/or for other reasons known only to the said Co-Defendant.

35.     The Co-Defendant, Mosing, is the third largest stockholder of ZLOOP, holding 1% of the Company's equity, having previously invested in Zloop between October 2012 and January 2014, in the form of franchise and equity investments, direct loans, and by securing a line of credit for the Company all of which were properly recorded in the records of Zloop, and, at all relevant times, either maintained or supervised by Mosing through his associates named herein as Co-Defendants, with any assertion to the contrary being false.

36.     Through Mosing's equity position and the influence he individually and through his various Surrogates, including but not limited to, the Co-Defendants, Mosing, maintained *de facto* control over ZLOOP's accounting systems, its capital expenses, and its investments. Mosing also exploited his tight grip on ZLOOP's finances to pursue his own personal interests and to ensure that ZLOOP focused on geographies that suited his personal conveniences, namely his home State of Louisiana, which was contrary to the best interest of Zloop, a fact totally ignored by Mosing and those associated with his interests to the detriment of Zloop and the Plaintiffs.

37.     During the Spring and Summer of 2014, the founders (and sole directors) of ZLOOP, BB and BL (hereinafter collectively, the "ZLOOP Founders," together with ZLOOP, the (ZLOOP Parties"), decided to focus ZLOOP's resources in the large, untapped Western United States market which was contrary to the wishes of Mosing, who wanted to limit future expansion

and development to areas other than Louisiana despite being advised on numerous occasions that such emphasis was contrary to the best interest of Zloop and its stockholders.

38.     As a result of the differences in the approach to the expansion of Zloop, negotiations were commenced to resolve the respective interest of Mosing and those affiliated with his position as minority stockholders. These negotiations resulted in the entry into a contract to repurchase the interest of Mosing and his related parties. This agreement and other related agreements, included validly executed releases of Zloop as well as BB and BL, a designated term for payment of the sums required and other specified provisions all of which are contained in the said agreement and were legally binding on the parties to the agreement. In addition, the agreement included a forum selection provision which was consistent with the same or similar provisions regarding application of law and forum selection contained in the numerous franchise agreements previously executed by Mosing designating the laws of the State of North Carolina as controlling and Catawba County, North Carolina as the forum.

39.     On August 28, 2014, prior to the due date of the purchase price set forth in the settlement agreement by and between the parties, Mosing and ZLOOP LA, LLC ("ZLOOP LA") sued Zloop; BB and BL, individually in direct violation of the previously executed releases, forum selection and choice of Law by instituting an action in Federal District Court in Mosing's home State of Louisiana, alleging a myriad of purported violations of federal and state securities laws; related state tort and contract laws and other causes of action in a rambling pleading herein referred to as the "Louisiana Action", which he either knew or by the exercise of due diligence, should have known at the time of filing was false, misleading, malicious and a direct breach of his contractual agreement and release with Zloop and the Plaintiffs. In the "Louisiana Action", Mosing seeks to conveniently and falsely presented present himself as an unsophisticated, innocent and

unadvised investor, who was "duped by fanciful -- but apparently hollow -- promises of fortune." This characterization stands in stark contrast to Mosing's self- proclaimed business acumen, his status as a "Billionaire" and/or a brilliant, seasoned businessman, rather than being uninformed as claimed, Mosing individually and through the Co-Defendants, exercised almost total control over all of the financial aspects of Zloop. His unlimited access to the books and records of Zloop stand in sharp contrast to his falsely asserted lack of access, knowledge or participation in such affairs. Through false and misleading assertions as to his involvement in or responsibility for certain actions taken by Zloop or its stockholders, Mosing has prosecuted, through the lawsuits and other means, his desire to acquire Zloop by force. Through a myriad of lawyers, false claims, delays, business and personal character assassination of the company, its founder's BB and BL, instigation of and/or participation in investigations which he knew were, false, unnecessary and motivated by a desire to destroy Zloop and the Plaintiffs by any and all means at his disposal.

40.     At all relevant times complained of., Mosing, an experienced force in the recycling market, knowingly breached clear and express contracts, which he negotiated at arm's length, and throughout his involvement with Zloop and the Plaintiffs. Mosing, the other named Co-Defendants and other un-named Co-Defendants with whom they conspired, engaged in repeated bad faith tactics designed to alienate business partners necessary to the successful operation of Zloop, customers and other investors in order to acquire the assets of the business at less than their fair market value and contrary to the provisions of the repurchase or redemption agreements between the parties.

41.     At all relevant times, the Defendants were "involved in commerce" as defined by N.C.G.S. Sec. 75-1.1 et. seq. .and the cases related thereto.

42.    Mosing and Miller-Mosing are husband and wife. Upon information and belief, at the direction of Mosing, ZLOOP transferred corporate funds to Miller-Mosing for her own personal shopping fund and/or other unauthorized and improper uses.

**VI.**

**FACTUAL ALLEGATIONS**

**(Boston and LaBarge Meet JJanes )**

43.    All previous paragraphs are incorporated herein by reference as if fully set forth herein.

44.    In or around May 2011, BB was introduced to JJanes by Greg Christos, owner of Cambridge Global Consultancy. In August, 2011, BB and BL met with JJanes in Scott, Louisiana. At that meeting, JJanes introduced BB and BL to JJanes's business partners, Mosing and Bryan Lipari. BB and BL worked closely with JJanes, Mosing, and Lipari over the next nine months on business opportunities in South America, and, specifically, Brazil and Argentina. In or around April 2012, United Branding Group, LLC -- an entity owned by BB and BL which was granted a minority equity interest in Petroleum Automated Tank Cleaning Services, LLC, along with JJanes, Mosing, and Lipari, who holds his interests though AML Holdings, LLC. Mosing Becomes A ZLOOP Franchisee.

45.    In May 2012, BB and BL began developing what would become ZLOOP's first "Super Center," the Hickory Super Center, and immediately began exploring equipment purchasing opportunities with suppliers such as Recycling Equipment, Inc., E Recycling Systems, LLC ("E Recycling"), and E Recycling's European manufacturer-suppliers.

46.    ZOOP initially planned to raise capital for its startup of operations through the sale of franchises.   In September 2012, ZLOOP began installing sample recycling processing equipment obtained from E Recycling to be used in investor demonstrations.  On September 23, 2012, with the assistance and on advice of counsel, BB sent to JJanes a sample pro forma ZLOOP franchisee prospectus (the "*Pro Forma* Franchisee Prospectus"), and four days later, BL provided a requested list of items included in the franchise fee (together with the *Pro Forma* Franchisee Prospectus, the "Sample Franchisee Information").

47.    Acknowledging Mosing's complimentary backgrounds in start-ups and recycling, on October 2, 2012, BL sent to JJanes a ZLOOP franchisee prospectus for the Louisiana market. Then, on October 4 and 5, respectively, ZLOOP sent to JJanes a Franchise Disclosure Document and copies of (1) ZLOOP's investor overview, (2) its five-year forward looking projections, and (3) its equipment calendar.

48.    On October 15, 2012, Mosing met with BB and BL in the Hickory, NC plant and ZLOOP headquarters. Mosing was accompanied by JJanes, Lawrence G. Schafran, several Austin, Texas investors and lawyers. The purpose of the meeting was for Mosing and his team to perform due diligence on the potential purchase of a Louisiana franchise.  Before the meeting ended, Mosing, with the advice of his team, determined to purchase all three offered Louisiana franchises. Before the meeting ended Mosing executed three agreements purchasing ZLOOP franchises in Louisiana (each a "Louisiana Franchise Agreement," and collectively, the "Louisiana Franchise Agreements"). Mosing executed each Louisiana Franchise Agreement purportedly on behalf of ZLOOP LA-T1, LLC, ZLOOP LA-T2, LLC, and ZLOOP LA-T3, LLC (together, the "Mosing Louisiana LLCs"), respectively, with LaBarge countersigning all on behalf of ZLOOP, LLC. In short, each Louisiana Franchise Agreement conferred on Mosing the right to operate a ZLOOP

recycling franchise for a renewable, ten-year term.  Thereafter, on October 29, Mosing paid to

ZLOOP $1,989,179 in accordance with the Louisiana Franchise Agreements (the "October 2012

Payment").

49.    On November 2, 2012, Mosing formed ZLOOP LA.  Upon information and belief,

the Mosing Louisiana LLCs were never formed.

### Mosing Begins Making Non-Franchise Equity Investments and Makes A Loan

50.    On October 20, 2012, five days after becoming a ZLOOP franchisee, Mosing

executed a subscription agreement, committing $1 million for a 1% equity interest in ZLOOP

("October 2012 Subscription Agreement").

51.    By agreement dated December 15, Mosing pledged to raise an additional

$4,000,000 in capital investments for ZLOOP. On December 17, 2012, Mosing made a six-month,

$4 million, interest free loan to the Company (the "December 2012 Note").  Mosing wired $3.5

million to ZLOOP on December 18, 2012.

52.    ZLOOP used the proceeds derived from the sale of franchises to Mosing, loan

proceeds borrowed from Mosing, and capital contributed to ZLOOP by Mosing to purchase the

land and improvements in Hickory, NC, and to purchase and install the equipment to assemble

ZLOOP's first Super Center.  For example, on November 12, 2012, ZLOOP entered into a

purchase agreement with recycling processing equipment supplier KM Manufacturing for the

purchase and delivery of two wire processing systems (the "Wire Systems").

### In 2013, Mosing Continues Making Non-Franchise Equity Investments In ZLOOP, Makes Another Loan To The Company, And Commits to Purchasing More Franchises

53.     On January 5, 2013, Mosing signed another subscription agreement, raising his equity stake in ZLOOP to 2% in return for another $1 million ("January 2013 Subscription Agreement").

54.     Then, on June 11, 2013 Mosing, interested in expanding his franchise territory holdings, purchased an option on all the available franchises in Texas (the "Texas Franchises" and, as to the option, the "Texas Franchise Option") for $1,000,000 (the "June 2013 Option Payment").

55.     Also in June, ZLOOP began taking delivery of the Wire Systems at the Hickory Super Center.

56.     Approximately two months later, Mosing extended another loan to ZLOOP, this time for $2 million at an interest rate of 10%, with a maturity date of October 31, 2013 (the "August 2013 Note"). ZLOOP never granted to Mosing a security interest in any of ZLOOP's assets. Neither ZLOOP, nor BB or BL represented to Mosing that any UCC-1 Financing Statement had been filed in Catawba County, North Carolina, or otherwise granting or perfecting a security interest in any of ZLOOP's assets, nor did Zloop ever authorize the filing of any UCC-1 in any jurisdiction. Any and all UCC-1's filed for or on behalf of Mosing or any of his affiliated parties were without the prior consent or knowledge of Zloop and represent the continuing fraud and misconduct of the Defendants.

57.     In September 2013, BB, BL, Mosing, and JJanes reached a global agreement, whereby Mosing would exercise the Texas Franchise Option and invest an additional $9 million in exchange for interests in eight franchises in Texas (the "Texas Franchise Funding") and the Janeses would receive certain benefits from ZLOOP. Specifically, in a letter from BB to JJanes, BB represented that after Mosing completes the Texas Franchise Funding, "ZLOOP, LLC will: a)

[e]xecute an additional 1% of Common B Shares to MJanes[; and] b) [w]ire payoff amount of the primary residence jointly owned by [JJanes and MJanes]" (the "Janes Mortgage Payoff"). In a separate letter to Mosing, BB outlined the following terms of the Texas Franchise Funding:

1)    As of September 23, 2013 ZLOOP, LLC has received US$1,000,000.00 (One Million U.S. Dollars) for the option to buy the 8 Franchise Territories in the State of Texas for a total investment of US $10,000,000.00 (Ten Million U.S. Dollars).

2)    Mr. Mossing [sic] will be purchasing the territories at a discounted rate.

3)    Mr. Mossing [sic] has the right to:

a)    Resell any or all territories at date-of-sale value

b)    Donate any or all territories to any 501c3 Charity at the date-of-donation value

c)    Retain any or all territories

4)    Any territories retained and operated by Mosing shall be exempt from paying Franchisor any and all marketing fees. Mosing will be required to spend a minimum of those values in marketing at his discretion.

58.    The parties' negotiations on the Texas Franchises continued. On September 30, BB issued to JJanes a Term Sheet, which outlined the terms of yet another Mosing loan to ZLOOP, this time for $3 million (the "September 2013 Term Sheet"). The September 2013 Term Sheet set out specific terms as to (1) "Use of proceeds, (2) "Provisions," (3) "Repayment," (4) "Credit," and (5) "Sweetener" respectively:

[(1)] [the $3 million will be used to] completely settle with the Austin Investors, including signing of mutual general releases [,] and [] to satisfy other current liabilities [;]

[(2)] [u]pon completion of the WIRE transfer of $3M, ZLOOP will immediately issue 5% of ZLOOP B Shares brining Mr. Mosing's ownership to 7% [, and] Jim Janes will commit to be present in Hickory on a regular basis to assist with operations [;]

[(3)] [f]rom revenues generated by operations [, and] from proceeds derived by new franchisees [;]

[(4)] [t]he $3M may be applied to Mr. Mosing's purchase of the Texas Franchise territories bringing his total down payment to $4M ($6M outstanding) [; and]

[(5)] [u]pon completion of the WIRE transfer of $3M, ZLOOP will immediately issue 1% of ZLOOP B Shares to Marian Janes bringing her total ownership to 2%.

59.    Mosing would later wire to ZLOOP the $3 million on October 7 (the "September 2013 Term Sheet Payment"). By October 2013, Mosing, the Co-Defendants and his surrogates had contributed significantly to ZLOOP's viability as a going concern. On October 1, BB and BLe, as ZLOOP's sole Managers, passed a resolution authorizing ZLOOP to grant to Mosing, MJanes, and Sean LeBlanc warrants to purchase varying levels of "Class B Interests" "in order to compensate them for past services and incentivize them to continue to provide services to the Company" (the "October 2013 Written Consent"). Specifically, the October 2013 Written Consent authorized ZLOOP to grant to Mosing, MJanes, and LeBlanc warrants to purchase, respectively, up to 5%, 1.5%, and 0.5% of the outstanding Class B Interests. The grant agreements and warrants were issued that same day, and on October 2, BL delivered draft copies of membership certificates.

60.     By the end of 2013, ZLOOP had placed contracts with all the necessary recycling equipment manufacturers to operate the Hickory Super Center.

### In 2014, Mosing Purchases Even More ZLOOP Franchises, Makes Yet Another Loan To The Company, And Takes Care Of His Friends

61.     On January 2, 2014, Mosing exercised his Texas Franchise Option. In a letter, Mosing proposed the following terms to reach the $10 million total purchase threshold: (1) credit his $1 million June 2013 Payment; and (2) credit the $7.5 million in outstanding loans made by Mosing to ZLOOP and the $700,000 in accrued interest owing on those loans (thus converting this debt to equity, but providing ZLOOP no additional liquidity).  As to the remaining $800,000, Mosing proposed to execute a note in favor of ZLOOP in that amount.  The ZLOOP Founders agreed to Mosing's terms, and that same day Mosing executed eight franchise agreements covering each of the available ZLOOP territories in the state of Texas (each a "Texas Franchise Agreement" and collectively, the "Texas Franchise Agreements").  Mosing executed each agreement personally. In short, the Texas Franchise Agreements obligated Mosing to operate a "ZLOOP recycling business" for a renewable, ten-year term. In executing the Texas Franchise Agreements, Mosing became the only holder of ZLOOP franchises in Texas.

62.     Later in January, Mosing assigned a 1% interest in ZLOOP to his cousin-in-law, LeBlanc, which assignment had been consented to by the ZLOOP Founders.  The same day, Mosing and LeBlanc executed a promissory note, whereby Mosing lent to LeBlanc $1 million interest free, secured by LeBlanc's now 1.5% interest in ZLOOP.

63.     Around the same time, ZLOOP became embroiled in a dispute with E Recycling based on the failure of the Wire Systems to function properly, causing ZLOOP's clients to become concerned.

### Mosing's Unfettered Access To ZLOOP's Business And In-Depth Involvement

**In Company's Day-To-Day Operations And Control Over Financial Aspects of Business**

64.     From late 2012 through August 2014, Mosing exercised *de facto* control over ZLOOP's business, despite never actually holding more than a 2% equity stake in the Company.

65.     At the direction of Mosing, MJanes served as ZLOOP's Treasurer, maintaining responsibility over the Company's accounting books and other business records and audited ZLOOP's inventory. JJanes and his wife also were given carte blanche access to the Company's electronic records, which included all the business records and streaming video links to the Hickory Super Center's security cameras, thus providing the Janeses access to all the records remotely and at any time. Moreover, Burton Kolder, of Kolder, Champagne, Slaven & Co., LLC, Mosing's accounting firm, prepared and filed ZLOOP, LLC's Fiscal Year 2012 Form 1120 federal corporate income tax returns, with JJanes signing as the Company's representative. Mosing and JJanes retained sets of keys to ZLOOP's Hickory Super Center and, generally without much notice, visited the site to inspect the Company's growth and operations. Finally, Mosing and the Janeses maintained e-mail addresses hosted by ZLOOP.

66.     The ZLOOP Founders, BB and BL, routinely sought Mosing's and JJanes's preapproval of capital expenditures and other business decisions, large and small. For example, when considering nearly every potential real estate investment or equipment purchase, BB or BL took pictures and video and sent them to Mosing and JJanes, soliciting comments and advice. In addition, after nearly every equipment delivery, BB and BL undertook much the same process to keep Mosing involved and up-to-date. In addition, BB and BL sought comments and approval of draft organizational documents and included Mosing and JJanes in the decision-making process concerning investments.

**Change In Business Model to Eliminate Franchises**

67.   On February 5, 2014, after being introduced by Schafran and JJanes, ZLOOP entered into an agreement with Loeb Partners Corporation ("Loeb Partners") to raise capital to expand the business and fund the Company's operations and to meet ZLOOP's obligations under the Mosing Termination Agreement (the "Loeb Partners Capital Raise Agreement"). As a result of their meetings, Loeb Partners recommended converting ZLOOP to a corporation and repurchasing ZLOOP's franchises, making the Company more attractive to high net worth investors and enabling the Company to pay back Mosing. JJanes and Schafran, on Mosing's and ZLOOP's behalf, worked closely with Boston and LaBarge in negotiating the Loeb Partners Capital Raise Agreement and then in formulating the plan to repurchase franchise interests (the "Franchise Repurchase Plan"). On the advice and with participation of counsel, including Alba-Justina Secrist of Parker Poe, in preparation for the business entity conversion ZLOOP undertook a complete audit of the Company's accounting, financial, and other business records (including meeting minutes and employment and insurance agreements). MJanes was responsible for the audit, providing progress reports to and otherwise communicating with Kodler.

On February 7, BB formally notified Mosing of the Franchise Repurchase Plan. Specifically, BB stated that should Zloop become unable to cover all the balances owing to Mosing(which, ostensibly, had been applied to Mosing's purchase of the Texas Franchises), any remainder, "will revert back to loans to the company." And, in any event, BB noted that if the Franchise Repurchase Plan was not implemented, "all loans will be reinstated in their current status." BB provided the following uncontroverted loan schedule:

| | |
|---|---|
| December 2012 Note | $4 million |
| June 2013 Payment: | $1 million |
| August 2013 Note: | $2.2 million |

| | |
|---|---|
| September 2013 Term Sheet Payment: | $3 million |
| (payment to Mosing on December 10, 2013, applied to December 2012 Note) | ($1 million) |
| BALANCE DUE    TO MOSING | $9.2 million |

( *Id.*)

68.    On March 26, 2014, BB and BL acted by written consent to convert ZLOOP, LLC to ZLOOP, Inc. (the "March 2014 Written Consent").   Consent also included a plan of conversion (the "Conversion Plan"), which, among other things, stated that "[t]he members of the LLC immediately prior to the Effective Time shall be the stockholders of the Corporation.".  Below is a table reflecting the conversions of each of the members' interests in accordance with the Conversion Plan:

| MEMBER | LLC MEMBER INTEREST | SHARES OF COMMON STOCK |
|---|---|---|
| Boston | 48.95% | 4,895 |
| LaBarge | 48.95% | 4,895 |
| Mosing | 1.00% | 100 |
| LeBlanc | 1.00% | 100 |
| Majory S. Diamond, as Trustee of the Majory S. Diamond Trust | 0.05% | 5 |
| Roland Fox, as Trustee for the benefit of the Rolan Fox Living Trust | 0.05% | 5 |

69.    The Conversion Plan also included the Zloop, Inc. Certificate of Incorporation, Bylaws, and Certificate of Conversion.

**70.** Also, on March 26, Zloop's Incorporator, Secrist, filed the Certificate of Conversion and Certificate of Incorporation with the Secretary of State for the State of Delaware, and elected BB and BL as the initial Directors of the Board (the "Initial Board") The Initial Board then adopted a series of Resolutions (the "Initial Board Resolutions"), including: (1) adopting bylaws and a form of stock certificate; (2) appointing (a) BB as Chairman of the Board and as CEO, (b) BL as President and Secretary, and (c) MJanes as Treasurer; and (3) determining that shares of stock shall issue consistent with the Conversion Plan. Finally, all the stockholders listed in the Conversion Plan acted by written consent in ratifying both the acts of the Incorporator and the Initial Board Resolutions. In accordance with the Conversion Plan, the capitalization of ZLOOP as of March 26, 2014 is set forth below:

| | |
|---|---|
| Authorized | 100,000 |
| Issued and outstanding | 10,000 |
| Unissued and reserved for issuance under warrants to purchase common stock | 700 |
| Total outstanding on a fully-diluted basis | 10,700 |

**71.** Diamond, Fox, Mosing, and LaBlanc were provided formal written notice on March 31 of all of the aforementioned actions taken in converting Zloop, LLC to Zloop, Inc.

### Zloop Recinds Zloop LA's and Mosing's Franchises; Mosing Releases the Zloop Parties of All Claims, Known and Unknown

**72.** On March 27, 2014, consistent with the Franchise Repurchase Plan, Zloop issued to Mosing an offer for the Company to repurchase all of Mosing's franchise interest (the "Repurchase Offer Letter") .

73.    In the Repurchase Offer Letter, Zloop offered two options for Mosing to liquidate his Interest: (1) the "Recession Option"; and (2) the "Equity Option" (collectively the "Termination Options").    Under the Rescission Option, ZLOOP would remit to Mosing the "aggregate amount of payments that [he] ha[d] made to date directly to [ZLOOP] for his [f]franchise[s]" (the "Total Franchise Payment Amount"), "upon the earlier to occur of [(a)] the completion of a single financing by [ZLOOP] that raises gross proceeds of not less than $20,000,000 [] and [(b)] December 31, 2014 . . . ."    On the other hand, under the Equity Option, ZLOOP would issue "the number of shares of Common Stock that are equivalent in value to your Total Franchise Payment Amount [] and a warrant to purchase the same amount of Common Stock in connection with a [c]hange of [c]ontrol...    The shares in ZLOOP offered under the Equity Option represented a ZLOOP valuation of $100,000,000 (Repurchase Offer Letter.    In either instance, the Repurchase Offer Letter required Mosing franchisee to execute an "Offeree Information Sheet" and a "Termination Agreement."

74.    On April 1, 2014, Mosing elected the Rescission Option and, accordingly, chose to liquidate his franchise interests for a payment of $10,989,179 (Mosing's Total Franchise Payment Amount taking into account the Louisiana Franchises and the Texas Franchises) , upon the earlier of (1) ZLOOP completing a $20 million capital raise or (2) December 31, 2014.    Mosing executed the two applicable Termination Agreements, one each relating to Louisiana and Texas franchises.

75.    Importantly, both Termination Agreements contained the same broadly drafted release clause:

> **Release**.  In connection with the offer of rescission and the parties' agreement to terminate the franchises, and for consideration as set forth in the [Repurchase Offer Letter], notwithstanding any other provisions to the contrary, Franchisee for itself and on behalf of each of its members,

shareholders, officers, managers, affiliates and investors hereby unconditionally and immediately upon signing of this Termination Agreement, release [ZLOOP, Inc.], its affiliates and each of their officers, directors, members, managers and employees from any and all claims, demands, obligations and liabilities of any nature whatsoever, known or unknown, whenever arising.

76.     Upon information and belief, at all times relevant, Mosing was represented by counsel of his choosing and the decision made was the free, voluntary and informed choice knowing made by Mosing for consideration and the contractual duties created by his election legally binding.

77.     Following the execution of the Termination Agreements, ZLOOP continued to benefit from the assistance of Loeb Partners and continued to solicit investment in ZLOOP in order to meet its obligations to Mosing and ZLOOP LA.

78.     As a direct result of the acts and omissions of Mosing including the filing of the Louisiana Action which forced the Bankruptcy, unfortunately, ZLOOP was stymied from performing its duties under the Liquidation Options.

**Mosing Provides Security For ZLOOP To Increase A Line Of Credit In Texas**

79.     When in mid-2014 ZLOOP's operations/development of Super Centers required additional liquidity, ZLOOP sought an increase in a line of credit it held with Patriot Bank in Houston, Texas ("Patriot Bank" or the "Bank").

80.     On April 29, 2014, following Mosing's execution and delivery to ZLOOP of the Termination Agreements and following conversion of ZLOOP to a corporation under Delaware law, Patriot Bank agreed to increase ZLOOP's line and credit, which was evidenced by ZLOOP's execution of a promissory note for $14 million, structured as a non-disclosable revolving line of credit and with a maturity date of April 29, 2016 (the "April Patriot Bank Note," or as to the

transaction the "April 2014 Patriot Bank Transaction"). The April 2014 Patriot Bank Transaction rolled up ZLOOP's prior existing obligations to Patriot Bank into the April Patriot Bank Note.

81.    To secure the April 2014 Patriot Bank Transaction, upon information and belief Patriot Bank increased the hold against Mosing's account in the amount of $14 million.

82.    The documents comprising the entire April 2014 Patriot Bank Transaction are attached to this Complaint at . All the agreements, including the Patriot Bank Note reflected that ZLOOP, LLC was the Borrower, despite that ZLOOP, LLC was converted to ZLOOP, Inc. in March 2014. In addition, relevant to this action, the April 2014 Patriot Bank Note included a provision stating that:

"Upon default, [Patriot Bank] may declare the entire indebtedness, including unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which [ZLOOP] is responsible under this Note or any other agreement with [Patriot Bank] pertaining to this loan, immediately due, without notice, and then [ZLOOP] will pay that amount."

83.    Upon information and belief, at all relevant times Mosing was an officer or director or significant shareholder of Patriot Bank and used his position to obtain the loan.

## Mosing Disagrees With ZLOOP Founders
## Regarding Business Expansion and Becomes Adversarial

84.    In or around May 2014, Mosing and the ZLOOP Founders, BB and BL, began to disagree over the direction of the Company's expansion efforts. Since December 2012, BB and BL had investigated thoroughly the cost to develop an additional Super Center, particularly in Louisiana at Mosing's request/demand, as well as at locations in the Western United States. ZLOOP's established development model involved locating distressed real estate upon which to

develop its Super Centers. Mosing showed no concern for what was best for Zloop in pushing his own agenda.

85. Attempting to satisfy Mosing's needs, the ZLOOP Founders, BB and BL engaged real estate agent Tom Miller to locate potential locations along the I-10 and I-49 corridor of Acadia Parish, Vermillion Parish, Lafayette Parish, and St. Landry Parish in Louisiana. Simultaneously with the ZLOOP Founders' efforts, JJanes, acting apparently on behalf of ZLOOP, engaged Bill Rodier, Executive Director of the Acadiana Economic Development Council and St. Landry Parish Economic Development, to locate a suitable building site and to assist in providing ZLOOP with tax credits and incentive programs. BB visited potential locations and met with Rodier three times. JJanes, on behalf of ZLOOP, met and attended meetings with Rodier and members of the St. Landry Parish Board no less than ten times.

86. After approximately a year and a one and a half searching and numerous property visits, BB and BL were unable to identify a property in Louisiana that fit within ZLOOP's Super Center development and financial model. The properties available in Louisiana were simply too expensive for the Company to consider. On the other hand, the ZLOOP Founders BB and BL. identified a significant opportunity for the Company in the rapidly developing Western United States market. More specifically, BB and BL had identified a potential partnership with the Nevada company, PRC Industries, Inc. ("PRC Industries"), who was ready and willing to deliver to ZLOOP bulk quantities of recyclables. Considering the potential revenue stream stemming from that partnership and that real estate prices in Nevada were much more affordable, BB and BL, as was their right, decided to focus ZLOOP's resources on developing a Nevada Super Center. Despite the fact that the ZLOOP Founders' exhaustive efforts had revealed that a Western United States market expansion would improve the Company's prospects and that continued focusing on

the Louisiana market would jeopardize ZLOOP as a going concern, Mosing continued his demand that ZLOOP focus on Louisiana, thus demonstrating a total disregard for the welfare of the company resulting in increasing friction between the parties. Upon information and belief, Mosing acting in concert with one or more of the Co-Defendants had begun developing a strategy intended to undermine the company for the benefit of Mosing.

87.    On or about May 29, 2014, JJanes and Mosing improperly contacted Holmes, a loan officer at Patriot Bank, requesting that Patriot Bank grant Mosing the exclusive authority to pre-approve any further draws on the line of credit.  Initially, Holmes approved Mosing's request and placed a hold on the line of credit. This action on the part of Mosing and JJanes was without the prior knowledge or authorization of the Corporation. As a result, ZLOOP was prevented from drawing from the account the funds necessary to issue a down payment on property selected. Upon learning of what had occurred, Boston immediately contacted Holmes disputing the hold.  After some deliberations, on the same day, Patriot Bank lifted the hold and, upon information and belief, informed Mosing that he had no authority under the Patriot Bank Note to assert control over disbursements.

88.    That same day, BB sent to JJanes (with copies to Harmon and Holmes) the following notice:

[a]ny further interference of any kind including but not limited to false or damaging comments made to [Mosing], Loeb Partners, Patriot Bank, Bill Holmes or any other party directly attached to ZLOOP, Inc. will be considered an intent to damage ZLOOP, Inc. and will be litigated to the fullest extent of the law.

89.    Mosing next, upon information and belief, directed MJanes to inquire as to the status of the Sample UCC-1 Financing Statement, which properly revealed that no financing

statement was on file in North Carolina. In response to said determination and notwithstanding the broad release Mosing had granted in favor of ZLOOP and the ZLOOP Founders, BB and BL, Mosing, again, acting through JJanes, threatened legal action against the ZLOOP's Founders., BB and BL. Given the prior settlement Agreement and granting of the referenced releases, ZLOOP declined to grant a security interest of the type set forth in the Sample UCC-1 Financing Statement on the basis that Mosing already possessed a sufficient security interest in the form of the Texas Franchises. Without any proper authority or authorization, upon information and belief, Mosing directed the fraudulent unilateral filing of a new UCC-1 Financing Statement on August 15, 2014 (the "Unsupported UCC-1 Financing Statement"). Upon information and belief, Mosing and his agents either knew, or by due diligence should have known that the improper filing of the unauthorized UCC-1's would have a devastating effect on the ability of the Company to borrow the money necessary to comply with their obligation; however, despite such knowledge, Mosing and/or his agents including the individual Co-Defendants, proceeded with improper and illegal filings Mosing without the knowledge or consent of BB or BL.

*90.*   The Unsupported and unauthorized UCC-1 Financing Statement indicates that it was filed by Donna Thibodeaux, of the law firm Allen & Gooch, and lists essentially all of ZLOOP's assets as collateral. The Unsupported and unauthorized UCC-1 Financing Statement was recorded with the Secretary of State of Delaware and the Secretary of State of North Carolina.

*91.*   ZLOOP made numerous efforts to obtain financing from private equity lenders, asset lenders, and regional and national banking institutions. As members of ZLOOP's team, Mosing, JJanes, and MJanes were aware of these funding efforts. Since the neither the Company, BBn nor BL had knowledge of the improperly filed UCC-1's, they had not been listed on the various loan applications. During the relevant due diligence periods, the potential lenders

discovered the Unsupported UCC-1 Financing Statement and asked ZLOOP why they had not

disclosed their existence in the loan applications.  As a result of the lenders' discovery of the

Unsupported UCC-1 Financing Statement, ZLOOP was refused any further capital funding.  The

entities that declined any funding were banks Community One Bank, N.A., Branch Banking and

Trust Company, PNC Bank, and private equity firm Gryffin Partners, Inc. (collectively, the

"Potential Lenders").

### Mosing And ZLOOP LA Violate The Release, Commence Civil Action Against The ZLOOP Parties

**92.**    Notwithstanding that ZLOOP's obligation under the Rescission Agreement did not

mature, at the latest, until December 31, 2014, that ZLOOP was in the middle of a capital raise

with Loeb Partners, and that Mosing had granted the ZLOOP Parties broad unconditional releases

in April 2014, on August 28, 2014, Mosing and ZLOOP LA commenced the Louisiana Action in

Federal District Court in the Western District of Louisiana, naming BB and BL as the ZLOOP

Parties and only defendants, the filing of this action was in direct breach of the prior releases and

contractual agreements. Mosing and ZLOOP LA asserted in the complaint twelve individual

counts of violations federal and state securities laws and related state tort and contract laws, all of

which centered on Mosing's theory of the case that he was innocently duped into sinking millions

of dollars into a scam by the ZLOOP Founders, BB and BL (the "Louisiana Complaint")   which

at the time of the filing he knew to be false and likely to damage the Plaintiffs.

**93.**    The Louisiana Complaint is rife with knowingly false statements of material facts

concerning the history of events surrounding Mosing's involvement with, investments in, and

loans to ZLOOP.  For example, Mosing and ZLOOP LA alleged that "[n]either Kendall Mosing

individually nor [ZLOOP LA] executed the [Louisiana Franchise Agreements]." Yet, Mosing did,

in fact, execute each of the Louisiana Franchise Agreements, and indeed he initialed every page

of each agreement.  Moreover, Mosing and ZLOOP LA alleged that in a private placement memorandum produced to him in March 2013 (the "March 2013 PPM"), the ZLOOP Parties represented falsely that JJanes currently served on a board of seven directors of ZLOOP, that the "board" actually consisted of only BB and BL, and that the ZLOOP Parties "simply called [JJanes] a director to make Mosing feel like he had some degree of control over his investments." Not only do these statements unreasonably characterize, without any factual basis, the ZLOOP Parties' motives as fraudulent, but they also knowingly ignore that the March 2013 PPM was *prospective*, such that the seven board members – to include JJanes *and Mosing* – would obtain such positions only upon the later "effective date."  Mosing and ZLOOP LA also claimed that Mosing "and the [ZLOOP Parties] never had any intention for Kendall Mosing to actually operate the [Texas Franchises]."

94.     In addition, Mosing and ZLOOP LA made numerous knowingly false and unsupported claims that defame and call into question BB and BL, character, ethics and business practices, namely that they used the veil of their business to hustle an investor into financing their "lavish" personal lifestyles, which Mosing knew at the time was false and likely to damage the Plaintiffs. ("As was typical of [Boston's] efforts to secure funding from Kendall Mosing, the window of opportunity to act was tiny and constituted high pressure sales tactics that are unfair and deceptive."); ("Both PPM's omitted the material fact that BB and BL were using ZLOOP money for their personal benefit, including lavish shopping trips to Chicago and hiring a private jet."); ("All of these misrepresentations were designed to sell additional securities in ZLOOP using high-pressure sales tactics created by stated emergency needs for funding."); *see also id.* Heading Q ("Defendants email more misrepresentations into Lafayette, Louisiana to trick Mosing into giving [ZLOOP] an additional $5 million.").)  The Louisiana Complaint conveniently makes no

mention, however, that Mosing consistently was provided with time and opportunity to adequately review all pertinent documents and indeed was represented at all times by lawyers and other reputable advisors of his choosing. The Louisiana Complaint also omits any mention of Mosing's or his surrogates' intimate involvement in ZLOOP's strategic planning and day-to-day operations, including its bookkeeping by MJanes and MJanes's intimate involvement in the preparation for and implementation of the conversion of ZLOOP LLC to ZLOOP, Inc.

95.    The Louisiana Complaint seeks damages, including those arising from Mosing's guaranty of the April Patriot Bank Note.

96.    On November 19, 2014, ZLOOP filed a Motion to Transfer to the Western District of North Carolina pursuant to 28 U.S.C. § 1404(a), on the basis of the forum selection clauses in the franchise agreements. For the reasons stated in a decision issued by the Court on June 25, 2015, the Louisiana District Court granted the Motion to Transfer. *See Mosing v. Boston*, Civil Action No. 14–cv–2608, 2015 WL 3911798 (W.D. La. June 25, 2015).

97.    As a direct and proximate result of the false and malicious allegations made in the Louisiana Complaint, at least one ZLOOP supplier, namely, Rapid Granulator AB, terminated its relationship with ZLOOP.

98.    The actions of Mosing and the other Defendants regarding the filing of the spurious action was, upon information and belief, part of a plan scheme or design on the part of the Defendants and other associated with the Defendants intended to interfere with Zloop, cause the Plaintiffs to expend unnecessary attorney's fees and suffer other damages to the company and individually without lawful excuse.

**<ins>Mosing Directs Harassing Statements To ZLOOP Business Partners;</ins>**
**<ins>ZLOOP's Ability to Raise Capital Evaporates and Business Plummets</ins>**

99.    On January 23, 2014, ZLOOP and PRC Industries entered into a one-year contract, with automatic annual renewals, to process various consumer electronics and consumer appliances (the "ZLOOP-PRC Partnership").    ZLOOP thereafter began processing at the Hickory Super Center in or around January 2014 and, after experiencing a significant uptick in business, increased its production to two shifts, five days per week by approximately July 2014.    By the time of the eventual termination of the ZLOOP-PRC Partnership, discussed *infra*, ZLOOP successfully had recycled from PRC Industries 3.8 million pounds (1,900 short tons) of Keurig brand coffee brewers and 1 million pounds (500 short tons) of consumer appliances with a significant gross revenue of at least $1.8 million.    The 2015 projected annual weight was 16.5 million pounds (8,250 short tons), corresponding to projected annual gross revenue of $10.85 million.    Moreover, in April 2014, ZLOOP and PRC Industries were preparing for a shared refurbishing and recycling plant to be located at ZLOOP's Fernley, NV facility, thus bolstering the value of the ZLOOP-PRC Partnership to the Company.    In June 2014, ZLOOP and PRC Industries jointly considered a property in Newton, North Carolina to replace and consolidate PRC Industries' Spruce Pine, North Carolina location and ZLOOP's Hickory, North Carolina, location.    During the next month, BB and BL visited the Long Island, New York headquarters of PRC Industries to continue developing co-marketing programs as well as working on obtaining various industry certifications such as ISO-9001, ISO-14001, OHSA18001 and R2 2013 standard.

100.    Upon information and belief, in September 2014, Mosing, aware of the Zloop-PRC Partnership, in concert and conspiracy with the named Co-Defendants and other as yet un-named Co-Defendants, began directing and/or participating in harassing mailings to PRC Industries in an effort to dissuade that company from continuing to work with ZLOOP.

101.    On or about September 25, 2014, Darren A. Krantz, President of PRC Industries, received a package bearing the return address "ZLOOP, Inc., Hickory, NC 28601," which included (1) news articles related to ZLOOP, (2) a list of "cc" recipients (the "Additional Recipients"), with whom ZLOOP had existing or prospective business relations, and (3) a copy of the Louisiana Complaint (complete with notations highlighting Mosing's and ZLOOP LA's allegations concerning the ZLOOP Parties' illegal business practices (the "First Harassing PRC Package"). That same day, by e-mail Krantz forwarded to the ZLOOP Founders, Boston and LaBarge, copies of the contents of the First PRC Package, and stating:

102.    Received the attached today via US Mail see all attached, Kevin O'Boyle will need to speak with you guys to discuss any potential issues, he is in NC through tomorrow but he will most likely reach out directly or request to stop by on his way back to airport.

103.    Then, by mail stamped by the U.S. Postal Service in Atlanta, GA on October 28, 2014, PRC Industries received an anonymous letter (the "Second Harassing PRC Package")  with the following message:

WHY ARE YOU PARTNERS WITH THIS COMPANY??????
I don't think your investors would be happy.  Nobody likes bad press.
Nobody wants federal investigations or indictments.

104.    The letter also included a public web address to which a copy of the Louisiana Complaint had been posted. Finally, enclosed with the letter was a second page with a print-out from ZLOOP's website depicting ZLOOP's locations and the Las Vegas, NV office of PRC Industries, labeled as "Recycling Partner." The information regarding the customer list was confidential propriety information with very tightly restricted access which only included four persons, namely, BB, BL, Mosing and Janes. The disclosure of this information was in direct

violation of the non-disclosure/confidentiality agreement previously signed by all parties with such access and demonstrates a mean spirited desire on the part of the Defendants involved to damage or destroy Zloop, Inc., BB and BL for reasons known only to the offending parties.

105.    On or about November 3, 214, PRC Industries received yet another anonymous package enclosing further information describing the Louisiana Action (the "Third Harassing PRC Package," and together with the First Harassing PRC Package and the Second Harassing PRC Package, the "Harassing PRC Packages").

106.    As a direct and proximate result of the Harassing PRC Packages received, PRC Industries terminated its partnership with ZLOOP, requesting that ZLOOP "remove all references to PRC from all ZLOOP, ZLOOP.com & ZLOOPit.com websites, facility maps, etc…." Upon information and belief, Mosing either individually, through various agents or acting in concert with one or more other parties, caused the First Harassing PRC Package to be delivered to all of the Additional Recipients as well. In furtherance of the plan, scheme or design on the part of Mosing and the other named and un-named Defendants, to undermine Zloop,. and/ or BB and BL and in so doing cause a diminution in the value of Zloop, and a consequential diminution in the value of the stock or equity of the Plaintiffs, for reasons known only to the Defendants or those associated or aligned with the interest of Mosing. Said acts and omissions did in fact proximately result in the destruction of the previously excellent reputations of Zloop,., BB and BL with devastating financial effects upon Zloop, and the Plaintiffs without legal justification or excuse.

### Mosing Purchases The Patriot Bank Note Without Telling BB and BL, Then Sues ZLOOP for $14 Million Dollars

107.    Upon information and belief, in December, 2014, Mosing and Patriot Bank surreptitiously entered into an agreement, whereby Mosing purchased the April 2014 Patriot Bank Note.in order to avoid claims by said Bank that Mosing had fraudulently obtained the loan. The

Assignment and Assumption of Loan Documents (the "Assignment"), upon information and belief, was back-dated effective October 3, 2014. Following the Assignment, Mosing allegedly sent a letter to ZLOOP on December 12, 2014, informing ZLOOP of the Assignment and declaring the entire indebtedness immediately due and owing; however, neither ZLOOP nor the ZLOOP Founders, BB and BL ever received this letter. To date, neither ZLOOP nor the ZLOOP Founders, BB and BL, have received any notice of default, notice of intent to accelerate, or notice of acceleration from Patriot Bank with whom Mosing by his own declaration had a "special relationship!".

108. On December 15, 2014, Mosing filed a second action against ZLOOP in the District Court of Harris County, Texas to recover the same $14 million under the Patriot Bank Note, acquired by Mosing from Patriot as described in paragraph 85 above. The jurisdictional basis for said action was pursuant to language contained in the Note which is in conflict with the numerous documents previously signed by Mosing and ratified by performance thereon setting North Carolina as the proper Forum for all actions between the parties. In addition, this subsequent action in Texas, as was the case with the initial action in Louisiana, were commenced after the execution of releases by Mosing as to Zloop, BB and BL which included the alleged debt. Mosing as to Zloop, BB and BL.

109. Zloop, through counsel, removed the Texas case to the United States District Court for the Southern District of Texas, Houston Division, on the basis of diversity jurisdiction. Mosing, through counsel, sought remand on the grounds that Zloop had constructively waived its right to removal. On April 22, 2015, the Texas District Court granted Mosing's motion to remand. All pending matters in both the Texas and Louisiana are presently stayed by the virtue of the filing of

the Chapter 11 petition. Zloop, BB and BL, have valid defenses to each action which have not as yet been asserted by responsive pleading due to the aforementioned stay.

110.    The various contracts referred to hereinabove between the parties are valid and enforceable Contracts under the Laws of the State of North Carolina, with which the Plaintiff has fully Complied.

111.    Upon information and belief, the acts and omissions of the Defendants were intentional rather than accidental and constitute part of an ongoing conspiracy by said defendants with each other and other parties aligned with their interest, the intent of which is to disrupt or destroy Zloop thus allowing Mosing and his aligned shareholders to acquire the assets of Zloop at less than the fair market value and outside the predetermined method for acquisition or relinquishment of the stock in Zloop.

112.    At all relevant times complained of, Mosing and the other named and/or un-named Defendants involved in the preparation and filing of the unauthorized UCC-1's either knew or by reasonable due diligence, should have known the requirements of the Uniform Commercial Code as set forth in the Statutes of the State of North Carolina, yet willfully failed to comply with said requirements.

113.    Upon information and belief the Defendants and other as yet un-named engaged in a common scheme, plan or design, the intention of which was to damage or destroy Zloop and the Plaintiffs. Said acts include, but are not limited to the following:

   a)    Making knowing false accusations of criminal misconduct against BB and BL which constitute slander per sae.

   b)    Engaging in a pattern of harassment directed against BB and BL.

   c)    Initiating, causing the imitation and/or participating in a Federal investigation of BB and BL for alleged misconduct which the Defendants knew had no basis in fact.

d)      Interfering with the employment contracts of the Plaintiffs.

e)      Spreading false and malicious rumors about the Plaintiffs to third parties knowing the same to be false and misleading.

f)      Interfering with the contracts of Zloop with various third parties in order to damage Zloop and through Zloop the Plaintiffs.

g)      Preparing and filing unauthorized documents injurious to Zloop and the Plaintiffs.

h)      Incitation and engaging in a civil conspiracy against the Plaintiffs.

i)      Knowingly filing and pursuing one or more lawsuits with no basis in law or fact to cause unnecessary worry and expense to the Plaintiffs in violation of Rule 11 of the N.C.R.C.P and or the corresponding Federal Rules of Civil Procedure.

j)      Engaging in other acts and omissions which will be discovered during discovery.

114.    With regard to all matters involving conspiracy, upon information and belief, the acts engage in by the co-conspirators were knowing and intentionally engage in with the full understanding of the likely consequences of said acts as part of a continuing plan, scheme or design to commit illegal acts or legal acts in an improper or corrupt fashion in furtherance of the established civil conspiracy.

115.    That the acts and omissions of the Defendants are so outrageous and so egregious, that they establish a proper foundation for the award of punitive damages to the Plaintiffs.

116.    That as a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs have suffered and continues to suffer damages which include, but are not limited to The following:

a)      Diminution in the value of value of the stock or equity in Zloop.

b)      Costs and attorney's fees spent in the defense of the various spurious actions filed by the Defendants.

c)      Defamation of the character of Zloop and the Plaintiffs.

d)      Loss of employment by the individual Plaintiffs with Zloop and the salary and other benefits associated therewith.

e)      Diminished employability of the individual Plaintiffs.

f)      Destruction of Zloop, Inc as a business entity.

g)      Loss of business opportunity.

117.    The Defendants, prior to having access to the confidential financial information of Zloop and/or the Plaintiffs as majority shareholders, were required to sign a confidentiality/non-disclosure agreement to ensure that all such information aa well as any other propitiatory information or "Trade Secrets" were not disclosed to or shared with any third party or parties without prior consent.

118.    The guarantee of confidentiality and non-disclosure by the Defendants was a condition precedent to any between the Plaintiffs and the Defendants or their agents.

119.    The entry into the confidentiality/non-disclosure agreement constituted a valid and enforceable contract between the Plaintiffs, Zloop and the Defendants.

120.    As a result of the special relationship established between the Plaintiffs and the Defendants, the Defendants had a fiduciary duty to the Zloop and the Plaintiffs.

121.    At all relevant times prior to the transfer of any interest in or to Zloop, all stock was owned by the Plaintiffs in equal shares.

122.    At all relevant times prior to the transfer of any ownership interest in Zloop by the Plaintiffs, Mosing and his related Defendant minority stockholders made various representations, promises and inducements to the Plaintiffs regarding their intentions with regard to their involvement in Zloop if the Plaintiffs agreed to transfer a portion of their ownership to the Defendants upon which the Plaintiffs relied as conditions precedent to the transfer.

**123.** At all relevant times the Plaintiffs were assured that the representation, promises and inducements made by the Defendants were truthful and thereafter relied upon said representations to their detriment.

**124.** Upon information and belief, the Defendants prior to the making of the various promises, statements or inducements to the Plaintiffs necessary to gain an ownership interest in Zloop, knew that the representations were materially false and/or misleading and that they had no intention to honor their commitments made either orally or in writing.

**125.** The Plaintiffs, as the sole stockholders of Zloop, had no duty to transfer or allow the transfer of any ownership interest in or too Zloop; however, relying upon the promises, and inducements made the decision to become involved with the Defendants which, had they been truthfully advised of the intentions of the Defendants they would not have made.

**126.** The Defendants engaged in fraud and misrepresentations to acquire an interest in Zloop and thereafter proceed to breach virtually all of the promises, inducements and agreements between the parties resulting in monetary damages to the Plaintiffs occasioned by said treachery.

**127.** Upon information and belief, the acts and omissions of the Defendants demonstrate a total disregard for truth, fairness or honesty to the extent that they demonstrate that the inducements and promises constituted fraud in the factum as well as fraud in the treatise.

**128.** Upon information and belief, the acts and omissions of the Defendants are part of a preconceived plan or course of conduct intended to acquire an interest in Zloop from the Plaintiffs by whatever means possible and thereafter orchestrate what amounts to a hostile takeover of Zloop through a series of carefully planned obstructionist's acts against the Plaintiffs which include but are not limited to the following:

      **a.** gaining access to and control over the financial records of the company the factum;

b.    gaining concessions from the Plaintiffs by the use of fraud and misrepresentation;

c.    sharing confidential information protected by duly executed confidentiality agreements with various third parties in direct violation of said agreement;

d.    spreading false and malicious rumors about the Plaintiffs;

e.    threatening to seek or initiate a criminal investigation of the Plaintiffs;

f.    filing spurious or frivolous lawsuits to tax the resources of Zloop and the Plaintiffs;

g.    Engaging other third parties to deliver to various customers of Zloop negative information regarding the false claims made in the various frivolous lawsuits filed by Mosing and/or the other Defendants associated with him and the potential for an investigation the Defendant Mosing intended to initiate to further harass or damage the Plaintiffs;

h.    Making derogatory statements designed to demean the good character of the Plaintiffs in public and private, which he knew to be false, in order to create a false negative impression of the Plaintiffs in the business arena in which they operate;

i.    engaging in slander per sae and slander per quad as to the Plaintiffs for personal revenge or gain;

j.    orchestrating by sheer force of financial ability and position a plan of increasing hostile harassment against the Plaintiffs individually and the company or companies with which they were associated;

k.    engaging in a civil conspiracy against the Plaintiffs individually for person gain or negotiating position; intentionally breaching valid and enforceable contracts or agreements in the mistaken belief that the Plaintiffs lacked the personal resources to resist or defend against such efforts;

l.    filing or causing to be filed various action which they knew, or by due diligence should have known were barred by the prior releases granted,

m.    to create additional harassment and expense to the Plaintiffs;

n.      Failing to properly handle the books and records of the corporation and thereafter falsely accusing the Plaintiffs of misconduct regarding the entries made by or at the direction of the Defendants;

o.      materially altering various company records, email, memo to create a false or purposely designed issue related to the content or existence of such items;

p.      falsely claiming lack of knowledge regarding acts and omissions knowingly made by the Defendants in order to cast suspicion of misconduct on the Plaintiffs unjustly;

q.      engaging the services of various professionals to make the lives of the Plaintiffs as difficult as possible and their condition intolerable without just cause or excuse;

r.      engaging in other acts and omissions as yet unknown, which will be determined during discovery;

s.      doctoring or attempting to doctor or alter the records of the company to negatively impact the Plaintiffs or create unnecessary and unfounded suspicion about the Plaintiffs;

t.      engaging in the malicious and mean spirited acts complained of and thereafter seeking to prevent any action for recovery from being filed by buying or attempting to buy the potential claims of Zloop for $200,000 dollars to provide a shield against being held responsible for his or their outrageous actions;

u.      engaging in a course of conduct totally devoid of any regard for truth or fair dealing in his interactions with the Plaintiffs.

## I.
### FIRST CAUSE OF ACTION
### (Breach of Contract as to Mosing Only)

129.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

130.    On March 27, 2014, ZLOOP made a written offer to Mosing for ZLOOP to repurchase the Texas Franchises, which offer clearly and expressly required Mosing to execute contemporaneously a Termination Agreement (the "March 27 Repurchase Offer"). The Termination Agreement contained a clear and express term through which Mosing "unconditionally and immediately upon signing of this Termination Agreement, release[d] [ZLOOP, Inc.], its affiliates and each of their officers, directors, members, managers and employees from any and all claims, demands, obligations and liabilities of any nature whatsoever, known or unknown, whenever arising." Such release was offered "[i]n connection with the offer of rescission and the parties' agreement to terminate the franchises, and for consideration as set forth in the [Repurchase Offer Letter] ...".

131.    On April 1, Mosing accepted the March 27, 2014 Repurchase Offer by, *inter alia*, signing the Termination Agreement. which created a valid and enforceable agreement.

132.    In the Louisiana Action, Mosing has pursued claims against the ZLOOP Parties arising under the Texas Franchise Agreements and other related contracts entered into between the parties.

133.    Among other binding provisions, the agreements between Mosing and the Plaintiffs included a Release of all claims between the Parties which was breached by Mosing with the filing of the actions complained of.

134.    Mosing has breached the express terms of the Termination Agreement. and the Releases associated therewith. Said breach constitutes a material breach which has not been cured by Mosing.

**135.**    At all relevant times, the Plaintiffs fully complied with the terms and conditions of the various contracts and were legally entitled to require the faithful performance of its terms and conditions by Mosing.

**136.**    As a direct and proximate result of Mosing's breach, the Plaintiffs have suffered damages compensatory damages in an amount in excess of $75,000 with the actual amount to be determined.

### II.
### SECOND CAUSE OF ACTION
### (Breach of Contract as to Mosing only)

**137.**    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

**138.**    On March 27, 2014, ZLOOP made a written offer to Mosing for ZLOOP to repurchase the Texas Franchises (the "March 27 Repurchase Offer"). In the March 27 Repurchase Offer Letter, ZLOOP offered two liquidation options to franchisees: (1) the "Rescission Option"; and (2) the "Equity Option." Under the Rescission Option, ZLOOP would remit to Mosing the "aggregate amount of payments that [he] ha[d] made to date directly to [ZLOOP] for his [f]ranchise" (the "Total Franchise Payment Amount"), "upon the earlier to occur of [(a)] the completion of a single financing by [ZLOOP] that raises gross proceeds of not less than $20,000,000 [] and [(b)] December 31, 2014 . . . ."    On the other hand, under the Equity Option, ZLOOP would issue "the number of shares of Common Stock that are equivalent in value to your Total Franchise Payment Amount[] and a warrant to purchase the same amount of Common Stock in connection with a [c]hange of [c]ontrol . . . ."    To make a selection, Mosing was required to complete the "Offeree Information Sheet."

139.    On April 1, 2014, Mosing accepted the March 27, 2014 Repurchase Offer by, *inter alia*, completing and signing the Offeree Information Sheet. The parties, therefore, formed a valid and enforceable agreement on April 1, 2014 which was breached by Mosing resulting in damages to Zloop and consequently to the Plaintiff's.

140.    In completing the Offeree Information Sheet, Mosing elected the Rescission Option and, accordingly, would receive a payment of $10,989,179 (Mosing's Total Franchise Payment Amount taking into account the Louisiana Franchises and the Texas Franchises), upon the earlier of a $20 million capital raise or December 31, 2014.

141.    Notwithstanding that ZLOOP's obligation under the Rescission Agreement did not mature, at the latest, until December 31, 2014, and that ZLOOP was in the middle of a capital raise with Loeb Partners, Mosing improperly commenced the Louisiana Action on August 28, 2014.

142.    As a result of Mosing commencing the Louisiana Action, ZLOOP's capital raise efforts failed.

143.    By reason of the facts and circumstances stated above, Mosing has breached the express terms of the agreement forming the basis of the Offeree Information Sheet. The said breach is a material breach, resulting in compensatory damages to and/or diminution of the value of Zloop and the consequential damage to the Plaintiffs in the loss of equity value.

144.    At all relevant times, Zloop and or the Plaintiffs complied with the terms and conditions of the contract and had the legal authority to demand compliance by Mosing.

145.    As a direct and proximate result of Mosing's breach, ZLOOP has suffered a diminution in value resulting in compensatory damages to the Plaintiffs in an amount in excess of $75,000 with the actual amount to be determined at trial.

**III.**
**THIRD CAUSE OF ACTION**
**(Breach of Contract as to Mosing and ZLOOP LA)**

**146.**    All Preceding paragraphs are incorporated herein by reference as if fully set forth herein.

**147.**    On March 27, 2014, ZLOOP made a written offer to Mosing for ZLOOP to repurchase the Louisiana Franchises, which offer clearly and expressly required Mosing to execute contemporaneously a Termination Agreement (the "March 27 Repurchase Offer").    The Termination Agreement contained a clear and express term through which Mosing "unconditionally and immediately upon signing of this Termination Agreement, release[d] [ZLOOP, Inc.], its affiliates and each of their officers, directors, members, managers and employees from any and all claims, demands, obligations and liabilities of any nature whatsoever, known or unknown, whenever arising." Such release was offered "[i]n connection with the offer of rescission and the parties' agreement to terminate the franchises, and for consideration as set forth in the [Repurchase Offer Letter] ..."

**148.**    On April 1, 2014, Mosing accepted the March 27, 2014 Repurchase Offer by, *inter alia,* signing the Termination Agreement. Mosing signed the Termination Agreement on behalf of ZLOOP LA. The parties, therefore, formed a valid and enforceable agreement on April 1, 2014 which contained various provisions including releases as to Zloop, BB and BL.

**149.**    The filing of the action in Louisiana by, Mosing and ZLOOP LA is in direct violation of the terms and conditions of the prior release as to Zloop, BB and BL upon which they had the legal authority to rely.

**150.**    By reason of the facts and circumstances stated above, Mosing and ZLOOP LA have materially breached the express terms of the Termination Agreement and have failed to cure the said breach.

**151.**    As a direct and proximate result of Mosing's and ZLOOP LA's breach, the Plaintiffs have suffered compensatory damages in excess of $75,000 with the actual amount to be determined at trial.

## IV.
## FOURTH CAUSE OF ACTION
### (Breach of Contract against Mosing and ZLOOP LA)

**152.**    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

**153.**    On March 27, 2014, ZLOOP made a written offer to Mosing for ZLOOP to repurchase the Louisiana Franchises (the "March 27 Repurchase Offer"). In the March 27 Repurchase Offer Letter, ZLOOP offered two liquidation options to franchisees: (1) the "Rescission Option"; and (2) the "Equity Option." Under the Rescission Option, ZLOOP would remit to Mosing the "aggregate amount of payments that [he] ha[d] made to date directly to [ZLOOP] for his [f]ranchise" (the "Total Franchise Payment Amount"), "upon the earlier to occur of [(a)] the completion of a single financing by [ZLOOP] that raises gross proceeds of not less than $20,000,000 [] and [(b)] December 31, 2014 . . . ." On the other hand, under the Equity Option, ZLOOP would issue "the number of shares of Common Stock that are equivalent in value to your Total Franchise Payment Amount [] and a warrant to purchase the same amount of Common Stock in connection with a [c]hange of [c]ontrol . . . ." To make a selection, Mosing was required to complete the "Offeree Information Sheet." On April 1, 2014 Mosing accepted the March 27 Repurchase Offer by, *inter alia*, completing and signing the Offeree Information Sheet. Mosing

completed the Offeree Information Sheet on behalf of ZLOOP LA. The parties, therefore, formed a valid and enforceable agreement on April 1, 2014.

154.    In completing the Offeree Information Sheet, Mosing and ZLOOP LA elected the Rescission Option and, accordingly, would receive a payment of $10,989,179 (Mosing's Total Franchise Payment Amount taking into account the Louisiana Franchises and the Texas Franchises), upon the earlier of a $20 million capital raise or December 31, 2014.

155.    Notwithstanding that ZLOOP's obligation under the Rescission Agreement did not mature, at the latest, until December 31, 2014, and that ZLOOP was in the middle of a capital raise with Loeb Partners, Mosing and ZLOOP LA commenced the Louisiana Action on August 28, 2014.

156.    As a result of Mosing and ZLOOP LA commencing the Louisiana Action against, ZLOOP's and other acts and omissions in direct violation of the terms of the contractual agreements between the parties the capital raise efforts by the Zloop failed., resulting in a series of events that resulted in the diminution of the value of Zloop and the resultant consequential damages to the Plaintiffs.

157.    By reason of the facts and circumstances stated above, coupled with other acts and omissions Mosing and ZLOOP LA have materially breached the express terms of the agreement forming the basis of the Offeree Information Sheet and have failed to cure said breach.

158.    As a direct and proximate result of Mosing's and ZLOOP LA's breach of contract, ZLOOP and through Zloop the Plaintiffs have suffered compensatory damages in excess of $75,000 with the actual amount to be determined at trial.

## V.
## FIFTH CAUSE OF ACTION
### (Tortious Interference with Contracts)

**159.**   All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

**160.**   At all relevant times, the Defendants either knew or by reasonable due diligence should have known about the existence of various contracts between Zloop and various customers, suppliers and financial institutions which would likely be adversely effected by the filing of spurious or misleading complaints, the dissemination of false and misleading information and or other similarly disruptive acts; however, despite such knowledge, engaged in the acts and omissions complained of above and upon information and belief other similarly egregious acts that will be discovered during discovery in this matter.

**161.**   In addition, the Defendants knew of the existence of Release as to the Plaintiffs created by contract upon which the Plaintiffs had the legal authority to rely.

**162.**   The acts and omissions on the part of the Defendants were intended to interfere with and did in fact interfere with various contractual relationships between Zloop and various third parties as well as the contracts of the Plaintiffs resulting in compensatory damages. in an amount in excess of $75,000 dollars with the actual amount to be determined at trial.

## VI.
## SIXTH CAUSE OF ACTION
### (Tortious Interference with Contract of Employment)

**163.**   All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

164.    In August 2014, Mosing directed or participated with the other Defendants in the filing of the Unsupported and unauthorized UCC-1 Financing Statement, which broadly encompassed, essentially, every asset of ZLOOP.

165.    Aware of ZLOOP's ongoing and languishing funding efforts, Mosing, upon information and belief, directed the filing of the previously discussed Unsupported and unauthorized UCC-1 Financing Statement for the purpose of surreptitiously placing himself in a better position than other existing or potential creditors to collect on the debts allegedly owed by ZLOOP to him.

166.    As a sophisticated and seasoned business person, Mosing clearly understood, or should have understood, that his act would cause ZLOOP difficulty in, if not prevent outright, ZLOOP efforts at obtaining funding from outside sources.

167.    As a direct result of the filing of the Unsupported and unauthorized UCC-1 Financing Statement, the Potential Lenders with whom Zloop had filed applications, declined to offer any funding to ZLOOP.  In addition, the existence of the improper filings prevented further efforts on the part of Zloop to obtain outside funding from other sources from having any reasonable likelihood of successs.

168.    By reason of the facts and circumstances stated above, it is respectfully contended that the Defendants willfully, intentionally and tortuously interfered with ZLOOP's prospective business relations with one or more of the Potential Lenders being courted by Zloop. Resulting in the diminution in the value of Zloop and the consequential damages to the Plaintiffs related thereto.

169.    As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs have suffered Compensatory damages in an amount in excess of $75,000 with the actual amount to be determined at trial.

## VII.
## SEVENTH CAUSE OF ACTION
### (Tortious Interference with Business Relations as to Mosing only)

170.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

171.    In September 2014, upon information and belief, Mosing, individually and/or acting in concert with one or more un-named persons or entities, directed or participated in the mailing of the First Harassing PRC Package, which caused PRC Industries, with which ZLOOP had an existing partnership agreement, to contact ZLOOP, questioning the continuing viability of the companies' partnership.

172.    In October 2014, upon information and belief, Mosing, individually and/or acting in concert with one or more persons or entities, directed or participated in the mailing of the Second Harassing PRC Package, which included the negative personal message "WHY ARE YOU PARTNERS WITH THIS COMPANY?????? I don't think your investors would be happy. Nobody likes bad press. Nobody wants federal investigations or indictments," and attached a map specifically identifying PRC Industries' partnership with ZLOOP., knowing the statements to be false and slanderous and likely to interfere with or destroy the relationships engaged in or anticipated with the parties to whom the mailing was sent.

173.    Upon information and belief, in November 2014, Mosing, individually and/or in concert with one or more persons or entities, directed or participated in the mailing of Third Harassing PRC Package.

174.    Upon information and belief, Mosing, either individually or acting in concert with one or more individuals or entities, directed or participated in the Harassing PRC Packages with

full knowledge that ZLOOP had an existing contract with PRC Industries and that delivery of the materials complained of would likely interfere with or destroy the existing relationship.

175.   Upon information and belief, one, if not the primary reason for the acts and omissions of Mosing and those associated or involved with him in the distribution of the packets complained of, was out of revenge and for the purpose of causing PRC Industries to withdraw from its partnership with ZLOOP, which Mosing knew would severely damage   ZLOOP's business and/or threaten Zloop's survivability.

176.   As a direct and proximate result of the receipt of the Harassing PRC Packages, PRC Industries did in fact terminated its partnership with ZLOOP, requesting that ZLOOP "remove all references to PRC from all ZLOOP, ZLOOP.com & ZLOOPit.com websites, facility maps, etc...."

177.   By reason of the facts and circumstances stated above, Mosing tortuously interfered with ZLOOP's existing business relationship with PRC Industries.

178.   As a direct and proximate result of Mosing's interference, ZLOOP suffered compensatory damages in an amount in excess of $75,000 with the actual amount to be determined at trial.

## VIII.
### EIGHT CAUSE OF ACTION
#### (Conversion/Intentional Diminution of the Value of Zloop)

179.   All preceding paragraphs are incorporated herein by reference as if full set forth herein.

180.   Upon information and belief, the Defendants individually or acting in concert with one or more persons or entities, known and unknown, engaged in a concerted plan, scheme or design the intention of which was to improperly convert to their own use certain "confidential proprietary information" or "Trade Secrets" belonging to Zloop which were covered by the

provisions of one or more non-disclosure/confidentiality agreements previously executed by the Defendants.

181.    The information converted was privileged and otherwise unavailable to any party not covered by a confidentiality/non-disclosure agreement given its importance to Zloop and the Plaintiffs.

182.    Upon information and belief, the Defendants and others acting in concert with them surreptitiously converted the privileged information, in direct violation of their contractual duties, to their individual use for the purpose of using the information in a distorted form to damage Zloop and the Plaintiffs and/or gain an economic advantage in their efforts to take control of Zloop at less than the predetermined conversion value or the fair market value.

183.    The acts and omissions of the named Defendants and those with whom they have conspired or associated, have effectively destroyed the value of Zloop and the net worth of the Plaintiffs due to the loss of their individual interest in Zloop.

184.    As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs have suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

185.    The acts and omissions of the Defendants are so outrageous and so egregious, that they form a proper foundation for the award of punitive or punishment damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Thousand Dollars with the actual amount to be determined at trial.

# IX.
## NINTH CAUSE OF ACTION
### Fraud and/or Misrepresentation)

**186.**    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

**187.**    Upon information and belief, the Defendants engaged in the making of materially false and misleading statements or inducements to the Plaintiffs intended to deceive the Plaintiffs, which did in fact deceive them resulting in damages to the Plaintiffs.

**188.**    At all relevant times the Defendants knew that their deception would likely cause damage to the Plaintiffs who were relying upon the information as being true and correct; however, despite such knowledge persisted in their course of conduct against the Plaintiffs or reasons known only to the Defendants.

**189.**    Upon information and belief, the fraud and misrepresentation engaged in by the Defendants with the Plaintiffs was part of a larger plan, scheme or design intended to damage or destroy Zloop and or the individual Plaintiff's interest therein.

**190.**    As a direct and proximate result of the fraud and misrepresentations by the Defendants, The Plaintiffs have suffered and continue to suffer damages which include, but are not limited to the following

  **a.**  loss of business advantage

  **b.**  loss of credibility in the business arena

  **c.**  loss of business customer relationships

  **d.**  loss of exclusive name recognition

  **e.**  loss of market share

  **f.**  loss of profits or potential profits from their business or businesses

  **g.**  Corporate raiding

  **h.**  a hostile takeover of their business interest

    **i.**     loss of employment

    **j.**    breach of contract

    **k.**    loss of the value of their interest in Zloop

    **l.**    costs and attorney's fees

    **m.**   other damages to be determined during discovery

    **n.**    Defamation of character

191.    As a direct and proximate result of the fraud and deception of the Defendants, the Plaintiffs suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

192.    The acts and omissions of the Defendants were so outrageous and so egregious, that they form a proper legal basis for the award of punitive or punishment damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## X.
## TENTH CAUSE OF ACTION
### (Libel *Per Se* against Mosing and ZLOOP LA)

193.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

194.    On August 28, 2014, Mosing and ZLOOP LA commenced the Louisiana Action, notwithstanding that in April 2014, Mosing and ZLOOP LA granted ZLOOP, Boston and LaBarge, among others, broad, unconditional and immediately effective releases. In the Louisiana Complaint, and, upon information and belief outside the lawsuit, Mosing and ZLOOP LA knowingly make knowing false, malicious and slanderous statements of purported fact concerning the history of events surrounding Mosing's involvement with, investments in, and loans to ZLOOP. The statements made by Mosing and/or Zloop LA both in and outside the action were

intended to slander the previously good name of Zloop, Boston and LaBarge by the making of numerous false and unsupported claims that defame and call into question Zloop's, BB's and BL's character, reputation, ethics and business practices, knowing the same to be false and likely to cause damage to said persons or entity.

195.    On their face, Mosing's and ZLOOP's allegations as contained in the Louisiana Complaint and as, upon information and belief expressed to other third parties were designed to improperly impeach or bring into question Zloop's, BB's and BL's reputation with in the trade and profession with which they are associated.

196.    After filing the spurious Louisiana Complaint, upon information and belief, Mosing, either individually or acting in concert with one or more persons or entities directed or participated in the delivery of the Harassing PRC Packages to PRC Industries and to the additional recipients, with whom ZLOOP had prospective or existing business relations. By accessing confidential proprietary information that was subject to previously executed confidentially/non-disclosure agreement between Zloop, Mosing and Zloop LA which was restricted to only two persons other than Boston and LaBarge. Upon information and belief, in addition to the foregoing acts, Mosing individually or acting in concert with one or more persons or entities posted, or directed the posting of, the Louisiana Complaint to an online public website and thereafter spread the word as to the posting among clients, creditor's, stockholders and customers of Zloop with the full knowledge of the negative impact such information would have on Zloop. As of the date of the filing of this Complaint, the website has been viewed in excess of 3,000 times and continues to cause damage to Zloop, BB and BL.

197.    At all relevant times prior to the acts complained of, Zloop as a business and BB and BL as individuals had excellent reputation within the trade, a fact very critical to the success

and growth of a new company. As a direct result of the acts of Mosing and the others with whom he associated in the dissemination of the false, misleading and slanderous information, the reputations of Zloop, BB and BL were negatively impacted or damaged.

198.    These republications of the knowingly false and defamatory statements are not privileged because the republications occurred outside the context of the Louisiana Action or any other litigation to which they would be relevant thus constituting the individual act of the Defendant's.

199.    The statements made and/or disseminated as stated above by Mosing and ZLOOP LA constitutes libel *per se*.

200.    As a direct and proximate result of the acts and omissions of Mosing and Zloop LA constituting libel per se, the Plaintiffs have suffered and continues to suffer compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) with the actual amount to be determined at trial.

201.    The acts and omissions of the Defendants are so outrageous and so egregious as to form a proper legal basis for the award of punitive or punishment damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## XI.
## ELEVENTH CAUSE OF ACTION
### (Violations of the UCC by Mosing and affiliated Co-Defendants)

202.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

203.    At all relevant times, Mosing and all parties involved in the preparation, distribution and/or filing of the unauthorized UCC-1's previously described hereinabove were subject to the

statutory requirements of the Uniform Commercial Code ("UCC") as set forth in Article 9 of the General Statutes of the State of North Carolina.

204.    The acts and omissions of Mosing and those Defendants associated with him in the preparation, dissemination and filing of the unauthorized UCC-1's discussed above constitutes a statutory violation of Chapter 9 entitling the Plaintiff to damages which include. the remedies set forth in Sec. 9-625, et seq.

205.    As a result of the improper filing of the UCC, the Plaintiffs were individually and corporately precluded from obtaining funds necessary to continue the operation of Zloop.

206.    As a direct and proximate result of the violations of the provisions of Chapter 9 by Mosing and those associated or involved with him in the preparation and filing of the unauthorized UCC-1's, Zloop and the Plaintiffs individually have suffered compensatory and/or statutory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

207.    The acts and omissions of the Defendants are so outrageous and so egregious, that they form a proper legal basis for the award of punitive or punishment damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars.

## XII.
## TWELFTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

208.    All preceding paragraphs are incorporated herein by reference as if full set forth herein.

209.    As noted, in April 2014, Mosing and ZLOOP formed an agreement whereby ZLOOP agreed to pay to Mosing $10,989,179 in exchange for Mosing tendering all of his franchise

interests. Under that agreement, ZLOOP was to make such payment upon the earlier of the Company securing a $20 million capital raise or December 31, 2014.

210.    In interfering with ZLOOP's existing and prospective business relations, including filing the Unsupported UCC-1 Financing Statement, causing the delivery of the Harassing PRC Packages and the posting of the Louisiana Complaint on the public website, and then his purchase and legal enforcement of the April 2014 Patriot Bank Note, Mosing knowingly and unreasonably impeded ZLOOP's ability to complete its capital raise and other funding such that the Company was unable, as a result of Mosing's conduct, to secure $20 million to be able to meet its obligations under the March 27 Repurchase Offer and Liquidation Options.

211.    By reason of the facts and circumstances stated above, Mosing breached the implied covenant of good faith and fair dealing inhering to the March 27 Repurchase Offer and Liquidations Options.

212.    The Defendants individually and acting in concert and conspiracy, one with the other, have engaged in acts and omissions which violate the implied covenant of "Good Faith And Fair Dealing" as well as the provisions of the various agreements they have breached or ignored.

213.    As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs have suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars.

214.    The acts and omissions of the Defendants, jointly and severally are so outrageous and so egregious as to form a proper legal foundation for the award of punitive or punishment damages in an in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

# XIII.
## THIRTEENTH CAUSE OF ACTION
### (Unjust Enrichment)

**215.** All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

**216.** As to Mosing. on January 2, 2014, Mosing made a written offer to exercise his Texas Franchise Option. In that offer, as part payment toward the Texas Franchises, Mosing agreed to execute a $800,000 note in favor of ZLOOP, which amount was intended to cover the remainder owed on the Texas Franchises after crediting several of Mosing's loans and other payments to ZLOOP. In part relying on Mosing's promise to execute an $800,000 note, the ZLOOP Founders, BB and BL accepted Mosing's offer.

**217.** Mosing executed the Texas Franchise Agreements in February of 2014, however, they were backdated to January 2. 2014.

**218.** Despite having executed the Texas Franchise Agreement, Mosing never executed a note for the $800,000 dollars in favor of ZLOOP, as required and later improperly claimed to own the rights to all of the Texas Franchises free and clear which he knew to be untrue.

**219.** To the extent of ownership in or claims of ownership in the Texas Franchises, Mosing has been unjustly enriched by at least $800,000 dollars.

**220.** Upon information and belief, the Defendants individually and jointly have engaged in acts and omissions calculated to unfairly and unjustly enrich themselves to the detriment of the Plaintiffs.

**221.** As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs have suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## XIV
## FOURTEENTH CAUSE OF ACTION
### (Fraud and Misrepresentation)

222.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

223.    Upon information and belief, Mosing and the other named Defendants have engaged in a pattern of fraud and misrepresentation in their dealings with the Plaintiffs including the making of promises, inducements and representations which they knew, or by due diligence, should have known were false and misleading to the extent they constituted fraud. Said acts included, but are not limited to the following:

a.    Filing or causing to be filed UCC-1's to strengthen Mosing's position as a creditor without obtaining prior approval or authorization for the preparation and filing of said documents.

b.    Making or causing to be false and misleading statements about Zloop and the Plaintiffs its majority shareholders in an attempt to diminish the value of said Corporation in order to attempt to acquire the corporation for less that fair market value or for other improper purposes known only to the Defendants.

c.    Making materially false or misleading statements regarding their intentions with regard to

d.    Zloop as inducements for the Plaintiffs to allow Mosing and his affiliated Co-Defendant minority shareholders to become involved with Zloop knowing at the time the materially false and misleading statements were made that they were false and further, that the Plaintiffs were relying upon the assertions as being true to their detriment. But for the fraud in the factum engaged in by the Defendant shareholders, they would not have been allowed to purchase an interest in or become involved with either the Plaintiffs or Zloop.

**e.**     Engaging in the systematic distribution of false information regarding Zloop and the Plaintiffs which they knew to be false and misleading which were obtained through the improper use and dissemination of restricted confidential proprietary information in direct breach of a legally binding confidentiality agreement.

**f.**     Failing to honor the requirements established by duly executed and legally binding contracts and/or releases with Zloop and the Plaintiffs.

**g.**     Violating their fiduciary duties to Zloop and the Plaintiffs.

**h.**     Tortuously interfering with contracts of Zloop including the employment contracts of the Plaintiffs.

**i.**     Engaging in systematic violations of the confidentiality/non-disclosure agreements previously entered into by distributing customer lists, financial information or other restricted, proprietary information.

**j.**     Engaging in overt acts calculated to interfere with or destroy Zloop. and destroy the Plaintiffs financially.

**k.**     Engaging in self-dealing adverse to the best interest of Zloop and the Plaintiffs.

**l.**     Using funds of Zloop for personal expenses without the knowledge or permission of Zloop or the Plaintiffs.

**m.**     Engaging in a civil conspiracy the object of which is the destruction of Zloop as a going concern to allow one or more of the Defendants to acquire the assets at less that the fair market value to the detriment of Zloop and the other stockholders including the Plaintiffs.

**n.**     Violating the position of trust afforded the named Defendants due to their respective positions as shareholders, advisors, officers or investors in Zloop.

**o.**     Engaging in other improper or destructive acts to be determined during discovery.

**p.**     The acts and omissions of the Defendants were calculated to deceive the Plaintiffs and did in fact deceive the Plaintiffs resulting in damages to the Plaintiffs.

224.    The Plaintiffs, at all relevant times, relied upon the statements and inducements of the Defendants as true, when, upon information and belief, the statements, acts, inducements, and promises were known by the Defendants to be false or misleading at the time they were made; that they would be relied upon by the Plaintiffs and that such reliance would result in damage to the Plaintiffs.

225.    The Plaintiffs suffered damages as a proximate result of the fraud and misrepresentations of the Defendants.

226.    Had the Defendants been honest and truthful with the Plaintiffs regarding their intentions prior to their initial involvement, the Plaintiffs would not have sold or allowed the transfer of a minority interest to said plaintiffs thus eliminating all of the damages they have suffered as a result of such involvement.

227.    As a direct and proximate result of the fraud and misleading acts and omissions of the Defendants, the Plaintiffs have suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

228.    The acts and omissions of the Defendants are so outrageous and so egregious as to form a proper legal basis for an award of punitive or punishment damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## XV
### FIFTEENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)
### (as to Kendall. G. Mosing, James V. Janes, III, Marian Janes)

229.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

230.   At all relevant times the above named Defendants had a fiduciary duty to Zloop and through Zloop to the Plaintiffs as its Majority shareholders.

231.   The named Defendants have breached their fiduciary duties to the detriment of Zloop and the Plaintiffs individually.

232.   As a direct and proximate result of the Defendant's breach of their fiduciary duties, the Plaintiffs suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

233.   The acts and omissions of the Defendants are so outrageous and so egregious as to form a proper legal basis for the award of punitive or punishment damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## XVI.
## SIXTEENTH CAUSE OF ACTION
### (Defamation of Character)
### (as to all Defendants)

234.   All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

235.   At all relevant times prior to the acts and omissions of the Defendants, the Plaintiffs possessed excellent characters and reputations within the community in which they live and the industry in which the worked.

236.   The Defendants have systematically engaged in acts and omissions intended to defame and destroy the character and reputation of the Plaintiffs, which has in fact defamed and damaged their respective character.

237.   Upon information and belief the acts and omissions of the Defendants include but are not limited to the following:

**a.**     Accusing the Plaintiffs of misfeasance and/or malfeasance which they knew to be false.

**b.**     Falsely accusing the Plaintiffs of criminal misconduct which they knew at the time the statements were made to be false.

**c.**     Falsely referring to the Plaintiffs as crooks or in other derogatory terms.

**d.**     Making false and misleading negative statements about the Plaintiffs to other third parties when they knew the statements made were untrue.

**e.**     Referring to the Plaintiffs as criminals, dishonest, not trust worthy, liars, crooks and other similar derogatory terms which they knew to be false

**f.**     Other statements and references which are as yet unknown but may be determined during discovery.

238.   As a direct result of the acts and omissions of the Defendants the employability of each of the Plaintiffs has been significantly diminished and their character and reputations both personally and within the business community diminished

239.   As a direct and proximate result of the acts and omissions of the Defendants, the Plaintiffs have suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

240.   The acts and omissions of the Defendants are so outrageous and so egregious as to form a proper foundation for the award of punitive or punishment damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## XVII.
## SEVENTEENTH CAUSE OF ACTION
## (CONSTRUCTIVE AND/OR RESULTING TRUST)
### (as to all Defendants)

241.    All preceding paragraphs are incorporated herein by reference as if full set forth herein.

242.    As a direct and proximate result of the fraud and misrepresentations complained of hereinabove, a constructive and/or resulting trust in favor of the Plaintiffs has been established in an amount equal to the damages occasioned by said fraud against the Defendants.

243.    That the constructive and/or resulting trust created in favor of the Plaintiffs is in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## XVIII.
## EIGHTEENTH CAUSE OF ACTION
## (CIVIL CONSPIRACY)
### (as to all Defendants)

244.    All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

245.    Upon information and belief, the Defendants acting in concert with one or more other Defendants, have engaged in a conspiracy to commit either unlawful acts or lawful acts in an improper manner the intention of which is to damage or destroy the Plaintiffs.

246.    Upon information and belief, the acts and omissions of the Defendants are part of a calculated scheme, plan or design to interfere with the lives, occupations and financial status of the Plaintiffs without lawful excuse or justification, which have in fact virtually destroyed the reputation, employment and character of the Plaintiffs.

247. As a direct and proximate result of the civil conspiracy engaged in by the Defendants the Plaintiffs have suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the actual amount to be determined at trial.

## XIX.
## NINETEENTH CAUSE OF ACTION
## (UNFAIR AND DECEPTIVE TRADE PRACTICES) CHAPTER 75-1.1 et seq.
### (as to all Defendants)

248. All preceding paragraphs are incorporated herein by reference as if fully set forth herein.

249. At all relevant times the Defendants were engaged in commerce.

250. The acts and omissions of the Defendants complained of hereinabove including the allegations of Fraud and misrepresentation constitute "unfair and Deceptive Trade Practices" in violation of N.C.G.S Sec. 75-1.1 et seq. and the analogous provisions of the Federal Statute.

251. As a direct and proximate result of the unfair and deceptive trade practices of the Defendants, the Plaintiffs have suffered compensatory damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars with the amount to be determined at trial. dollars with the actual amount to be determined at trial. Pursuant to the provisions of this statute all amounts recovered should be trebled and the Plaintiff awarded all costs incurred including reasonable attorney's fees.

**Wherefore** the Plaintiffs respectfully pray the Court as follows:

1.      That the Plaintiffs have and recover of the Defendants jointly and severally compensatory damages in an amount in excess of $75,000.00 exclusive of costs and interest with the actual amount to be determined at trial.

2.      That the Plaintiffs have and recover of the Defendants jointly and severally punitive damages in an amount in excess of $75,000.00 dollars with the actual amount to be determined at trial.

3.      That the acts and omissions of the Defendants be determined to be in violation of N.C.G.S Sec. 75-1.1 et. seq. and all damages recovered trebled and in addition all costs and attorney's fees recovered of the Defendants.

4.      That the Plaintiffs recover, pursuant to the terms of the various contracts discussed above, all costs and attorney's fees incurred in the prosecution or defense of these actions or any other actions necessitated by the wrongful acts and omissions of the Defendants.

5.      That the Plaintiffs be awarded both pre and post judgment interest on all sums recovered.

6.      That the Plaintiffs be afforded a trial by jury as to all claims.

7.      For such other and further relief as the Court deems just and proper.

This the _____ day of _____ , 2016

By: _____

# Exhibit 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KENDALL GARRETT MOSING                    CIVIL ACTION NO. 14-CV-2608
and ZLOOP LA, LLC

VERSUS                                     JUDGE HAIK

ROBERT BOSTON,                             MAGISTRATE JUDGE HANNA
ROBERT LABARGE, ZLOOP, LLC,
and/or ZLOOP, INC.

## MEMORANDUM RULING
### *(Rec. Doc. 11)*

Currently pending before the undersigned, on referral from the district judge

for ruling, is the defendants' Motion to Transfer to the Western District of North

Carolina pursuant to 28 U.S.C. §1404(A) [Rec. Doc. 11]. After considering the

applicable law, the written submissions and arguments of the parties, and for the

following reasons, the motion is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

This is an action by Zloop LA, LLC and its sole owner Kendall G. Mosing

against Zloop, LLC and its successor, Zloop, Inc., Robert Boston and Robert

LaBarge for alleged violations of Section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C.A. § 78a *et seq.*; SEC Rule 10b-5, 17 C.F.R. §240.10b–5; Sections

11, 77d and 77l of the Securities Act of 1933, 15 U.S.C.A. § 77a *et seq.*;SEC

Regulation D, 17 C.F.R. § 230.500 *et seq.*; the Louisiana Securities Law, La. R.S.

51:701 *et seq.*; the Louisiana Business Opportunity Law, La. R.S. 51:1821 *et seq.*;

the Louisiana Unfair Trade Practice Act, La. R.S. 51:1401; fraud; conversion;

breach of contract; negligent misrepresentation and detrimental reliance. Kendall

Garrett Mosing is a Louisiana resident and sole member of Zloop LA, LLC, a

Louisiana limited liability company. Defendant Zloop, LLC was a Delaware LLC

with its principal place of business in North Carolina; ZLOOP, Inc. is a Delaware

corporation with its principal place of business in North Carolina; Robert Labarge

is a citizen of South Carolina who resides in North Carolina; and Robert Boston is

a citizen and resident of Maryland. Both Labarge and Boston are alleged to be

officers and directors of ZLOOP, Inc. [Rec. Doc. 1, pp. 7-8]. In a 102 page

Complaint, the plaintiffs detail a long and complicated chronology of events

alleged to have been initiated by the defendants which they contend constituted

fraud, deception, misrepresentation, forgery and other dishonest acts designed to

induce Mosing to invest in the Zloop franchise enterprises described to him.[1]

According to the Complaint, the defendants generally communicated with

Mosing through his trusted friend, and on numerous occasions Mosing was

persuaded to invest in Zloop franchises, to loan money to Zloop and to establish

---

[1]Zloop purports to recycle electronic waste for profit. From old electronic equipment, they produce byproducts (copper, plastic, etc) for sale on the commodities market. Franchisees collect e-waste to be processed, earning a percentage of the processing revenue.

lines of credit for Zloop, secured by Mosing's money. Specifically, the plaintiffs

allege that beginning on September 25, 2012, the defendants began making

overtures to Mosing regarding prospects for Zloop franchises in Louisiana and

Ohio. On October 4, 2012, Mosing signed franchise disclosure documents related

to the possible purchases of three Louisiana Zloop franchises. [Rec. Doc. 11-3]

The documents disclosed various aspects of the contemplated franchise agreement,

including specifically identified risk factors to be considered by potential

purchasers. Included were the following provisions:

> 1. THE FRANCHISE AGREEMENT REQUIRES THAT ANY
> ACTION BROUGHT BY EITHER PARTY AGAINST THE OTHER
> IN ANY COURT SHALL BE BROUGHT WITHIN THE STATE OF
> NORTH CAROLINA. OUT OF STATE LITIGATION MAY
> FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT
> FOR DISPUTES. IT MAY ALSO COST YOU MORE TO
> LITIGATE IN NORTH CAROLINA THAN IN YOUR HOME
> STATE. THIS PROVISION IS SUPERSEDED BY CERTAIN
> STATE LAWS.
>
> 2. THE FRANCHISE AGREEMENT STATES THAT NORTH
> CAROLINA LAW GOVERNS THE AGREEMENT, AND THIS
> LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND
> BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE
> THESE LAWS.

[Rec. Doc, 11-3, p. 2]. The page on which these provisions appear bears the

initials "KGM" in the bottom, right corner. Mosing's full signature, as

"Franchisee," appears at page 56 of the document.

Eleven days later, on October 15, 2012, Mosing signed three franchise

agreements for the purchase of the Louisiana franchises by/for three limited

liability companies, which the plaintiffs assert were not in existence at the time

and were never formed.[2]  Mosing initialed each page of the agreements. [Rec. Doc.

11-3, pp. 57-168].  Each franchise agreement contains the following identical

provision, at art. XXIV(B):

> The parties agree that any action brought by either party against the
> other in any court, whether federal or state, shall be brought within
> the State of North Carolina and do hereby waive all questions of
> personal jurisdiction or venue for the purpose of carrying out this
> provision.

On September 23, 2013, Mosing executed the option to purchase eight

Texas franchises.  The Texas franchise agreements purport to have been signed by

Kendall Mosing as franchisee on January 2, 2014, but Mosing has declared he has

no memory of ever signing the Texas documents, and he disputes the date on the

documents.  He does not declare that he never signed the agreements, or that he

never owned the Texas franchises, and in briefs the plaintiffs state that he

maintained his position as owner of all franchise rights in Louisiana and Texas as

of April 30, 2014. [Rec. Doc. 23, p. 15].  The Texas franchise agreements contain

---

[2]      Zloop LA-T1, LLC, Zloop LA-T2, LLC, and Zloop LA-T3, LLC.  The named
plaintiff Zloop LA, LLC was formed 17 days later on November 2, 2012.

the identical forum-selection provision cited above from the Louisiana franchises. [Rec. Doc. 11-4, pp. 1-146].

The defendants seek to have this litigation transferred to North Carolina, consistent with the forum-selection clauses appearing in the franchise agreements. [Rec. Doc. 11]. They assert that the plaintiffs violated the mandatory North Carolina forum selection clauses in the franchise agreements by filing suit in this court. In response, the plaintiffs argue that (1) Mosing's claims are not within the scope of the forum selection clauses, since the plaintiffs do not claim breach of the franchise agreement(s), but assert claims which are non-contractual and beyond the scope of the clause, and (2) enforcement of the forum-selection clause is unreasonable under the circumstances of this case. [Rec. Doc. 23].

## APPLICABLE LAW AND ANALYSIS

*1. Whether the forum selection clause is mandatory or permissive*

Parties to a contract are permitted to select venue via a forum selection clause.[3] In order to find whether a forum selection clause requires the parties to litigate in the named forum, a court must first determine whether the forum

---

[3]*City of New Orleans v. Municipal Administrative Services, Inc.*, 376 F.3d 501(5th Cir. 2004).

selection clause is mandatory or permissive.[4]  Where a forum selection clause is

ambiguous and subject to more than one reasonable interpretation, the clause is

properly construed as permissive.  Mandatory forum selection clauses have

"express language limiting the action to the courts of a specific locale which is

clear, unequivocal and mandatory."[5]  "On the other hand, a permissive forum

selection clause authorizes jurisdiction or venue in a selected forum, but does not

prohibit litigation elsewhere."[6]  The Fifth Circuit explained:

> A party's consent to jurisdiction in one forum does not necessarily
> waive its right to have an action heard in another. For a forum
> selection clause to be exclusive, it must go beyond establishing that a
> particular forum will have jurisdiction and must clearly demonstrate
> the parties' intent to make that jurisdiction exclusive. It is important to
> distinguish between jurisdiction and venue when interpreting such
> clauses. Although it is not necessary for such a clause to use the word
> "venue" or "forum," it must do more than establish that one forum
> will have jurisdiction.[7]

The plaintiffs argue that the forum-selection clause at issue (Paragraph B)

should be considered permissive when read in conjunction with the paragraph

---

[4]*Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127(5th Cir. 1994).

[5]*Id.* at 127-28.

[6]*Bentley v. Mutual Benefits Corp.*, 237 F.Supp.2d 699, 701(S.D.Miss.2002)(*citing Caldas & Sons, Inc.* at 127-28).

[7]*City of New Orleans v. Municipal Administrative Services Inc.*, 376 F.3d at 504.  See also *International Environmental Services, Inc. v. Maxum Industries, LLC*, No. 14-cv-00601, 2014 WL 4629662, at *3 (W.D. La. Sept. 15, 2014).

following it in the franchise agreement (Paragraph C)[8], which the plaintiffs contend "modifies Paragraph B." [Rec. Doc. 46, p. 2]. That argument is unpersuasive since the two paragraphs address different things, with Paragraph C addressing the 'rights and remedies' available to the parties, and Paragraph B declaring the parties' intent and agreement that those rights and remedies be asserted within the State of North Carolina. Paragraph C does nothing to alter the content of Paragraph B. There is no reason to conflate the two as each can stand alone to clearly and unambiguously reveal the intent of the parties.

Mosing has also argued that promissory notes executed by Zloop, LLC as borrower, to Mosing as holder, "require a Lafayette, Louisiana forum to resolve disputes when read *in pari materia*." [Rec. Doc. 23, p. 15]. The language in the promissory notes addresses only the parties' consent to personal jurisdiction in the state and federal courts in Lafayette Parish, Louisiana.[9] There is no mandatory

---

[8] Paragraph C provides:
No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed to be, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy. [Rec. Doc. 11-3, p. 162].

[9] 6.    GOVERNING LAW.
(a) Choice of Law. The laws of the state of Louisiana govern this note (without giving effect to its conflicts of law principles).
(b) Choice of Forum. Both parties consent to the personal jurisdiction of the state and federal courts in Lafayette Parish, Louisiana. [Rec. Doc.18-7, p. 2]

language cited from the promissory notes to warrant characterizing the referenced

provision as a forum-selection clause or anything other than a permissive consent-

to-jurisdiction clause which cannot overcome or 'trump' the mandatory language

of the actual forum-selection clause appearing in the franchise agreements.

It is the finding of this Court that the language in the forum-selection clause

that, "*any action* brought by *either party* against the other *in any court*, whether

federal or state, *shall be brought within the State of North Carolina*," is clear,

unequivocal, and mandatory.

*2. Whether the forum selection clause applies to the parties and claims*

Whether the forum-selection clause applies to this case involves two

separate inquiries: (1) whether the forum-selection clause is enforceable, and (2)

whether the present case falls within the scope of the forum-selection clause.[10]

The enforceability of a forum-selection clause is a question of law.[11]  Under

federal law, forum-selection clauses are generally considered to be *prima facie*

valid and should be enforced unless it would be unreasonable under the

---

[10]*Brown v. Federated Capital Corp.*, 991 F.Supp.2d 857, 861, 2014 WL 97292, at *2(S.D. Tex. Jan. 6, 2014) (citing *Stinger v. Chase Bank, USA, NA*, 265 Fed.Appx. 224, 226-27(5th Cir. 2008) (evaluating whether to apply a contract provision mandating arbitration by assessing (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.).

[11]*Haynsworth v. The Corporation*, 121 F.3d 956, 961 (5th Cir. 1997).

-8-

circumstances to do so.[12]  The term "unreasonable" is equated in the jurisprudence

with the terms "unfair" and "unjust."[13]  There is a "strong presumption in favor of

enforcement of forum selection clauses."[14]  The presumption of enforceability

applies to negotiated forum-selection clauses and also to those set forth in form

contracts.[15]  The burden is on the party resisting enforcement to demonstrate that

enforcement would be unreasonable.[16]  In fact, "[t]he party resisting enforcement...

bears a 'heavy burden of proof.'"[17]

There is no dispute that Kendall Garrett Mosing signed the Louisiana

franchise agreements.  He also initialed and signed the franchise disclosure

materials which preceded the agreements. Based on his acknowledgment that he

---

[12]*In re Spillman Development Group, Ltd.*, 710 F.3d 299, 306 (5th Cir. 2013), citing *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972).

[13]*The Bremen v. Zapata Off–Shore Co.*, 407 U.S. at 15, 18; *Calix-Chacon v. Global Intern. Marine, Inc.*, 493 F.3d 507, 511 (5th Cir. 2007) ("The Supreme Court reversed and held that in maritime actions forum selection clauses are to be enforced unless the forum selection clause is fundamentally unfair and therefore unreasonable.")

[14]*Calix-Chacon v. Global Intern. Marine, Inc.*, 493 F.3d at 513.

[15]*Kevlin Services, Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995).  See, also, *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 593 (1991), which enforced a forum-selection clause contained in non-negotiated, preprinted form contracts.

[16]*In re Spillman Development Group, Ltd.*, 710 F.3d at 306.

[17]*Haynsworth v. The Corporation*, 121 F.3d at 963 (quoting *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. at 17). See, also, *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008).

signed the Louisiana disclosure documents and franchise agreements,[18] as a sophisticated party, Mosing is not in a position to legitimately claim ignorance of the forum selection clauses contained in the documents. The plaintiffs argue instead that Mosing signed the Louisiana agreements as "Managing Member" of the three LLCs referenced in the agreements, which entities were never formed and do not exist.[19] Mosing further argues that he does not recall signing the Texas franchise agreements, which purport to bear his signature as franchisee, although Mosing does not dispute that he received and returned for editing a draft of the Texas franchise disclosure document in September, 2013. [Rec. Doc. 33, p. 3].

The defendants do not dispute that Mosing signed the Louisiana franchise agreements as Managing Member of entities which were never formed. Plaintiff Zloop La. LLC was formed by Mosing, its sole owner, on November 2, 2012, seventeen days after execution of the Louisiana agreements. The obvious question is whether either plaintiff can be bound by the forum-selection clause contained within the Louisiana agreements. A forum-selection clause in an agreement can be enforced as to a nonsignatory only if the nonsignatory is bound by that

---

[18]The Texas franchise agreements bear signatures purporting to be Mosing's, in his individual capacity as franchisee, but Mosing cannot recall signing those documents. See Rec. Doc. 11-4, p. 35.

[19]See Rec. Doc. 11-3, p. 90.

-10-

agreement under recognized contract or agency principles. Those principles are:

incorporation by reference; assumption; agency; veil-piercing/alter ego; estoppel;

and third party beneficiary.[20] The defendants invoke direct-benefits estoppel as

the basis for applying the forum-selection clause to the plaintiffs. The Fifth

Circuit has held that even a nonsignatory to an agreement may be bound by a

forum selection clause under the direct-benefit estoppel theory "by knowingly

seeking and obtaining 'direct benefits' from the contract,"[21] and/or "by seeking to

enforce the terms of that contract or asserting claims that must be determined by

reference to that contract."[22] Other courts have found that forum-selection clauses

may bind non-parties who are closely related to the dispute such that it becomes

foreseeable that the non-party will be bound.[23] In determining whether a

nonsignatory is closely related, the court considers factors including the

nonsignatory's ownership of the signatory, the nonsignatory's involvement in the

negotiations, the relationship between the two parties, and whether the

---

[20] *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514-17(5th Cir. 2006); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355-56 (5th Cir. 2003).

[21] *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010).

[22] *Id.* See also *Vloeibare Pret Limited v. Lloyd's Register North America, Inc.*, 2015 WL 1727355 at *3 (April 16, 2015).

[23] See *Hugel v. The Corps of Lloyd's*, 999 F.2d 206, 209-10(7th Cir. 1993); *Carlyle Investment Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 219 (3d Cir. 2015).

nonsignatory received a direct benefit from the agreement.[24]  Further, third parties

"that should have foreseen governance by the clause may also be bound to it."[25]

From the face of the Complaint it is clear that Mosing entered into the

Louisiana franchise agreements with the intent to avail himself or entities he

controlled of the benefits of the agreements. He signed the Louisiana agreements

as "Managing Member" of LLCs which did not exist, presumably to comply with

the franchise requirement that the franchisee be a corporation or LLC.[26]  Such

action is consistent with an effort by Mosing to exploit the agreement containing

the forum-selection clause.   Based on the record, it is also foreseeable that

multiple entities controlled by the same control person (Mosing) would be subject

to the forum selection clause, including Zloop La, LLC, which Mosing formed

days after signing the Louisiana agreements.  The incorporation of the Zloop name

into the LLC name cannot be coincidental. Based on the facts presented in the

Complaint, the Court finds that direct-benefit estoppel binds Mosing and the

---

[24]*Carlyle Investment Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d at 219;
*Skold v. Galderma Labs., L.P.*, 2015 WL 1740032, at *13 (E.D. Pa. Apr. 17, 2015); *Weygandt. v. Weco, LLC.* 2009 WL 1351808, at *4 (Del. May 14, 2009).

[25]*First Financial Management Group, Inc. v. Universal Painters of Baltimore, Inc.*, 2012 WL 1150131, at *3 (E.D.Pa. Apr. 5,2012).

[26]See Rec. Doc. 11-3, pp. 7,26.

Mosing-owned Zloop La, LLC to the forum-selection agreements Mosing entered into in the Louisiana franchise agreements he signed.

The plaintiffs next argue that even if the court were to find the forum-selection clause to be valid and binding upon them, the clause does not encompass the claims made in this litigation, since the plaintiffs do not allege a breach of the franchise agreements or seek to enforce them, articulating instead numerous other claims based on violations of Louisiana business laws, unfair trade practices and civil fraud.[27] [Rec. Doc. 23, p. 8]. That argument is unpersuasive in light of and looking to the broad and unrestrictive language of the forum-selection clause at issue, which applies to "any action" by "either party." Such language is broad enough to encompass both statutory and tort claims, including claims of fraudulent inducement as articulated in the Complaint.[28] Further, the Fifth Circuit, interpreting similar and even more restrictive clauses, has generally rejected distinctions between tort and contract claims.[29] The plaintiffs' argument that the defendants would have needed to insert more specific language of the intent to

---

[27]The Complaint's introductory paragraph also references"breach of contract." [Rec. Doc. 1, p. 7].

[28]*See Harland Clarke Holdings Corp. v. Milken*, 997 F.Supp.2d 561, 571(W.D.Tx 2014), *citing Personal Security & Safety Systems*, 297 F.3d 388, 391 (5th Cir. 2002); *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222-23 (5th Cir. 1998).

[29]*See Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222 (5th Cir. 1998).

apply the provision to disputes beyond the franchise agreement, actually listing the types of claims contemplated [Rec. Doc. 23, p. 20] is offered without legal support of any kind, and the argument is unavailing, especially in light of the very broad language of the forum-selection clause at issue.

Next, the plaintiffs argue that the claims against the defendants are not based on the franchise agreements, which, according to the plaintiffs, "supply the background for and not the focus of Mosing's suit," [Rec. Doc. 23, p. 21] and are "contextual but not controlling."[Rec. Doc. 23, p. 28]. The allegations in the Complaint demonstrate that the plaintiffs rely heavily on the existence of the franchise agreements, the franchisor/franchisee relationship between the parties, references to federal and state franchise laws, the characterization of the franchise agreements as securities and business opportunities for application of federal and Louisiana laws, as well as claims allegedly stemming from the defendants' misrepresentations regarding income/earning potential of the franchises, and the defendants' alleged conversion of equipment purchased by Mosing as part of his purchase of the franchises. By the plaintiffs' design of the Complaint, the franchise agreements form a significant component of the claims made. Therefore, the Court rejects the notion that the claims made in the instant litigation fall outside the scope of the forum-selection provision at issue, which by its language

is broad enough to encompass all of the plaintiffs' claims, including those claims

unrelated to breach of the contracts containing the forum selection clause.[30]

It is the finding of this Court that the forum-selection clause included in the

Louisiana franchise agreements is valid and applicable to the parties and the

claims made by the plaintiffs. Given that finding, the Court need not determine at

the validity/authenticity of the Texas franchise agreements.

### 3. Whether enforcement of the forum-selection clause is reasonable

Recognizing and acknowledging that a strong presumption exists in favor of

enforcement of forum-selection clauses, the plaintiffs next assert that even if the

Court were to find their claims are within the scope of the forum-selection clause,

enforcement of the clause is unreasonable under the circumstances of this case.

[Rec. Doc. 23, p. 30]. There are four bases for concluding that a forum-selection

clause is unreasonable: (1) if the incorporation of the forum-selection clause into

the agreement was the product of fraud or overreaching; (2) if the party seeking to

escape enforcement will, as a practical matter, be deprived of his day in court

because of the grave inconvenience or unfairness of the selected forum; (3) if the

fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or

---

[30]*See MaxEn Capital, LLC v. Sutherland*, 2009 WL 936895, at *6 (S.D.Tex.Apr. 3, 2009); *Brown v. Federated Capital Corp.*, 991 F.Supp.2d 857, 862 (S.D.Tex.2014).

(4) if enforcement of the forum-selection clause would contravene a strong public policy of the forum state.[31] According to the plaintiffs, "[t]he first and fourth exceptions are implicated in this case." [Rec. Doc. 23, p. 30].

The incorporation of a forum-selection clause into a contract as a product of fraud or overreaching would make the clause unreasonable. However, it is well-settled, as the plaintiffs acknowledge, that in order to invalidate a forum-selection clause, the fraud and overreaching must be specific to the clause itself, and the inclusion of the clause in the contract must be shown to have been the product of fraud or coercion.[32] There has been no showing that the forum-selection clause was the product of fraud or overreaching by the defendants. The plaintiffs have vigorously argued that the franchise agreements themselves were products of fraud, but that is not sufficient in this analysis. While the plaintiffs have spent considerable effort impugning and challenging the authenticity of the Texas franchise agreements, they have not so challenged the Louisiana agreements, which Mosing has admitted he signed after also signing disclosure documents referencing the forum-selection clause at issue as a "risk factor" to be considered.

---

[31]     *Calix-Chacon v. Global Intern. Marine, Inc.*, 493 F.3d at 511; *Haynsworth v. The Corporation*, 121 F.3d at 963; *Carnival Cruise Lines v. Shute*, 499 U.S. at 595; *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. at 10.

[32]     *Scherk v. Alberto-Culver Co.,417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270(1974); Smith v. Lucent Technologies, Inc.*, 2004 WL 515769 (E.D.La. 3/16/04).

The plaintiffs have presented no credible argument or legal support to suggest that the inclusion of the forum-selection clause itself in the franchise agreements was a product of fraud.

The record also defeats any argument that the forum-selection clause resulted from overreaching. "Overreaching is that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties."[33] It is apparent from the record and the significant sums involved that the parties in this case were sophisticated individuals and businesses. There is no allegation by the plaintiffs of an inability to negotiate freely relative to the forum-selection issue.

The plaintiffs have also argued that public policy concerns preclude enforcement of the forum-selection clause at issue. "The public policy of Louisiana is expressed in its statutes and codes."[34] Thus, the statutory law of the state reflects its public policies. Conceding that the Louisiana Supreme Court has stated that contractual forum-selection clauses are not *per se* violative of public

---

[33]*Haynesworth v. The Corporation*, 121 F.3d 956, 965 n. 17(citations omitted).

[34]*Case Atlantic Co. v. Blount Bros. Const., Inc.*, 42,251 (La. App. 2 Cir. 06/20/ 07, 960 So.2d 1274, 1277, *writ denied*, 065 So.2d 403.

-17-

policy,[35] the plaintiffs point to provisions of the Louisiana Unfair Trade Practices

Act [LUTPA], La. R.S. 51: 1407(A) and the Louisiana Business Opportunity law,

La. R.S. 51:1823(7) as provisions which they contend preclude enforcement of the

forum-selection clause.

The LUTPA anti-waiver provision at La. R.S. 51:1407(A) declares that it is

against Louisiana public policy to allow a contractual selection of venue or

jurisdiction contrary to the provisions of the Louisiana Code of Civil Procedure,

and the statute declares that "no provision of any contract which purports to waive

those provisions of venue, or to waive or select venue or jurisdiction in advance of

the filing of any civil action, may be enforced against any plaintiff in an action

brought in these courts."[36]

In *Lejano v. Bandak,*[37] the Louisiana Supreme Court clarified that the

provision, amended by Act 943 of the 1997 Legislature, "is limited in scope to

transactions or interactions between out-of-state, professional telephone solicitors

and Louisiana residents."[38]  In *Shelter Mutual Insurance. Co. v. Rimkus*

---

[35]    *Shelter Mutual Insurance Co. v. Rimkus Consulting Group, Inc. of La.,* 148 So.3d
871, 881 (La. 7/1/14).

[36]La. R.S. 51:1407.

[37]*Lejano v. Bandak*, 705 So.2d 158 (La. 1997).

[38]*Id.* at 170.

*Consulting Group, Inc.*, the Louisiana Supreme Court cited *Lejano* to conclude

that La. R.S. 51:1407 is limited in scope to interactions between out-of-state,

professional telephone solicitors and Louisiana residents.[39]  In *Lejano*, the

term"professional telephone solicitor" is referenced from legislative comments to

apply only to solicitations for charitable organizations.[40]  That interpretation is

consistent with a definition of "professional solicitor" in La. R.S. 51:1901(6) at

Chapter 24 of the Unfair Trade Practices and Consumer Protection Law.  Finally,

§1407 is limited to actions in which the attorney general is seeking to restrain such

practices.[41]  Thus, the Court rejects the notion that the protection intended by La.

R.S. 51:1407 fits the facts of the instant case "perfectly," as suggested by the

plaintiffs in brief. [Rec. Doc. 23, p. 34].

The plaintiffs also cite Louisiana's Business Opportunity Law which

contains a similar anti-waiver provision at La. R.S. 51:1823(7), restricting a

business opportunity seller or agent from "including in any agreement a waiver of

the purchaser's rights established by law."   What is not mentioned by the

---

[39]*Shelter Mutual*, 148 So.3d at 881.

[40]*Lejano*, 705 So.2d 158, n. 12.

[41] *Rodriguez v. Class Travel Worldwide, L.L.C.*, 2000 WL 222165, at *3 (E.D. La. Feb. 18, 2000).

plaintiffs is Louisiana's more specific franchise law, which would allow for the inclusion of forum-selection clauses in franchise agreements.  La. R.S. 12:1042 provides in part:

> **Unless provisions of a business franchise agreement provide otherwise**, when the business to be conducted pursuant to the agreement and the business location of the franchisee are exclusively in this state, disputes arising under a business franchise agreement shall be resolved in a forum inside this state....[42] [Emphasis added].

The defendants argue, citing the Louisiana Supreme Court decision in *Burge v. State*,[43] that the fundamental rule of statutory construction dictates that when two statutes deal with the same subject matter, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character.  By any analysis, the above-referenced provision belies any notion that forum-selection clauses in franchise agreements are against public policy in Louisiana, and the Court finds no basis for a conclusion that the forum-selection clause in the instant case is violative of any public policy implicit in the statutory provisions cited.

The plaintiffs next argue that enforcement of the forum selection clause violates Louisiana's strong policy against facilitating unlawful activity as stated in

---

[42]La. R.S. 12:1042.

[43]*Burge v. State*, 54 So.3d 1110, 1113 (La. 2011).

the 'clean hands doctrine.' [Rec. Doc. 23, p. 35]. The clean hands doctrine is generally recognized as a defense in Louisiana. A person cannot maintain an action if, in order to establish his cause of action, he must rely in whole or in part, on any illegal or immoral act or transaction to which he is a part.[44]   According to the Louisiana Supreme Court,

> It is likewise fundamental that equity imperatively demands of suitors in its courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. One who has resorted to injustice, unfairness and unrighteous dealing, which it is the purpose of courts of equity to suppress, will appeal in vain, even though in his wrongdoing he may have kept himself strictly within the law. Manifestly, under this maxim any act which would be condemned and pronounced wrongful by honest and fair-minded men must be held sufficient to make the hands of one who seeks equity unclean.[45]

In support of the 'clean hands' argument, the plaintiffs assert that the defendants seek to enforce franchise agreements which constitute unfair trade practices under federal and state law, since the Louisiana franchise agreements were signed by Mosing eleven days after he signed, as Franchisee, the franchise disclosure documents in violation of provisions which they allege require a minimum of 14 days to elapse between a franchisee signing disclosure

---

[44]*Guillie v. Comprehensive Addiction Programs*, (La.App. 4 Cir. 4/21/99), 735 So.2d 779.

[45] *Cimarex Energy Co. v. Mauboules*, 40 So.3d 931, 945 (La. 4/9/10)(*citing City of New Orleans v. Levy*, 98 So.2d 210, 218 (La.1957).

documentation and a franchise agreement.[46]  The defendants respond that Mosing "was furnished" with the disclosure documents "on or around September 10, 2012," well over the 14 day requirement. [Rec. Doc. 28-1, p. 2].  The signature page of the disclosure document confirms that Mosing signed the document on October 4, 2012.  Above his signature, on the same page, appears the statement that Mosing "received a disclosure document dated August 1, 2012...." [Rec. Doc. 11-3, p. 56].  The substantive argument that the timing/notice issue described constitutes an unfair trade practice or other violation of law is not directed to the forum-selection clause but to the merits of the case and is therefore premature in the context of the motion before the court.[47]  This Court finds the argument likewise insufficient to preclude enforcement of the forum selection clause at issue on public policy grounds.

Therefore, this Court finds that, based on an analysis of the relevant factors, enforcement of the forum selection clause is reasonable under the circumstances.

---

[46]16 C.F.R. 436-37.  16 C.F.R. 436.2 provides that it is an unfair or deceptive act or practice for a franchisor to fail to furnish a prospective franchisee with a copy of the current disclosure document at least 14 calendar days before the franchisee signs a binding agreement.

[47]*Haynsworth v. The Corporation*, 121 F.3d at 964 (Allegations that the entire contract was procured as a result of fraud or overreaching are "inapposite to our [forum-selection clause] enforceability determination, which must...precede any analysis of the merits [of the contract's validity]."

*4. Whether transfer is appropriate under the 28 U.S.C. 1404(a) analysis mandated by Atlantic Marine vs. United States District Court for the Western District of Texas*

Having answered the threshold questions to find that the forum-selection clause in the Louisiana franchise agreements is mandatory, applicable to the parties and claims made, and that the clause is valid and enforceable, the Court concludes that the framework to determine a venue transfer under 28 U.S.C. §1404(a), as modified by the Supreme Court in *Atlantic Marine,* controls.[48]

Under  §1404(a), a district court may, for the convenience of the parties and witnesses and in the interest of justice, transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.  *Atlantic Marine* stated not only that §1404(a) "provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district" but that "a proper application of §1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases."[49]

---

[48] *Atlantic Marine Const. Co., Inc. v. United States District Court for the Western District of Texas,* __ U.S. __, 134 S.Ct. 568, 575-579 __ L.Ed. 2d __(2013).

[49]*Id.*, at 579.

The Court also revised the analysis to be used in evaluating whether transfer should be ordered in such cases, stating that the plaintiff's choice of forum carries no weight; no arguments concerning the parties' private interests are permitted, and the court must deem those interests to weigh in favor of the preselected forum, the parties having struck that balance by their selection contract[50]; the court may consider arguments about public-interest factors only, and the original venue's choice-of-law rules are not to be considered.[51] A plaintiff seeking to maintain the litigation in a forum other than that chosen in the forum-selection clause "bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted. . . and the plaintiff must bear the burden of showing why the court should not transfer the case to the forum to which the parties agreed."[52] The court also stated that the evaluation of public interest factors will rarely defeat a transfer motion, so that "the practical result is that forum-selection clauses should control except in unusual cases."[53]

---

[50] *Id.,* at 582. *See also In re Rolls Royce Corp.*, 775 F.3d 671, 678(5th Cir. 2014).

[51] *Id.,* at 581-82.

[52] *Id.*

[53] *Id.*

The Court based the analysis on the parties' expectations as memorialized in their contract, stating:

> When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place. In all but the most unusual cases, therefore, "the interest of justice" is served by holding parties to their bargain.[54]

Thus, under the required §1404(a) analysis, this Court deems all private interest factors to weigh in favor of transferring the case to the Western District of North Carolina.

In determining whether "extraordinary circumstances" exist to warrant denial of the transfer, the Court examines the  public interest factors that the court may consider in deciding a transfer motion as presented herein.  Those factors include (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; and (3) the familiarity of the forum with the law that will govern the case , and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.[55]  The

---

[54]*Id.,* at 583.

[55] *Id.,* at 581 n.6.

plaintiffs bear the heavy burden of showing that the public interest factors "overwhelmingly disfavor a transfer."[56]

The plaintiffs have offered no argument regarding court congestion factors which might impact the first factor, and the Court finds this factor to be neutral. The plaintiffs argue that Mosing and Zloop LA, LLC are Louisiana-based and their business interests are located in this state, warranting consideration of their claims in this state. However, since the plaintiffs have already agreed to bring suit only in a North Carolina forum, they have effectively exercised their venue privilege.[57] As to this public interest factor, the plaintiffs have not shown that transfer is overwhelmingly disfavored.

As to the third and fourth factors, it is reasonable to find that federal courts in North Carolina can aptly apply the laws at issue in this matter, and the Supreme Court has stated that familiarity of the forum with the governing law should only be considered a public-interest factor weighing against transfer if the governing law is "exceptionally arcane."[58] No such showing has been made and this Court is not persuaded that the court in North Carolina would be less familiar with the law

---

[56] *Id. See also Arrington v. Everett Financial, Inc.*, 2015 WL 2401481 (W.D. Texas, 5/20/15).

[57] *Id.*, at 581-82, 584.

[58] *Id.*, 134 S.Ct. at 584. *See also Brown v. Federated Capital Corp.*, 991 F.Supp.2d 857, 863 (S.D. Tex. 2014).

governing this dispute so as to disfavor transfer on this ground. While this Court is sensitive to the potential discrepancies between Louisiana and North Carolina law and the possibility of conflicting opinions from those states, the Court does not find those potential legal considerations to be so exceptional as to make transfer of venue unwarranted in this case with a valid forum selection clause.

The Court finds that the plaintiffs have not met their heavy burden of showing that public-interest factors overwhelmingly disfavor transfer. Since this is not one of those "most unusual cases" in which the public interest overwhelmingly disfavors transfer, this Court finds that the interests of justice as defined in §1404(a) are served by holding the plaintiffs to their bargain via transfer to the parties' agreed-upon forum.[59] Therefore, the Motion to Transfer Venue pursuant to 28 U.S.C. §1404(a) is granted, and the Court will order that this case be transferred to the Western District of North Carolina.

Signed at Lafayette, Louisiana this 25th day of June, 2015.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[59] *Id.*, at 583. *See also Cline v. Carnival Corp.*, No. 3:13-CV-1090-B, 2014 WL 550738, *6 (N.D. Tex., Feb. 12, 2014).